1   GEORGE A. NICOUD III, SBN 106111
    tnicoud@gibsondunn.com
2   MATTHEW S. KAHN, SBN 261679
    mkahn@gibsondunn.com
3   DEENA B. KLABER, SBN 285237
    dklaber@gibsondunn.com
4   GIBSON, DUNN & CRUTCHER LLP
    555 Mission Street, Suite 3000
5   San Francisco, CA 94105-0921
    Telephone:    415.393.8200
6   Facsimile:    415.393.8306

7   *Counsel for Defendant Land O'Lakes, Inc.*

8   [Additional Counsel Listed on Signature Page]

9
                        UNITED STATES DISTRICT COURT
10
                      NORTHERN DISTRICT OF CALIFORNIA
11
                          SAN FRANCISCO DIVISION
12

13
    MATTHEW EDWARDS, *et al.*, individually and       Case No. 3:11-CV-04766-JSW (NJV)
14  on behalf of all others similarly situated,
                                                       [consolidated with 11-CV-04791-JSW
15                                     Plaintiffs,     and 11-CV-05253-JSW]

16                  v.                                 <u>CLASS ACTION</u>

17                                                     **DEFENDANTS' RESPONSE IN**
    NATIONAL MILK PRODUCERS                            **OPPOSITION TO PLAINTIFFS'**
18  FEDERATION, aka COOPERATIVES                       **MOTION FOR CLASS**
    WORKING TOGETHER; DAIRY FARMERS                    **CERTIFICATION**
19  OF AMERICA, INC.; LAND O'LAKES, INC.;
    DAIRYLEA COOPERATIVE INC.; and AGRI-               Before: Hon. Jeffrey S. White
20  MARK, INC.,

21                                     Defendants.

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.      STATEMENT OF ISSUES TO BE DECIDED ....................................................................1

II.     SUMMARY OF ARGUMENT ........................................................................................1

III.    RELEVANT PROCEDURAL BACKGROUND ................................................................3

IV.     FACTUAL BACKGROUND ..........................................................................................4

        A.    The CWT HR Program.....................................................................................4

        B.    Raw Milk Pricing .............................................................................................4

V.      LEGAL STANDARD ...................................................................................................6

VI.     PLAINTIFFS HAVE NOT DEMONSTRATED COMPLIANCE WITH
        RULE 23(A). .............................................................................................................6

        A.    Numerosity ........................................................................................................6

        B.    Commonality .....................................................................................................7

        C.    Other Rule 23 Factors.......................................................................................9

VII.    COMMON ISSUES OF LAW AND FACT DO NOT PREDOMINATE.............................9

        A.    Plaintiffs' Expert's Claimed Reliance on Dr. Brown Provides No Reliable Means of
              Demonstrating that CWT's HR Program Impacted Premiums. ..................10

        B.    Plaintiffs' Expert's Impact Model Ignores a Multitude of Factors that He Admitted
              Affect Premiums..............................................................................................11

        C.    Plaintiffs Fail to Separate the Impact of the Challenged Conduct From the Impact of
              Herd Reductions Under the CWT HR Program That are No Longer Subject to
              Challenge. ........................................................................................................16

        D.    Plaintiffs Improperly Rely on an Expert Opinion Regarding a Nationwide Class To
              Seek Certification of Sixteen Separate and Distinct Classes.........................18

        E.    Plaintiffs' Expert Has No Reliable Means of Demonstrating Impact on Premiums for
              Class II or Class III Milk. ...............................................................................19

        F.    Dr. Connor's Pass-Through Analysis is Unreliable As A Means of Demonstrating
              Impact or Damages..........................................................................................20

VIII.   THE CLASS IS NOT ASCERTAINABLE AND IS NOT MANAGABLE ...................23

        A.    No Acceptable Method Exists for Identifying Past Purchasers of Dairy Products. ....23

        B.    No Method Exists for Segregating Qualifying Dairy Products from Non-Qualifying
              Products. ..........................................................................................................24

CONCLUSION ...............................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Bell Atlantic Corp. v. AT & T Corp.*, 339 F.3d 294 (5th Cir. 2003)..............................19

*Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035 (8th Cir. 1999)...........11, 15

*Carlin v. DairyAmerica, Inc.*, 688 F.3d 1117 (9th Cir. 2012)......................................3, 5

*Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008 (8th Cir. 2001) ...................18

*Comcast Corp. v. Behrend*, -- U.S. ---, 133 S.Ct. 1426 (2013) ..............................................*passim*

*Davis v. Astrue*, 250 F.R.D. 476 (N.D. Cal. 2008)........................................................7

*Deitz v. Comcast Corp.*, 2007 WL 2015440 (N.D. Cal. July 11, 2007)......................................23

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011)..............................................10

*Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980).....................................12

*Fields v. Mobile Messengers Am., Inc.*, No. C 12-05160 WHA, 2013 WL 6073426 (N.D. Cal. Nov. 18, 2013).......................................................................................7

*Forrand v. Federal Exp. Corp.*, No. CV 08–1360, 2013 WL 1793951 (C.D. Cal. Apr. 25, 2013)...........................................................................................9

*Gray v. Golden Gate Nat. Recreational Area*, 279 F.R.D. 501 (N.D. Cal. 2011)..........................6

*Healy v. Beer Institute*, 491 U.S. 324 (1989) ..........................................................17

*In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. 1497 (D.Kan.1995)............................16

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982) .........................................................................................4

*In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007) (White, J.) ...............9

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, *14 (N.D. Cal. June 9, 2010).................................................................................23, 24

*In re Fresh Del Monte Pineapples Antitrust Litig.*, 2008 WL 5661873 (S.D.N.Y. Feb. 20, 2008)..................................................................................................24

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008)...............8, 22

*In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966 (C.D. Cal. 2012)..........................15

*In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D. Cal. 2001)...................................22

*In re OSB Antitrust Litig.,* No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 30, 2007) ...............22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013).......................9

*In re Taco Bell Wage and Hour Actions*, 2011 WL 4479730 (E.D. Cal. 2011)...........................17

*In re TFT-LCD,* 267 F.R.D. 583 (N.D. Cal. 2010).......................................................................22

*Johnson Elec. North America Inc. v. Mabuchi Motor America Corp.*, 103 F. Supp. 2d 268
   (S.D.N.Y. 2000).......................................................................................................................18

*Lukovsky v. San Francisco*, No. C 05–00389 WHA, 2006 WL 140574 (N.D. Cal. Jan. 17,
   2006).........................................................................................................................................6

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012)................................................7, 24

*Mann v. TD Bank*
   N.A., No. 09-1062 RBK AMD, 2010 WL 4226526 (D.N.J. Oct. 20, 2010)...........................24

*Mazur v. eBay Inc.*, 257 F.R.D. 563 (N.D. Cal. 2009) ..................................................................6

*Mylan Pharm. v. Warner Chilcott Pub. Co.*,No., 12-3824 (E.D. Pa. Nov. 20, 2013) ...................7

*NCAA v. Miller*, 10 F.3d 633 (9th Cir. 1993) ..............................................................................17

*Peridot, Inc. v. Kimberly-Clark Corp.*, No. MC 98-012686, 2000 WL 673933 (Minn. Dist.
   Ct. Feb. 7, 2000).....................................................................................................................25

*Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516 (C.D. Cal. 2011) ..............................................6

*Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009)................................................19

*Rowden v. Pac. Parking Sys.,* 282 F.R.D. 581 (C.D. Cal. 2012) ................................................25

*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997) ...........................................15

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No.
   CIV.A. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010)..............................................8

*Shepard v. Lowe's HIW, Inc.*, No. C 12-3893 JSW, 2013 WL 4488802 (N.D. Cal. Aug. 19,
   2013).......................................................................................................................................23

*Stein v. Pacific Bell*, No. C 00-2915 SI, 2007 WL 831750 (N.D. Cal. Mar. 19, 2007) ......1, 15, 16

*York v. Starbucks Corp.*, 2011 WL 8199987 (C.D. Cal. 2011)....................................................18

*Wal-Mart Stores, Inc. v. Dukes*, -- U.S. ---, 131 S. Ct. 2541, 2551 (2011) ..........................*passim*

*Zinser v. Accuf'x Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ...........................................6

1

## OTHER AUTHORITIES

2    Fed. R. Civ. P. 23 ...........................................................................................................passim

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.      STATEMENT OF ISSUES TO BE DECIDED**

Whether Plaintiffs' failure to affirmatively demonstrate their compliance with Rules 23(a) and (b), and to prove that their classes are ascertainable, requires that class certification be denied?

**II.     SUMMARY OF ARGUMENT**

Plaintiffs face a set of insurmountable hurdles in seeking to certify sixteen classes of indirect purchasers of milk and various other dairy products because of the allegedly unlawful conduct of the Cooperatives Working Together Herd Retirement Program ("CWT HR Program").  They bear the burden of establishing, among other things, that there are reliable methods by which they can demonstrate with common proof that (1) the CWT HR Program, in those states in which they still challenge its legality, adversely affected the premiums above regulated prices ("over-order premiums" or "OOPs") that processors pay for raw milk (as this Court has already held that regulated milk prices are beyond the reach of any damage claim here), and (2) that those increased premiums were passed on in the form of higher retail prices for milk, yogurt, half & half, cream cheese, sour cream, and cottage cheese products that were purchased by putative class members at thousands of retail outlets in sixteen different jurisdictions.  Plaintiffs' primary effort to meet this burden−the four declarations now submitted by their expert, Dr. John Connor−fails at every key step.

First, Plaintiffs have not provided an admissible and reliable means of isolating the effect of the CWT HR Program on premiums.  Dr. Connor seeks to demonstrate the impact of the program is to simply subtract the nationwide average premium charged by one cooperative (DFA) over a period of years before the CWT HR Program began, from DFA's nationwide average premium during the period affected by the CWT HR Program (July 2003-June 2013), after adjusting (albeit erroneously) for inflation.  Dr. Connor then *attributes the entire observed difference* between the premium levels in those time periods to the CWT HR Program, and to nothing else.  Dr. Connor's admitted failure to control for any of the other economic and historical factors that could and did cause premiums to increase during those years, despite acknowledging that such factors exist, is a fatal error that renders Dr. Connor's work inadmissible and inadequate to support Plaintiffs request for class certification. *See, e.g.*, *Stein v. Pacific Bell*, No. C 00-2915 SI, 2007 WL 831750, *12 (N.D. Cal. Mar. 19, 2007)

1    (failure to consider other causes of price increase makes expert's "before-and-after" analysis

2    inadmissible).

3          Second, Plaintiffs and Dr. Connor have put forward no method or common proof by which

4    they even attempt to separate the impact allegedly caused by the herd retirements occurring in those

5    states in which Plaintiffs still claim the CWT HR Program was illegal from the effects of herd

6    retirements elsewhere.  Dr. Connor's statistics purport to measure the effects of *all* herd retirements

7    nationwide, including those that took place in the twelve states in which the Plaintiffs recently

8    dropped their claims in their proposed Second Amended Consolidated Complaint.  As a result, the

9    supply reduction that he analyzes as the supposed cause of increases in premiums stems from both

10   challenged conduct (i.e., herd retirements in states in which Plaintiffs can still claim that the CWT

11   HR Program was not immunized from antitrust attack) and unchallenged conduct (including herd

12   retirements in the states in which their claims have been dropped).  They do not present a method of

13   common proof that only assesses the alleged impact *of the challenged conduct*.  That is a critical

14   failing.  *See Comcast Corp. v. Behrend*, -- U.S. ---, 133 S.Ct. 1426, 1433 (2013) (any "model

15   purporting to serve as evidence of damages in [a] class action must measure only those damages

16   attributable to th[e] theory" of liability put forward for class-wide treatment).

17         Moreover, Dr. Connor's erroneous assumption that his task is to support a nationwide

18   class−which is not what Plaintiffs' motion for certification seeks−cannot hide the complete failure of

19   proof as to many of the sixteen specific jurisdictions in which Plaintiffs actually seek to certify a

20   class.  For several states, including California and Arizona, Dr. Connor's data shows that premiums

21   *have not changed from the level they were before 2003*, making it obvious that the CWT HR

22   Program in those states had no demonstrable impact on premiums.  In six other states, Dr. Connor

23   offers no premium data at all.  A majority of Plaintiffs' proposed classes therefore either have *no*

24   *evidence* of impact, or evidence of *no impact*.

25         Finally, Plaintiffs and Dr. Connor have introduced no evidence of the rate at which the

26   alleged increase in premiums charged to milk processing plants were passed on in the form of higher

27   retail prices for consumers in any of the jurisdictions that remain at issue in the case.  By never

28   analyzing whether premiums (as opposed to the regulated price) were passed through to retailers, and

1    by relying on city-wide aggregated data that does not even reach many of the would-be class states at

2    all, Plaintiffs and Dr. Connor have not shown a reliable method of completing the causal chain to the

3    retail stores in which putative class members actually buy the products at issue.

4         For these reasons, as well as the others explained in further detail below, Plaintiffs' Motion

5    for Class Certification should be denied.

6    **III.     RELEVANT PROCEDURAL BACKGROUND**

7         Plaintiffs filed their Complaint in November 2011, alleging that CWT HR Program

8    constituted a conspiracy in restraint of trade that was illegal under the laws of twenty-six states and

9    the District of Columbia.  *See* Complaint, Dkt. # 1, ¶¶ 121–46.  Plaintiffs sought the the certification

10   of twenty-seven separate classes consisting of all consumers of "milk and/or fresh dairy products" in

11   those jurisdictions.  *Id.* ¶¶ 102(a)–(aa).  As damages, Plaintiffs sought to recover for the *total* change

12   in the prices of dairy products resulting from the CWT HR Program.  *Id.* ¶ 110.

13        Defendants moved to dismiss Plaintiffs' First Amended Complaint, arguing in part that

14   Plaintiffs' claims were barred by the filed-rate doctrine to the extent that they sought recovery for

15   changes to the *regulated* price of milk.  *See* Defs.' Mot. to Dismiss, Dkt. # 65, at 15 & n.13.  In

16   Response, Plaintiffs argued that their Complaint did not implicate the filed-rate doctrine because they

17   were seeking to recover solely for increases to privately-negotiated premiums above the regulated

18   price.  *See* Plfs.' Opp. to MTD, Dkt. # 91 at 14–15.  Plaintiffs then amended their Complaint to state

19   explicitly that their suit concerned only premiums above the regulated price.  *See* Consol. Am.

20   Compl., Dkt # 110, ¶ 4.  In thereafter denying Defendant's Motion, the Court cited *Carlin v.*

21   *DairyAmerica, Inc.*, 688 F.3d 1117, 1140 (9th Cir. 2012), and held that while the filed-rate doctrine

22   applies to claims challenging regulated portions of milk prices, "Plaintiffs' claims are premised on

23   the over-order prices of raw milk . . . .  They do not challenge the minimum prices set by the

24   FMMOs."  Order, Dkt. # 123, at 7-9.

25        On October 28, 2013, Plaintiffs filed their motion for class certification, and concurrently

26   sought leave to file a Third Amended Complaint.  *See* Dkt. # 186, 192.  That Complaint dropped

27   Plaintiffs' claims and proposed classes under the laws of a dozen states and purported to add a new

28   Missouri class.  *See* Dkt. # 192-1 at ¶ 126.  As Plaintiffs' explained, the decision to drop those claims

1    was motivated by a desire to eliminate from the case states whose antitrust immunity statutes

2    explicitly mention coordinated production as exempt conduct.  *See* Mot. at 9.

3    **IV.    FACTUAL BACKGROUND**

4            In addition to the factual allegations contained in Plaintiffs' Complaint,[1] the following facts

5    are relevant to Defendants' Oppostion to Plaintiffs' Motion for class certification.

6            **A.    The CWT HR Program**

7            CWT is a voluntary, publicly announced, program started by and for U.S. dairy farmers as a

8    way to lawfully strengthen and stabilize raw milk prices pursuant to the rights granted to them under

9    the Capper-Volstead Act and similar state laws.  The CWT HR Program, which operated from 2003

10   until 2010, imposed no limitation on the amount of milk any individual farmer or any participating

11   cooperative could produce.  *See* Expert Declaration of David P. Kaplan ("Kaplan") ¶ 22.  While the

12   farmers whose bids were selected in the program retired their herds completely, all other farmers and

13   dairy cooperatives had the ability to expand their output (e.g., by breeding additional heifers,

14   importing cows, or increasing production per cow), in response to rising prices or rising demand.

15   Thus, the nation's supply of milk actually *increased* by some 30 billion pounds over the life of the

16   Program. Kaplan ¶ 28 & Ex. 8.  Even in states that had some of the largest numbers of participants in

17   the CWT HR Program, the supply of raw milk increased.  California, for example, accounted for

18   roughly one-fourth of all herd retirements under the Program, but the state's annual production of

19   milk *grew* by 6 billion pounds (from 35 to 41 billion) over that time.  Kaplan ¶ 28 & Ex. 9.

20           **B.    Raw Milk Pricing**

21           As this Court has already made clear, "Plaintiffs' claims are premised on the over-order

22   prices of raw milk . . . .  They do not challenge the minimum prices set by the FMMOs."  Order, Dkt.

23   # 123, at 7-9.  Thus, there is no dispute that the price that matters for purposes of Plaintiffs' claims

24

25

26   ---

[1] Plaintiffs are required to "affirmatively demonstrate" their compliance with Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, -- U.S. ---, 131 S. Ct. 2541, 2551 (2011).  While Defendants may not contest the ultimate truth of Plaintiffs' underlying claims at this phase, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982), they can and do contest the sufficiency of those allegations to meet Plaintiffs' burden under Rule 23.

27

28

4

1   here are the over-order premiums (sometimes referred to as "service charges") paid by processors for

2   raw milk, and not the minimum prices set by federal or state regulators.

3        The basics of how milk prices are regulated is described in one of this Court's prior opinions,

4   Dkt. #123 at 7-10, and in the Ninth Circuit's opinion in *Carlin*, 688 F.3d at 1119-24.  With respect to

5   premiums, certain undisputed facts bear mentioning.  First, these premiums represent only a fraction

6   (approximately 9%) of the total price of raw milk.  *See* Kaplan ¶ 59 & Ex. 18.  Second, there is no

7   single "premium" that is charged.  Premiums are comprised of many separate charges and credits

8   that vary depending upon the marketing services requested by an individual customer.  These

9   charges are intended to pay cooperatives for the value of services provided, and to offset the cost of

10  providing them.  *See* Wilson Declaration ("Wilson") ¶ 9-11; Wegner Declaration ("Wegner") ¶¶ 8,

11  12-14; Mathur Declaration ("Mathur") ¶¶ 5, 7-9; Stammer Declaration ("Stammer") ¶¶ 8-9.  Third,

12  there is no "national" premium:  service charges are set *locally*, not nationally.  *See* Wilson ¶¶ 4-5;

13  Wegner ¶¶ 10, 16; Mathur ¶ 5.  Even for national cooperatives, pricing is conducted by regional

14  managers based upon local competitive conditions and the services demanded by their customers.

15  Wilson ¶ 5; Wegner ¶ 10.  There is therefore significant geographic variation in both the absolute

16  level of premiums nationwide, and the rates at which they change.  *Id.*  Finally, premiums are often

17  static for long periods of time, and may even be fixed by contract.  *See* Stammer ¶¶ 10-11; Wegner

18  ¶¶ 11, 15; Mathur ¶ 10.  According to the data series relied on by Plaintiffs' expert, premiums for

19  fluid milk in California, Arizona, and other jurisdictions were essentially unchanged throughout the

20  class period.  *See* Kaplan ¶¶ 50-51.

21       To the extent premiums did change during the proposed class period, many of those changes

22  are plainly unrelated to the CWT HR Program.  For example, a new premium became widespread in

23  2006-08 as many retailers began demanding that milk be produced without the use of a synthetic

24  growth hormone known as rBST.  Wilson ¶¶ 12–17; Mathur ¶¶ 12–13; Wegner ¶ 13; Stammer

25  ¶¶ 12–14.  The hormone had been used by many farmers to stimulate the production of larger

26  volumes of milk; foregoing its use therefore cost those farmers a loss in revenue, and the premium

27  was introduced for "rBST-free" milk (and accepted by processors) as a means of offsetting that cost.

28

1    *Id.*  A second new category of premium is the "fuel surcharge," which many cooperatives introduced

2    during the class period to offset rising diesel prices.  *See* Wilson Dec. ¶¶ 18–19; Stammer ¶ 15.

3    **V.      LEGAL STANDARD**

4            "Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine

5    whether the party seeking certification has met the prerequisites of Rule 23." *Zinser v. Accu'x*

6    *Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).[2]  "Rule 23 does not set forth a mere

7    pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, -- U.S. ---, 131 S. Ct. 2541, 2551 (2011).  "A

8    party seeking class certification must affirmatively demonstrate his compliance with the Rule—that

9    is, he must be prepared to prove that there are in fact sufficiently numerous parties, common

10   questions of law or fact, etc." *Id.*  "Frequently that 'rigorous analysis' will entail some overlap with

11   the merits of the plaintiff's underlying claim." *Id.*

12           Additionally, "before reaching the requirements of Rule 23, the party seeking class

13   certification must demonstrate that an identifiable and ascertainable class exists."  *Gray v. Golden*

14   *Gate Nat. Recreational Area*, 279 F.R.D. 501, 508 (N.D. Cal. 2011); *see also, e.g., Mazur v. eBay*

15   *Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (same); *Lukovsky v. San Francisco*, No. C 05–00389

16   WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006).  This means that the class must be

17   sufficiently definite that objective criteria can be used to determine if a particular person is a member

18   of the class.  *See, e.g., Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 523 (C.D. Cal. 2011).

19   **VI.     PLAINTIFFS HAVE NOT DEMONSTRATED COMPLIANCE WITH RULE 23(A).**

20           **A.      Numerosity**

21           Plaintiffs' entire argument under Rule 23(a)(1)'s numerosity requirement consists of a single,

22   unsourced sentence asserting that "each of the proposed Classes consists of thousands of individual

23   consumers who purchased milk and other fresh milk products over a period of years."  Mot. at 5.

24   However likely it may seem that Plaintiffs could find evidence to validate that claim, their bare

25   _____

26   [2] Under Rule 23(a), Plaintiffs must demonstrate numerosity, commonality, typicality and adequacy.
     Fed. R. Civ. P. 23(a).  Under Rule 23(b)(3), Plaintiffs must also establish that "questions of law or
27   fact common to class members predominate over any questions affecting only individual members"
     and that a class action would be "superior to other available methods for fairly and efficiently
28   adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

1   assertion of numerosity is a form of corner-cutting that courts frequently reject.  *See, e.g., Davis v.*

2   *Astrue*, 250 F.R.D. 476, 485–86 (N.D. Cal. 2008) (holding that although it was "hard to

3   contemplate" that there were not a sufficient number of people who met the class definition, plaintiff

4   failed to offer any evidence at all on the issue, and therefore failed to establish numerosity).[3]

5       This is not simply a question of technical compliance with the rule—although under *Dukes*,

6   technical compliance is a must.  131 S. Ct. at 2551 ("A party seeking class certification . . . must be

7   prepared to prove that there are in fact sufficiently numerous parties . . . etc.").  Given the substantial

8   issues ascertainability presented in this case, *infra* at 23–25, Plaintiffs' failure to introduce *any*

9   evidence of the size of their proposed classes follows from their fundamental inability to identify in

10  any principled manner the consumers who even qualify as putative class members.  Plaintiffs have

11  not met their burden of proof under Rule 23(a)(1).

12      **B.      Commonality**

13      The second Rule 23(a) requirement is the obligation to show the existence of a common

14  question of law or fact.  However, as the Supreme Court explained in *Dukes*, "that language is easy

15  to misread, since any competently crafted class complaint literally raises common 'questions.'"  131

16  S.Ct. at 2551 (internal quotation omitted).  Instead, "[w]hat matters to class certification . . . is not

17  the raising of common 'questions'—even in droves—but, rather the capacity of a classwide

18  proceeding to generate common answers *apt to drive the resolution of the litigation*." *Id.* (emphasis

19  added).  If the common question does not advance the litigation—the Supreme Court used such

20  examples as "Do [Wal-Mart] managers have discretion over pay?"—then it does not satisfy the

21  commonality requirement of Rule 23(a)(2).

22      Plaintiffs have not raised a common question in the sense required by *Dukes*.  Their first

23  proposed common question is simply whether the Defendants "enter[ed] into a horizontal conspiracy

---

[3] *See also, e.g., Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 595–97 (3d Cir. 2012) (reversing
class certification because while it was "tempting to assume," based on "common sense," that the
class met the numerosity requirement, plaintiff offered no evidence supporting that assumption);
*Mylan Pharm. v. Warner Chilcott Pub. Co.,*No. 12-3824 (E.D. Pa. Nov. 20, 2013) (same in action
alleging price-fixing for prescription drugs that were prescribed to hundreds of thousands of
patients; *Fields v. Mobile Messengers Am., Inc.,* No. C 12-05160 WHA, 2013 WL 6073426, at *5
(N.D. Cal. Nov. 18, 2013) (same in action challenging unauthorized charges to wireless customers).

to fix, raise, and/or stabilize the prices of raw farm milk?"  Mot. at 6.  Ordinarily, that would be a

critical threshold question in most antitrust price-fixing conspiracy cases because the defendants in

such cases almost always deny the existence of the agreement.  Here, however, that question is the

functional equivalent of asking whether Wal-Mart adopted the practices of supervisor discretion that

Plaintiffs were challenging as unlawful:  Defendants admitted in their joint answer that the the CWT

HR Program was entered into, and that each of the Defendants participated in it.  *See* Answer, Dkt. #

127, at ¶¶ 52–57.  The agreement itself is memorialized in a written instrument that was produced to

Plaintiffs at the outset of discovery.  The program's existence is not a "question" to which the answer

will "drive the resolution of the litigation."

   For the fundamental questions that would advance the litigation, such as whether the

challenged conduct caused actionable harm to the Plaintiffs,[4] there are, as in *Dukes*, no common

answers.  As explained in greater detail below, *infra* at 9–23, Plaintiffs have not put forth reliable

methods that can demonstrate with common proof whether the herd retirement program impacted

premiums, and whether this impact was passed on to retail consumers in the form of higher prices for

the dairy products at issue here.  Plaintiffs' proposed common questions thus do not satisfy Rule

23(a)(2).  *See, e.g., In re Graphics Processing Units Antitrust Litig*., 253 F.R.D. 478, 505-07 (N.D.

Cal. 2008) (declining to certify indirect purchaser damages class because "[t]he record show[ed] that

the only way to fully assess pass-through . . . would be to conduct a wholesaler-by-wholesaler and

re-seller-by-re-seller investigation, which would essentially result in thousands of mini-trials"

(citation and quotation omitted)); *Sheet Metal Workers Local 441 Health & Welfare Plan v.

GlaxoSmithKline, PLC*, No. CIV.A. 04-5898, 2010 WL 3855552, at *25 (E.D. Pa. Sept. 30, 2010)

(denying certification in pass-through case because "when the prices for some customers are going

up while the prices of other customers are not, there is reason to doubt that the different customers

(class members) are experiencing a common impact"); *see also* cases cited *infra* at 22.

---

[4] That is in essence what Plaintiffs' second and third proposed common questions collectively ask: "Did Defendants' conspiracy result in artificially inflated prices of raw milk?  Was the premium overcharge passed through to indirect purchasers?"  Mot. at 6.

8

1

**C.     Other Rule 23 Factors.**

2     Plaintiffs seek to certify a West Virginia state class, but there is no plaintiff from West

3 Virginia.  *Compare* Mot. at 3 n.4 *with* Proposed 2nd Am. Compl., Dkt. # 192-2, ¶¶ 24–40.  Absent a

4 representative plaintiff, the West Virginia class may not go forward. *In re Ditropan XL Antitrust*

5 *Litig*., 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (White, J.) (dismissing for lack of standing

6 indirect purchaser claims under the laws of states in which none of the plaintiffs resided); *Dukes*, 131

7 S. Ct. at 2550 (2011) ("[A] class representative must be part of the class. . .").

8 **VII.     COMMON ISSUES OF LAW AND FACT DO NOT PREDOMINATE.**

9     "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule

10 23(a)." *Comcast*, 133 S.Ct. at 1433.  To satisfy that element in an antitrust case, Plaintiffs must

11 demonstrate a method by which impact and damages can be established using common proof, and

12 that methodology "must measure *only* those damages attributable to th[e] theory" of liability put

13 forward for class-wide treatment.  *Id.* at 1433 (emphasis added).  "[A]t the class-certification stage

14 (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case,

15 *particularly with respect to the alleged anticompetitive effect of the violation*." *Id.* (quotation

16 omitted, emphasis added)).  As a result, "[t]he first step in a damages study is the translation of the

17 *legal theory of the harmful event* into an analysis of the economic impact *of that event*."  *Id.* at 1435

18 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)).

19 Absent such evidence, individual questions of impact and damages "will inevitably overwhelm

20 questions common to the class." *Id.* at 1433.

21     When an expert's "damages model cannot withstand th[e] scrutiny" that *Comcast* requires,

22 then "[n]o damages model, no predominance, no class certification."  *In re Rail Freight Fuel*

23 *Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013); *see also Forrand v. Federal Exp. Corp*.,

24 No. CV 08–1360, 2013 WL 1793951, at *3 (C.D. Cal. Apr. 25, 2013) ("As the Supreme Court

25 reemphasized in *Comcast*, in order for Rule 23(b)(3)'s predominance requirement to be satisfied, a

26 plaintiff must bring forth a measurement method that can be applied classwide and that ties the

27 plaintiff's legal theory to the impact of the defendant's allegedly illegal conduct.").

28

9

1         Plaintiffs have not met their burden of establishing that impact and damages *from the*

2  *challenged conduct* can be shown with a reliable method utilizing common proof.  They and their

3  expert instead propose methodologies that are not "consistent with [their] liability case."  *Comcast*,

4  133 S.Ct. at 1433.  Dr. Connor failed to consider any factors other than the CWT HR Program that

5  might have affected premiums, and has at best estimated the combined effects of both the challenged

6  conduct and perfectly lawful behavior, without distinguishing the two.  Moreover, his opinions are

7  based on a nationwide class, and not the sixteen separate classes for which the Plaintiffs seek

8  certification.  As detailed below, his statistical models are unreliable, inadmissible and inadequate to

9  support class certification,[5] and Plaintiffs have therefore failed to establish the predominance of

10  common questions over individual ones.

11      **A.**    **Plaintiffs' Expert's Claimed Reliance on Dr. Brown Provides No Reliable Means of Demonstrating that CWT's HR Program Impacted Premiums.**

12

13         Throughout this case, Plaintiffs have repeatedly pointed to the work of Dr. Scott Brown, a

14  University of Missouri professor retained by the National Milk Producers Federation to estimate the

15  effects of the CWT HR Program.  Dr. Brown's results are quoted extensively in Plaintiffs'

16  Complaint and in their Motion.  *See* Consol. Am. Compl. ¶¶ 14, 78-89, 113-29.  Indeed, Plaintiffs

17  argue in support of this motion that Dr. Brown's results are themselves "compelling proof of impact"

18  that support class certification.  Mot. at 16-18.  Dr. Connor likewise advances Dr. Brown's results as

19  proof that there exist "economically reliable methods and evidence common to the classes" with

20  which to calculate the impact of the CWT HR Program on prices for raw milk. Connor ¶ 63.

21         Plaintiffs' and Dr. Connor's reliance on Dr. Brown is misplaced.  As Dr. Brown himself

22  explains, the pricing effects that he estimated are *exclusively* the product of changes in the regulated

23  price of milk received by farmers, not changes to premiums:  "[T]he predictions that I made based on

24

---

25  [5] The Court may at this stage evaluate Dr. Connor's opinions under the *Daubert* standard and find

26  them inadmissible.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (upholding the use of *Daubert* admissibility standards on a Rule 23 motion).  In the absence of such a determination, however, it may still find his opinions insufficient to support class certification.

27  *Comcast*, 133 S.Ct. at 1431 & n.4 (requiring courts, when deciding a Rule 23 motion, to evaluate the sufficiency of an expert's evidence even in the absence of formal exclusion under *Daubert*).

28

1  my use of this model are derived entirely from predicted changes in the regulated portion of the price

2  of milk that farmers receive, and not from any changes in over order or other premiums charged or

3  earned by dairy farmers." *See* Declaration of Scott Brown ("Brown") ¶ 13. "I did not analyze the

4  impact, if any, of the CWT program on the premiums charged or earned by dairy farmers, *and the*

5  *model I used assumes that the premiums received by farmers are the same with and without the CWT*

6  *program.*" *Id.* (emphasis added). As a result, Plaintiffs cannot use Dr. Brown's model to estimate

7  the impact of the CWT HR Program on premiums—the only unit of price at issue in this case. *See*

8  Mot. at 20; *see also* Order, Dkt. # 123, at 7–9. Such a model is plainly incapable of establishing the

9  impact associated with Plaintiffs' theory of liability. *Comcast*, 133 S.Ct. at 133.

10       **B.       Plaintiffs' Expert's Impact Model Ignores a Multitude of Factors that He**
                    **Admitted Affect Premiums.**

11

12       Dr. Connor's methodology for estimating the effects of the CWT HR Program on premiums,

13  *see* Connor Rpt. ¶¶ 79–92, was nothing more than a simple "before and after" comparison, which

14  methodology numerous courts have found so flawed as to be inadmissible. *See, e.g.*, *Blue Dane*

15  *Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (expert's use of a

16  "before-and-after" damages model to explain change in the market value of beef cattle was

17  inadmissible because the expert "neglected to consider any variables other than" the complained of

18  conduct). All Dr. Connor did was compare the national average premiums charged by the one

19  cooperative (DFA) during the years before the CWT HR Program (July 1995-June 2003) against the

20  average of DFA's premiums during and shortly after the program (July 2003-June 2013). After

21  adjusting for inflation, Dr. Connor *attributed the entire observed difference in DFA's average*

22  *premiums to the effects of the CWT HR Program. See* Connor Rpt. ¶¶ 84–85. By his own admission,

23  his analysis accounts for no other factors that could have caused a change in premium levels:

24                 Q.  Now, is it your opinion, Dr. Connor, that once you have accounted
                       for inflation that the entire difference between DFA's average over-
25                     order premium in the class period as opposed to the pre-period was
                       caused by the CWT program?
26

27                 A       Well, pretty much we think that conditions during the pre-class
                       period, conditions in the post-class period, just have not changed enough
28                     to warrant a hypothesis that, and these are very long periods with large

averages involved. Yes, there may be spikes of the type we were talking about just before the break, odd occurrences, weather patterns, political events, changes in demand conditions, but these tend to even out over very long periods of time. . . *So a very large portion, maybe not all of it, but a very large portion of the changes, change in premiums having accounted for changes in inflation already will, in fact, be due to the cartel's impact. Yes.*

*See* Metz Declaration, Exhibit A, Deposition of John Connor ("Connor Dep.") at 148–49.

That conclusion, however, stands in stark contrast to Dr. Connor's admissions of the many other reasons why premiums could have increased—reasons that he ignored and that render his approach to causation and impact totally unreliable:

- Dr. Connor said that premiums are in substantial measure payment for services provided to customers, (Connor Dep. 132:4–8), yet Dr. Connor made no effort to consider changes in the costs or value of providing these services;

- Dr. Connor admitted that, ordinarily, collaborative price-setting by farmers and cooperatives—which is perfectly lawful and unchallenged in this case, *see, e.g.*, *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1038–39 (2d Cir. 1980) (holding that Capper-Volstead immunized "an agricultural cooperative marketing corporation, whose primary function was to establish prices for the member farmers' milk")—would be expected to increase premiums received by farmers, yet Dr. Connor made no investigation and took no account of new instances of farmer cooperation that came into being either during or just before the class period; (*Id*. at 48:13–49:17, 169:1–170:10)

- Dr. Connor acknowledged that new forms of premiums came into existence during the period of the CWT HR Program, most particularly premiums for rBST-free milk and fuel surcharges, which premiums were unrelated to the herd retirement program, yet he made no effort to quantify the size of those premiums; (*Id*. at 71:17–74:13; 140:3–142:3)

- Dr. Connor knew that macro economic forces could change premiums, and likely did during a striking premium increase in 2008, yet he took no account of such forces or the spike in premiums that they caused in evaluating impact or damages. (*Id*. at 134:1–137:13).

The factual record here is clear that these other factors have influenced premiums in significant ways. As Dr. Connor acknowledged, most premiums or service charges charged by cooperatives are made up of individual fees for specific marketing services. *See* Wilson ¶¶ 9-11; Wegner ¶ 13; Mathur ¶ 5; Stammer ¶¶ 8-9. As the costs of providing those services increase (e.g., rising diesel prices increasing the cost of hauling, Wilson ¶ 18; Stammer ¶¶ 11-14; Wegner ¶ 13), so too do the associated premiums. *Id.* Premiums can and have increased as a result of the (lawful) collective bargaining that cooperatives conduct through marketing agencies in common. Wilson ¶ 7; Wegner ¶ 17; Mathur ¶ 11. As those agencies came into creation (as with the example of the Greater Northeast Milk Marketing Agency in 2006, Mathur ¶¶ 12-13; Wegner ¶ 18), or as their membership increased (as with the case of Dairy Marketing Services, Mathur ¶ 11), cooperatives' ability to bargain for greater premiums increases. And, premiums can and have changed due to changes in customer demand—as with the example of the rBST-free premium that came into existence during the class period when retail grocery stores began demanding supplies of milk produced without the aid of the synthetic growth hormone rBST, and cooperatives responded by making that change and charging a premium to offset the costs that imposed on producers. *See* Wilson ¶¶ 12-17 & Exhibits 1, 2 (maps showing the growth in rBST-free premiums nationwide in 2007 & 2008); Mathur ¶¶ 12; Wegner ¶ 14; Stammer ¶¶ 11-13.

Indeed, the data file Dr. Connor used to calculate his average premium directly lists a category of premium—the "fuel surcharge"—that came into effect during the class period and that is directly attributable to rising diesel prices, and not to the CWT HR Program:

> This is a charge that was put in place by DFA and other dairy cooperatives to offset costs resulting from the sharp rise in diesel fuel prices. The cost of fuel is a significant expense for any cooperative or independent dairy farmer. Milk is generally produced in rural areas where farmland is abundant, and must be transported to processing plants that are sometimes hundreds of miles away. Over time, as fuel prices increased, it became apparent to us that rising fuel prices were not being fully covered by the service charges that we had in place.

Wilson ¶¶ 18–19 (explaining the rationale for the fuel surcharge); *see also* Wegner ¶ 13; Stammer ¶ 15. The fuel surcharge first appears in Dr. Connor's data file in July 2004 (i.e., one year into the

1   period for which he is attributing all premium increases to the CWT HR Program), at which time the

2   surcharge ranged from a low of ████/cwt to a high of ████cwt in those areas that had it.  *See*

3   Kaplan at ¶ 41 & Ex. 15.  By July 2008, the charge had risen to a low of ████ and a high of ████ in

4   those areas that had it.  *Id.*  These rising fuel charges feed directly into the "net service charge" that

5   Dr. Connor claims was rising solely as a result of the CWT HR Program.  *Id.*

6          Dr. Connor notes that there is a strong, upward time trend in the DFA premium data upon

7   which he relies.  That upward trend, of course, makes the average premium in the period of the CWT

8   HR Program greater than the average premium in the earlier period.  Dr. Connor did not bother to

9   examine or explain, however, the fact that a strong upward trend exists in the premium data in the

10  years before the CWT HR Program.  Kaplan ¶ 62.  In other words, if an increase in average

11  premiums during the period of CWT is the "proof" of damages caused by the program, then what

12  does he say about the increase in average premiums in the years *before the program*?  In fact, he says

13  nothing.  Moreover, although he testified that there were a number of methodologies that could be

14  used to test whether the trend during the CWT HR Program was anything other than the continuation

15  of the upward trend in the prior years, he conducted no such test.  When Mr. Kaplan did, he found no

16  evidence of elevated premiums during the CWT HR Program.  Kaplan ¶¶ 67–72 & Exs. 22-23

17  (indicator variable for CWT period is not significant; "damages" appear in the period before CWT

18  using Connor's "before and after" method).

19         Perhaps nothing underscores the failure of Dr. Connor's analysis to consider any causal

20  factors other than CWT more than the comparison of Dr. Brown's estimates, whose work is liberally

21  quoted in the Complaint and relied on in Plaintiffs' Motion, and upon which Dr. Connor likewise

22  claimed to rely.  Connor Rpt. ¶ 74.  Dr. Connor testified that Dr. Brown's work was reliable and that

23  Dr. Brown had made a professionally respectable effort to sort out the effects of the CWT HR

24  Program from other factors that might have changed milk supply and milk prices.  *See* Connor Dep.

25  22-24, 27-28, 53.  Yet, by the third and fourth versions of his Declaration, Dr. Connor proposed to

26  apply his "before and after" averaging method to both regulated milk prices and premiums, and

27  thereby to estimate an effect of the CWT HR Program that was *more than five times greater*

28  *($4.61/cwt) than Dr. Brown's 90 cent estimate*, Kaplan ¶ 82—the estimate he had sworn was

14

reliable.  The best Dr. Connor could offer at that point was to admit that he was "at a bit of a loss as to why our two estimates are so far apart."  Connor Dep. at 127.

The reason for the discrepancy is obvious to everyone but Dr. Connor:  Dr. Connor's failure to consider other factors that caused dairy prices to increase lacks scientific rigor and is unreliable. "Courts have consistently rejected 'before-and-after' models when experts failed to perform regression analysis or otherwise account for variables in the marketplace." *Stein*, 2007 WL 831750 at *12; *see also Blue Dane Simmental Corp.*, 178 F.3d at 1040-41 (before-and-after "method is not typically used to make statements regarding causation without considering all independent variables that could affect the conclusion").  By failing to take account of any of the above factors, and instead simply comparing average premiums before and during the CWT HR Program, Dr. Connor counted each of these changes—increased cost of providing service, increased collaborative price-setting, increases in new forms of premiums, and increases driven by macro economic forces, including the global run up in commodity prices in 2007-08—as premium increases caused by the CWT HR Program.  By controlling for none of these acknowledged causal factors, Dr. Connor erroneously attributes to the CWT HR Program price effects that were in reality caused by other, lawful sources. Such an analysis is plainly inadmissible.  *See Comcast*, 133 S.Ct. at 1435 ("Prices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant" to Rule 23); *Blue Dane Simmental Corp.*, 178 F.3d at 1040-41 (expert's use of a "before-and-after" damages model to explain change in the market value of beef cattle was inadmissible because the expert "neglected to consider any variables other than" the complained of conduct).[6]

---

[6] *See also, e.g., Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (an "expert's failure to make any adjustment for [explanatory] variables" other than the challenged conduct "indicates a failure to exercise the degree of care that a statistician would use in his scientific work" and leaves the resulting opinions inadmissible under *Daubert* and "entitled to zero weight"); *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 978 (C.D. Cal. 2012) (excluding "before and after" analysis that accounted for "no independent variables other than time"); *In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. 1497, 1504 (D.Kan.1995) ("before-and-after" model excludable because it assumed that "the conspiracy was the sole cause of the price difference between the conspiracy period and the normative period"); *Stein*, 2007 WL 831750 at *12 ("The fact that the price for DSL service after the class period was less than the price for DSL service during

**C.     Plaintiffs Fail to Separate the Impact of the Challenged Conduct From the Impact of Herd Reductions Under the CWT HR Program That are No Longer Subject to Challenge.**

If ever it was their intention to do so, Plaintiffs can now no longer claim that they are challenging the legality of CWT's HR Program everywhere that it existed.  At the very least, they have acknowledged that they are not challenging the program under the laws of the dozen states whose classes and claims Plaintiffs recently dropped.  Plaintiffs acknowledge that their decision to drop those states was precipitated by the existence of language in those states' agricultural immunity statutes granting cooperatives the right to coordinate on the "production" of their members' products.  *See* Mot. at 9; *see also* Mot. for Leave to File 2nd Am. Compl., Dkt. # 192, at 1.

On that rationale, as many as thirteen other states that have immunity statutes that are essentially the same as the twelve "dropped" states,[7] would be outside Plaintiffs' theory of liability as well.  Among the states remaining in the case, three of them (California, Wisconsin and Tennessee) also have immunity statutes that mention "producing" or "production," notwithstanding Plaintiffs' suggestion to the contrary.  *Cf.* Mot. at 9.  Taken together, the twenty-five states that should now be outside Plaintiffs' theory of liability account for nearly 40% of all herd retirements under the CWT HR Program.  *See* Kaplan ¶ 63 & Ex. 3.  If California, Wisconsin and Tennessee are counted among them, then it is twenty-eight states that account for 68% of all herd retirements.  *Id.*

For purposes of class certification, however, the Court need not decide whether the list of states whose herd reductions are outside Plaintiffs' theory of liability numbers twelve, twenty-five, twenty-eight, or some other number.  That there are indisputably *at least* twelve states that fit into that category is enough to create a *Comcast* problem:  a failure to establish the "alleged anticompetitive effect of the violation," *Comcast*, 133 S.Ct. at 1433.  Plaintiffs must be able to estimate the impact of herd retirements occurring *in those states where Plaintiffs still claim the CWT*

_____

the class period does not provide a sufficient basis for concluding that the price during the class period was supra-competitive, or that it was the result of unlawful conduct.").

[7] These thirteen states are Alabama, Arkansas, Georgia, Idaho, Indiana, Kentucky, Louisiana, Maryland, Pennsylvania, Rhode Island, Texas, Virginia, and Wyoming.  Plaintiffs had never made claims in these states because indirect purchasers lack standing to sue, so they had no claim to drop when they recently amended their Complaint.

*HR Program was a violation*.  Because Plaintiffs no longer claim that Defendants' implementation of the herd retirement program was *illegal* in the twelve states that they just dropped from their Complaint, then any increased premiums resulting from the CWT HR Program's operation in those states is not a premium "attributable to th[e] theory" of liability put forward for class-wide treatment.  *Comcast*, 133 S.Ct. at 1433.[8]  Any valid measure of impact and damages here must be based only upon the effects of conduct that Plaintiffs' liability case claims was illegal.

Plaintiffs have introduced no such measure.  Instead, Dr. Connor's analyses are expressly based on changes to the *total national* milk supply resulting from *all* herd retirements regardless of where they occurred.[9]  Connor Depo. 161–64.  He undertook no effort "to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to" Plaintiffs' theory of liability.  *Comcast*, 133 S.Ct. at 1435.  That failing is fatal to both class certification and the admissibility of Dr. Connor's opinions.  *See, e.g., In re Taco Bell Wage and Hour Actions*, 2011 WL 4479730, *6 (E.D. Cal. 2011) (denying class certification and excluding expert analysis that failed to differentiate between challenged and unchallenged conduct); *York v. Starbucks Corp.*, 2011 WL 8199987, *13-15 (C.D. Cal. 2011) (same); *Children's Broadcasting Corp. v. Walt Disney Co.*, 245

---

[8] Indeed, Plaintiffs could not advance such a theory consistent with the Constitution's commerce clause.  If New York, Pennsylvania, Texas, or the two-dozen other states that enacted these laws wish to make it their policy to permit agricultural producers to raise prices for raw milk produced in their state by coordinating their production levels, no other state may countermand that policy by imposing liability for herd reductions occurring *within those states that allowed it*.  *See Healy v. Beer Institute*, 491 U.S. 324, 337 (1989) ("Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."); *NCAA v. Miller*, 10 F.3d 633, 638-39 (9th Cir. 1993) (invalidating state law that had the practical effect of nullifying inconsistent laws in other states).  Such other states are free to prohibit the same practices taking place within their own borders, but may not enact regulations that have the "practical effect of . . . control[ling] conduct beyond the boundaries of the State."  *Healy*, 491 U.S. at 336.

[9] Dr. Connor did, at the end of his nationwide analysis, reduce his damages figure by the percentage of the population that lives outside the 16 states in which the Plaintiffs reside.  Connor Rpt. ¶ 119.  That adjustment for the number of consumers who are suing, however, by no means cures the defect in his common proof, which is premised on estimating the effect of *herd reductions everywhere*, including in states where Plaintiffs have indisputably dropped their claims because of the wording of those states' immunity statutes.  Kaplan ¶¶ 63-64.

1    F.3d 1008, 1018 (8th Cir. 2001) (affirming exclusion of expert whose damages calculation included

2    impact from lawful conduct).

3        **D.    Plaintiffs Improperly Rely on an Expert Opinion Regarding a Nationwide Class
             To Seek Certification of Sixteen Separate and Distinct Classes.**

4

5            Dr. Connor testified that his opinions on the feasibility of applying a reliable method to

6    demonstrate impact and damages with common proof was premised on the existence of a single,

7    nationwide class.   The problem, of course, is that Plaintiffs seek the certification of 16 separate

8    statewide classes, not one national class.  Their expert offered no opinion as to the use of common

9    proof to show impact or damages for any of the classes that the Plaintiffs actually ask the Court to

10   certify.

11           The issue is not merely theoretical; it renders Dr. Connor's results both unreliable and

12   misleading.  By analyzing national average premiums, Dr. Connor's analysis suggests that there were

13   premium changes in every jurisdiction in the country during the relevant time period, including the

14   sixteen jurisdictions still at issue.  But the very data upon which Dr. Connor relied belies his claim.

15   As the DFA official that maintains the data file that Dr. Connor utilized explains:

16               Information is not collected on service charges [premiums] in certain
17               cities, such as San Francisco and Los Angeles, *as those service charges
                 rarely change*.  A careful eye would note that the service charge in San
18               Francisco has been recorded as ▮▮▮▮/cwt since October 2001, and in
                 Los Angeles at ▮▮▮▮ /cwt since May 2003."
19

20   Lichte Dec. ¶ 7 (emphasis added).[10]   Dr. Connor does not and cannot provide a reliable basis for

21   using his national average change in premiums to make it appear as if premiums changed in all

22   sixteen jurisdictions at issue, when he knows that they did not.  Moreover, he offers absolutely no

23   means of showing the impact of the CWT HR Program on premiums in those jurisdictions in which

24   the premiums barely change between *from 2003 through 2013.*

25   _____

26   [10] Dr. Connor's mere presumption that the data file is representative of prices charged by all
     cooperatives throughout the country is without basis, and renders his resulting analyses unreliable
     and inadmissible.  *See, e.g., Johnson Elec. North America Inc. v. Mabuchi Motor America Corp.*,
27   103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (explaining that an "expert must have some reliable basis
     for extrapolating from the available data").

28

1    And that is not the only problem with Dr. Connor's use of national averages.  As the data file

2    relied on by Dr. Connor shows, in seven other states in which Plaintiffs seek to certify subclasses,

3    Dr. Connor *had no premium data at all*.  Kaplan ¶ 55.  His analysis simply assumes—with no

4    basis—that the premiums in these jurisdictions are consistent with the national average premium he

5    calculates.  Dr. Connor's use of national averages cannot reliably overcome the fact that in half of

6    the states for which Plaintiffs seek to certify a class, Dr. Connor either has evidence that premiums

7    *did not change,* or *no evidence* at all about whether premiums changed.  *See, e.g., Bell Atlantic Corp.*

8    *v. AT & T Corp.*, 339 F.3d 294, 304-05 (5th Cir. 2003) (affirming denial of class certification where

9    plaintiffs' use of averages failed to approximate the damages to any particular class member);  *Reed*

10   *v. Advocate Health Care*, 268 F.R.D. 573, 590-91 (N.D. Ill. 2009) (rejecting expert's use of averages

11   as a "fundamental flaw" that masked variability in the proposed class).

12       **E.    Plaintiffs' Expert Has No Reliable Means of Demonstrating Impact on Premiums**
              **for Class II or Class III Milk.**
13

14       Finally, the data file Dr. Connor uses relates only to Class I premiums, not Class II premiums.

15   *See* Lichte Dec. ¶ 12.  He therefore has no information at all with which to assess an impact the CWT

16   HR Program had on Class II premiums, even though those dairy products constitute the clear

17   majority of products in the class definition.  *See* Mot. at 1 (listing cream, half & half, yogurt, cottage

18   cheese and sour cream, all of which are Class II products).  Without any data, Dr. Connor simply

19   multiplies his calculated premium "overcharge" per hundredweight times the volume of Class I and

20   Class II milk produced during the years of the CWT HR Program.  Connor Rpt. ¶ 86.  Dr. Connor

21   recognized this limitation in his analysis, but he testified that he considered it a "conservative"

22   assumption to assume that Class II premiums were the same as Class I premiums.  Connor Dep. 160.

23       In fact, Class II premiums are generally smaller and more static than Class I premiums.

24   Wilson ¶ 20; Lichte ¶ 12 ("Class II net services charges . . . rarely change").  As a result, it is not a

25   "conservative" assumption to treat Class I and Class II premiums as if they were the same.  It is an

26   error—nothing more, nothing less—and an extrapolation of his results, flawed as they were, to

27   millions of pounds of milk production as to which he has no data whatsoever.

28

**F.     Dr. Connor's Pass-Through Analysis is Unreliable As A Means of Demonstrating Impact or Damages.**

The final step in Dr. Connor's analysis was to take the allegedly increased premiums that he observed (but that, as discussed above, he cannot show were related to the CWT HR Program) and determine to what extent such increases in premiums were passed through to consumers who purchased the dairy products at issue here.  The flaws in Dr. Connor's pass-through analysis are many and fatal.

First, he never even purports to put forward a methodology for evaluating the pass-on of over-order premiums, the only relevant price here.  All of his computations and assertions are based on total prices, which are dominated by the regulated minimum prices and of no consequence to this case.  As Defendants' expert, Mr. Kaplan, explains, "Although [Dr. Connor] claimed in his declaration that he analyzed the relationship between the DFA premiums separately and retail prices, he admitted at his deposition that he conducted no such analysis."  Kaplan ¶ 107.  Given that the increase in premiums arguably at issue here amounts to less than a penny in the overall price of a gallon of milk, Kaplan ¶ 7, it is easy to see why pass-through would be less than automatic.  And, in fact, when Dr. Connor's statistical method is applied to premiums, instead of to regulated or total prices, the finding of significant pass-through essentially disappears.  Kaplan ¶ 108, Exs. 32-33.

Second, Dr. Connor's pass-through methodology depends for its validity upon a statistical test that his data flunked.  Dr. Connor insisted at his deposition that his "co-integration test" was necessary for his pass-through regression equations to be valid—in fact, he chose not even to report results for those cities in which the data failed the test.  Connor Dep. 220-22.  What Dr. Connor did not appreciate, however, is that his own back up materials show that his data for the U.S. as a whole fail the co-integration test, rendering his regressions invalid by the very standard he articulated.  Kaplan ¶¶ 103–06.  Without being able to validate his own choice of methodology, Dr. Connor's preferred estimates of pass-through of even the total price of milk lack, by his own testimony, a reliable methodological foundation.  *Id.*

Third, Dr. Connor uses data for Class I fluid milk and simply assumes that it applies to the other products at issue here.  Kaplan ¶ 111.  Like so much of what he has done, this assumption lacks

20

1   any confirming data or theory.  As the factual record makes clear, there is simply no foundation for

2   assuming that premiums of the various classes are related, *see* Wilson ¶ 20; Lichte ¶ 12; Kaplan ¶

3   111, or that the pass-through of significantly branded products, such as yogurt, cream cheese and

4   sour cream, would be the same as the pass-through for fluid milk.

5          Fourth, as the discussion by Mr. Kaplan makes clear, there is no reason to suppose that

6   hundreds if not thousands of highly localized retail grocery markets can be analyzed with common

7   evidence:  products are different, competitive conditions are different, and retail pricing strategies are

8   different.  Kaplan ¶¶ 90–102, 112–14.  Tellingly, Dr. Connor acknowledges that competition from

9   different types of retailers will affect pricing strategies, *id.*, and that the area in which those changes

10  will exist is microscopic in comparison to his national average—"probably two to four miles."

11  Connor Dep. 186–87.  With local markets only a few miles in scope, there are dozens if not hundreds

12  of markets within each of plaintiffs' proposed sixteen jurisdictions in which pass-through would

13  have to be evaluated.  Even Dr. Connor's rudimentary pass through analysis, focused as it is on the

14  wrong price, shows dramatically different pass-through rates in different cities around the country.

15  *See* Connor Exh K.

16         Mr. Kaplan and Dr. Hanssens—an expert in retail pricing—have analyzed retail store pricing

17  data in order to test Dr. Connor's conclusions.  As they found, retail prices are highly variable, and

18  that within a single state and even within the same city, prices for the same product at different stores

19  were widely divergent.  Kaplan ¶ 94 & Ex. 29–31; Expert Declaration of Dominique Hanssens

20  ("Hanssens") ¶ 44 & Ex. 4.  Even a cursory review of the actual retail pricing data for the many

21  products at issue here in the many localities in which they are sold reveals a variety of pricing

22  patterns that cannot be summarized with common proof and that cannot conceivably represent a

23  consistent rate of pass-through of premium increases, even if one could attribute such increases to the

24  CWT HR Program in the first instance.  The isolation problem, moreover, is compounded by the fact

25  that, when calculated on a per gallon basis, an uptick in premiums—which are less than 10% of the

26  total price −would have a trivial impact on the retail price of milk:  How much would a five percent

27  elevation in premiums amount to in terms of the retail price of milk?  *Less than one cent*. Kaplan ¶ 7.

28

21

Defendants' retail expert, Dr. Hanssens, has studied the time trend in retail prices, using IRI data, for more than 240,000 product-store combinations in the states for which plaintiffs seek to certify classes.  Dr. Connor found a strong, statistically significant upward trend over time in premiums charged by DFA.  By contrast, Dr. Hanssen found that most retail products in most stores, during the years for which there is IRI data, ███████████████████████████████████████ ████████████████████████████████  As Dr. Hanssens explained, "the time trend pattern of deflated [inflation adjusted] retail prices for these product-store combinations, ███████████████████ ████████████████████████████████ is not consistent with widespread pass-through of small changes in wholesale cost for all or nearly all dairy products in all or nearly all retail outlets covered by the IRI data."  Hanssens ¶ 53.

Given these realities, Plaintiffs could only ever hope to prove the *existence* and *size* of pass-through by conducting a store-by-store analysis that they have no capacity to conduct.  It requires, in other words, individual proof that is so massive in its scope that there could never be a predominance of common issues.  *See, e.g., In re Methionine Antitrust Litig.,* 204 F.R.D. 161, 165 (N.D. Cal. 2001) (denying class certification because of the inadequacy of Dr. Connor's support for a single pass-through rate); *Graphics Processing Units Antitrust Litig.*, 253 F.R.D. at 504 (rejecting expert's "vague statement" that her methods "are applicable to all purchases made by class members" and denying certification because the "only way to fully assess pass-through in this action would be to conduct a wholesaler-by-wholesaler and re-seller-by-re-seller investigation"); *In re OSB Antitrust Litig.,* No. 06-826, 2007 WL 2253425, *10-*11 (E.D. Pa. Aug. 30, 2007) (denying certification of indirect purchasers because expert report relied on generalized theories of supply and demand elasticities and failed to analyze the "real economic world" and did not consider the data or variables necessary to determine whether an increase in wholesale prices actually caused an increase in retail prices).

Plaintiffs' citations, *see* Mot. at 20 n.118, are not to the contrary.  The court's conclusion in *In re TFT-LCD,* 267 F.R.D. 583 (N.D. Cal. 2010), is premised upon the Court's belief that it could not scrutinize Plaintiffs' expert's opinions at the class certification stage.  *Id.* at 601.  That is now

22

plainly incorrect. *See Comcast*, 133 S.Ct. at 1332–33. Plaintiffs' other citations rest upon showings of intra-product price uniformity that Dr. Connor has not even attempted to establish here.

## VIII.   THE CLASS IS NOT ASCERTAINABLE AND IS NOT MANAGABLE

As this Court has stated, "the party seeking class certification must demonstrate that an identifiable and ascertainable class exists. . . . The class definition must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member." *Shepard v. Lowe's HIW, Inc.*, No. C 12-3893 JSW, 2013 WL 4488802, at *2 (N.D. Cal. Aug. 19, 2013). This is a "threshold issue" to be resolved. *Id.* "Where information necessary to ascertain the class is not readily available, class certification is inappropriate." *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, *14 (N.D. Cal. June 9, 2010).

Plaintiffs are attempting to certify sixteen classes with the following definition:

> All consumers who, from 2003 to the present, as residents of [State], indirectly purchased milk and/or other fresh milk products (including cream, half & half, yogurt, cottage cheese, cream cheese, and/or sour cream) for their own use and not for resale.

Pls' Br. at 1. Plaintiffs' proposed classes are not ascertainable for at least two reasons.

### A.   No Acceptable Method Exists for Identifying Past Purchasers of Dairy Products.

First, Plaintiffs propose no method at all by which they could ever hope to identify *who* purchased the relevant dairy products in the relevant states over their decade-long class period. Defendants have no records capable of making such an identification—they produce *raw* milk, which is sold to processors, whose finished products are sold to retailers, and ultimately to consumers. If there are any third-parties that have information capable of identifying those consumers, there is no indication from Plaintiffs who those third-parties are, what records they possess, or how Plaintiffs propose to obtain and make use of them. Because "information necessary to ascertain the class is not readily available, class certification is inappropriate." *Flash Memory Antitrust Litig*. 2010 WL 2332081 at *15 (the "factually-intensive nature and the administrative infeasibility of ascertaining" consumers that purchased flash memory drives required denial of class certification); *see also Deitz v. Comcast Corp.*, 2007 WL 2015440 at *8 (N.D. Cal. July 11, 2007)

23

(proposed class of cable subscribers who owned cable-ready televisions was not ascertainable where defendant did not maintain records to identify those customers, making it "impossible to determine without significant inquiry which subscribers owned such devices").[11]

Should Plaintiffs propose in Reply that ascertainability can be achieved with self-reporting, that argument would fail for two reasons.  First, it is untimely and waived.  *Flash Memory Antitrust Litig*. 2010 WL 2332081 at *15.  Second, such a methodology is invalid because it requires Defendants to accept without challenge class members' assertions that they are part of the class.  *See Marcus v. BMW of North America, LLC,* 687 F.3d 583, 594 (3d Cir. 2012*)* (cautioning against "approving a method that would amount to no more than ascertaining by potential class members' say so" and explaining that "[f]orcing [defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications"); *Mann v. TD Bank*, N.A., No. 09-1062 RBK AMD, 2010 WL 4226526, at *12 (D.N.J. Oct. 20, 2010) ("[P]roposed class is too indeterminate because it would require individual hearings to establish who qualifies as a class member. . . . The Court would have to conduct fact-finding hearings to evaluate anecdotal evidence from each putative plaintiff.").  Inviting absent class members to claim under oath that they made purchases up to ten years ago for which they possess no records at all would be to invite fabrication that Defendants could not challenge.

## B.   No Method Exists for Segregating Qualifying Dairy Products from Non-Qualifying Products.

Plaintiffs fail to demonstrate the existence of an ascertainable class for a second, independent reason:  they do not propose any method for segregating dairy products produced from raw milk in states in which the CWT HR Program is being challenged as illegal, from those that were not.  As explained above, Plaintiffs' legal theory *excludes* any challenge to the operation of the CWT HR Program in states that have a particular kind of immunity statute.  *Supra* at 16.  Some of these states

---

[11] *See also, e.g., In re Fresh Del Monte Pineapples Antitrust Litig.,* 2008 WL 5661873 (S.D.N.Y. Feb. 20, 2008) (refusing class certification because "the problems inherent in ascertaining and distributing a damage award to countless consumers will make it impossible to administer the action and thereby negate any advantages gained by allowing the class allegations to stand." (quoting 7AA Wright, Miller & Kane, Federal Practice & Procedure § 1782 (3d ed. 2007)).

24

1    are significant producers of both raw milk *and* finished dairy products that are otherwise within

2    Plaintiffs' class definition—for example, Greek yogurt produced in New York, cream cheese

3    produced in Pennsylvania, or sour cream produced in Texas.  Wilson ¶¶ 23.  It is only after those

4    products have been manufactured, when they are beyond Defendants' control, that they are

5    transported throughout the country for sale to end consumers.  Wilson ¶ 22; Mathur ¶ 14.

6         Therefore, the task of ascertaining class members *who can recover for the conduct that*

7    *Plaintiffs are challenging as illegal* is not just the (already daunting task) of reliably identifying

8    consumers of more than a half-dozen dairy products over a ten year period, but the impossibly-

9    difficult task of sorting out which brands were produced in what states at all times in the class period,

10   and then tracing whether consumers purchased a brand of product that fits Plaintiffs' legal theory

11   instead of one that does not.  There is no method by which that can be done—not even with the

12   transactional records that Plaintiffs are already lacking. *See Rowden v. Pac. Parking Sys.,* 282 F.R.D.

13   581, 585-86 (C.D. Cal. 2012) (class not ascertainable because "[e]ven those few who retained their

14   receipts dating back five years will have to testify since those receipts do not disclose consumer

15   status"); *Peridot, Inc. v. Kimberly-Clark Corp.*, No. MC 98-012686, 2000 WL 673933, at *6 (Minn.

16   Dist. Ct. Feb. 7, 2000) (class definition that required "the tracking of specific products" was not

17   ascertainable).

18   **CONCLUSION**

19        For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

20

21   Respectfully submitted:

22   DATED: December 6, 2013         GIBSON DUNN & CRUTCHER LLP

23            By: /s/ George A. Nicoud III
              George A. Nicoud III (SBN 106111)
              Email: tnicoud@gibsondunn.com
24            Matthew S. Kahn (SBN 261679)
              Email: mkahn@gibsondunn.com
25            Deena B. Klaber (SBN 285237)
              Email: dklaber@gibsondunn.com
26            GIBSON, DUNN & CRUTCHER LLP
              555 Mission Street, Suite 3000
27            San Francisco, CA 94105-2933
              Telephone: (415) 393-8200
28

1    Fax: (415) 393-8200

2    EIMER STAHL LLP

3    Nathan P. Eimer (pro hac vice)
     Email: neimer@eimerstahl.com
4    Scott C. Solberg (pro hac vice)
     Email: ssolberg@eimerstahl.com
5    Vanessa G. Jacobsen (pro hac vice)
     Email: vjacobsen@eimerstahl.com
6    Daniel D. Birk (pro hac vice)
     Email: dbirk@eimerstahl.com
7    Sarah E. Malkerson (pro hac vice)
     Email: smalkerson@eimerstahl.com
8    EIMER STAHL LLP
     224 South Michigan Avenue, Suite 1100
9    Chicago, IL 60604
     Telephone: (312) 660-7600
10   Fax: (312) 692-1718

11   *Attorneys for Defendant Land O'Lakes, Inc.*

12   WILLIAMS & CONNOLLY LLP

13   By: /s/ Steven R. Kuney
     Steven R. Kuney (*admitted pro hac vice*)
14   Kevin Hardy (*admitted pro hac vice*)
     Carl R. Metz (*admitted pro hac vice*)
15   WILLIAMS & CONNOLLY LLP
     725 Twelfth Street, N.W.
16   Washington, D.C. 20005
     Telephone: (202) 434-5000
17   Facsimile: (202) 434-5029
     Email: skuney@wc.com
18   Email: cmetz@wc.com
     Email: khardy@wc.com
19
     W. Todd Miller (*admitted pro hac vice*)
20   BAKER & MILLER PLLC
     2401 Pennsylvania Avenue, N.W., Suite 300
21   Washington, D.C.  20037
     Telephone: (202) 663-7820
22   Facsimile: (202) 663-7849Email:
     tmiller@bakerandmiller.com
23
     Jesse W. Markham
24   ATTORNEY AT LAW
     2130 Fulton Street
25   San Francisco, CA 94117
     Telephone: (415) 422-4473
26   Facsimile: (415) 422-6433
     Email: markham@usfca.edu
27
     *Attorneys for Defendant Dairy Farmers of*
28   *America, Inc.*

                                    26

BOND SCHOENECK & KING, PLLC

By: /s/ Edward R. Conan
Edward R. Conan (*admitted pro hac vice*)
Suzanne O. Galbato (*admitted pro hac vice*)
Clifford G. Tsan (*admitted pro hac vice*)
Lucy S. Clippinger (*admitted pro hac vice*)
BOND SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: econan@bsk.com
Email: sgalbato@bsk.com
Email: ctsan@bsk.com
Email: lsclippinger@bsk.com

William S. Farmer
Jacob P. Alpren
FARMER BROWNSTEIN JAEGER LLP
235 Pine Street, Suite 1300
San Francisco, CA 94014
Telephone: (415) 962-2875
Facsimile: (415) 520-5678
Email: wfarmer@fbj-law.com
Email: jalpren@fbj-law.com

*Attorneys for Defendant Dairylea Cooperative Inc.*

SHIPMAN & GOODWIN LLP

By: /s/ Jill M. O'Toole
Jill M. O'Toole (*admitted pro hac vice*)
Susan S. Murphy (*admitted pro hac vice*)
Eric S. Goldstein (*admitted pro hac vice*)
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5000
Facsimile: (860) 251-5099
jotoole@goodwin.com
smurphy2@goodwin.com
egoldstein@goodwin.com

Diane C. Polletta (*admitted pro hac vice*)
Sarah J. McGinley (*admitted pro hac vice*)
300 Atlantic Street, Third Floor
Stamford, CT 06901
Telephone: (203) 324-8100
Facsimile:  (203) 324-8199
dpolletta@goodwin.com

1    smcginley@goodwin.com

2    Paula L. Blizzard (# 207920)
3    Jan Nielsen Little (# 100029)
     Shilpi Agarwal (# 270749)
4    KEKER & VAN NEST LLP
     633 Battery Street
5    San Francisco, CA 94111
     Telephone: (415) 773-6608
6    Facsimile: (415) 397-7188
     pblizzard@kvn.com
7    jlittle@kvn.com
     sagarwal@kvn.com
8

9    *Attorneys for Defendant Agri-Mark, Inc.*

10   STEPTOE & JOHNSON LLP

11   By: /s/  Chong S. Park
     Chong S. Park (*admitted pro hac vice*)
12   Kenneth P. Ewing (*admitted pro hac vice*)
     John J. Kavanagh (*admitted pro hac vice*)
13   STEPTOE & JOHNSON LLP
     1330 Connecticut Avenue, NW
14   Washington, DC  20036
     Telephone (202) 429-3000
15   Facsimile (202) 429-3902
     Email: cpark@steptoe.com
16   Email: kewing@steptoe.com
     Email: jkavanagh@steptoe.com
17

18   Dylan Ruga
     STEPTOE & JOHNSON LLP
19   2121 Avenue of the Stars
     Los Angeles, CA 90067
20   Telephone: (310) 734-3200
     Facsimile: (310) 734-3300
21   Email: druga@steptoe.com

22   *Attorneys for Defendant*
     *National Milk Producers Federation*

23

24

25

26

27

28