STEVEN R. KUNEY (*pro hac vice*)
Email: skuney@wc.com
KEVIN HARDY (*pro hac vice*)
Email: khardy@wc.com
CARL R. METZ (*pro hac vice*)
Email: cmetz@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC  20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Defendant Dairy Farmers of America, Inc.*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MATTHEW EDWARDS, *et al.*, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiffs,<br><br>        v.<br><br>NATIONAL MILK PRODUCERS FEDERATION, aka COOPERATIVES WORKING TOGETHER; DAIRY FARMERS OF AMERICA, INC.; LAND O'LAKES, INC.; DAIRYLEA COOPERATIVE INC.; and AGRI-MARK, INC.,<br><br>                                        Defendants. | Case No. 4:11-CV-04766-JSW (NJV)<br><br>[consolidated with 11-CV-04791-JSW and 11-CV-05253-JSW]<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR *DAUBERT* MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DAVID L. SUNDING**<br><br>Date:   July 24, 2015<br>Time:  9:00 am<br>Dept.:  Courtroom 5<br>Judge:  Hon. Jeffrey S. White |

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ...................................................................................................1

STATEMENT OF ISSUE TO BE DECIDED ........................................................................1

BACKGROUND ........................................................................................................................1

    A.    Over Order Premiums .....................................................................................1

    B.    Class Certification. ...........................................................................................2

    C.    Dr. Sunding's Opinions ..................................................................................2

LEGAL STANDARD ..............................................................................................................3

ARGUMENT .............................................................................................................................4

I.    DR. SUNDING'S REGRESSION MODEL POOLS OOP DATA FROM HIGHLY DISSIMILAR STATES, PRODUCING UNRELIABLE RESULTS. ...................4

    A.    Dr. Sunding's Aggregation or Pooling of Data is Not Reliable. ..................4

II.    KEY INPUTS TO SUNDING'S MODEL ARE INACCURATE AND UNRELIABLE. ........................................................................................................ 10

III.    DR. SUNDING'S MODEL IS NOT GROUNDED IN REALITY. ...................... 13

CONCLUSION ...................................................................................................................... 15

### TABLE OF AUTHORITIES

*A & J Liquor Co., Inc. v. State Compensation Ins. Fund*, 2003 WL 21419826
(Cal. Sup. Ct. Jun. 17, 2003) .......................................................................... 9

*Abrams v. UPS of Am., Inc.*, 200 F.R.D. 424 (E.D. Wis. 2001) ............................... 4, 10

*Bricklayers & Trowel Trades Intern. Pension Fund v. Credit Suisse Sec. (USA) LLC*,
752 F.3d 82 (1st Cir. 2014) ............................................................................ 6

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ........... 14

*Coates v. Johnson & Johnson*, 756 F.2d 524 (7th Cir. 1985) .................................... 9

*Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958 (M.D. Tenn. 2002), *aff'd*
89 Fed.Appx. 927 (6th Cir. 2003) ................................................................... 13

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) ..................................................... 3

*Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) ...................................... 1

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir. 1995) .......................... 14

*Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004) ........................... 5, 9

*Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 189 (N.D. Cal. 2004) ........................... 12

*Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training
Comm.*, 833 F.2d 1334 (9th Cir. 1987) ............................................................ 5

*Gen. Elec. Corp. v. Joiner*, 522 U.S. 136 (1997) .............................................. 13, 14

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) ..................................................... 14

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268
(S.D.N.Y. 2000) ........................................................................................... 7

*Kay v. First Cont'l Trading Co.*, 976 F.Supp. 772 ............................................... 12

*Laumann v. Nat'l Hockey League*, 12-cv-1817 (SAS), 2015 WL 3542322 (S.D.N.Y.
May 29, 2015) ............................................................................................. 14

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988) ...................... 3, 9, 12, 15

*Metabolife Inter., Inc. v. Wornick*, 264 F.3d 832 (9th Cir. 2001) ............................. 3

*MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, 132 F.Supp.2d 289 (S.D.N.Y. 2001) ............. 12

*Paige v. California*, 291 F.3d 1141 (9th Cir. 2002) ............................................................ 4

*Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.*, 49 F.Supp.3d 385, 405 (S.D.N.Y. 2014).................................................................................................................... passim

*Rowe Entm't, Inc. v. Wm. Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP), 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) ............................................................... 10

*Rudwall v. Blackrock, Inc.*, No. C 09-5176, 2011 WL 767965 (N.D. Cal. Feb. 28, 2011)............................................................................................................................ 4

*Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187 (9th Cir. 2007) .................................. 3

*U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, No. 1:02-CV-1168 ....................... 14

*Wal-Mart Stores, Inc. v. Dukes*, 603 F.3d 571 (9th Cir. 2010) (*en banc*), *rev'd* 131 S.Ct. 2541 (2011) ............................................................................. 9

## OTHER AUTHORITIES

Fed. R. Evid. 702 ........................................................................................................ 1, 3, 15

Fed. R. Evid. 703 ................................................................................................................ 1

Federal Judicial Center, *Reference Manual on Scientific Evidence* 256 (3d Ed. 2011) ................... 4

1

## SUMMARY OF ARGUMENT

2   Dr. Sunding is Plaintiffs' expert on the impact and damages purportedly resulting from the

3 CWT Herd Retirement Program (the "Program").  Departing from the methodology Plaintiffs

4 presented for class certification, Dr. Sunding's model combines data on over order premiums

5 ("OOPs")—i.e., the unregulated portion of milk prices, *see* ECF # 123, at 8—from 41 disparate

6 locations into a common pool, and then estimates a single, <u>average</u> effect of herd retirements on

7 OOPs.  Dr. Sunding then uses this average effect to calculate "damages" supposedly caused by the

8 Program.  This use of pooled data is singularly unreliable.  OOPs are highly dissimilar from state to

9 state, both in absolute terms and in how they changed over time.  In many class states, OOPs

10 declined or remained virtually unchanged; as a consequence, Dr. Sunding <u>excluded much of that data</u>

11 <u>from his pool</u>.  Instead, he used data from more than two dozen <u>non-class</u> states whose OOPs masked

12 the lack of impact of the Program in the class states.  Estimating a single relationship across this

13 entire group led Dr. Sunding to find ███████ of his claimed ███████ in Class I damages in

14 states where OOPs, if analyzed in that state alone, show no positive statistical relationship to herd

15 retirements, and $14 million more in states for which he says he lacks reliable OOP data.  Absent his

16 indefensible cherry-picking and pooling of data, Dr. Sunding's model collapses.

17   Second, Dr. Sunding's model is tainted by his use of demonstrably inaccurate data.  He

18 created his own California OOP data, which bears no relation to actual OOPs in that state; he relied

19 on the unrealistic assumption that every cow retired would have remained in production but for the

20 Program; and he mistimed by two years a change in consumer demand that significantly increased

21 OOPs for reasons unrelated to the Program.  No reliable model can be built on such flawed inputs.

22   Third, Dr. Sunding's model is hopelessly disconnected from OOPs in the real world.  He

23 finds massive claimed damages in 2010, when OOPs show no meaningful increase, by predicting

24 that OOPs should have fallen precipitously for just that year, even to <u>negative levels in two key</u>

25 <u>states</u>.  There is no basis in the record of the case or the OOP data for this forecasted plunge and

26 recovery, which accounts for nearly half the estimated damages, and even he admits that OOPs

27 cannot drop to negative numbers.  Dr. Sunding's model's lack of connection to the facts of the

28 marketplace underscores its utter lack of reliability.

### STATEMENT OF ISSUE TO BE DECIDED

Whether the opinions and testimony of David L. Sunding, Ph.D., concerning the impact of the CWT Herd Retirement Program and damages, should be excluded under Rules 702 and 703 of the Federal Rules of Evidence, and *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).

### BACKGROUND

#### A.  Over Order Premiums

Several facts about OOPs are pertinent to this motion.  First, because OOPs are set through private negotiation between buyers and sellers, there is no uniform OOP level throughout the country.  OOPs vary by geography and even by customer due to differences in the relative bargaining power of the parties; local supply and demand conditions; the level of services provided by the seller; and the ability of cooperatives to determine prices collectively (among other factors).[1] This variation is reflected in Dr. Sunding's data, which show significant disparities in both the absolute levels of OOPs (*e.g.*, in 2003 OOPs in Arizona were $0.15 per hundredweight ("/cwt"), while in Wisconsin they were $2.26 /cwt), and in the direction and rates at which they change (*e.g.*, from 2003 to 2010, OOPs in Washington, D.C., and Massachusetts <u>declined</u> slightly, while OOPs in Michigan and Tennessee doubled or nearly doubled).  *See* Ex. 5 (Sunding work paper).

These regional OOP variations are partly explained by the varied presence of Marketing Agencies in Common ("MACs"), whereby cooperatives collectively determine OOP levels for a specified area.  MACs typically increase the bargaining strength of participating cooperatives, enabling them to negotiate higher OOPs.  *See* Ex. 3 ¶¶ 70–75 (Kaplan).  There were MACs in many of the non-class states, but not in California or Arizona, which contributed to the very low OOPs in those states.  *See* Ex. 6 at 226:22–230:10 (Wilson Tr.).  Moreover, OOPs are in significant part designed to recover cooperatives' cost of "balancing" the marketplace,[2] which costs arise primarily due to fluctuations in supply and demand for Class I milk.  *See* Ex. 6 at 81:5–84:19; 101:21–103:22

---

[1]  *See* Ex. 6 at 73:6–16, 105:5–108:23, 238:14–240:9 (Wilson Tr.); Ex. 3 ¶¶ 76–78 (Kaplan).  "Ex. ___" refers to exhibits to the Declaration of Carl R. Metz in Support of Defendants' *Daubert* Motion to Exclude the Opinions and Testimony of David L. Sunding, dated June 17, 2015.

[2]  "Balancing" refers to the disposal of excess milk when supply exceeds demand, and the acquisition of additional milk when demand exceeds supply.  *See* Ex. 7 ¶ 29 (Cropp).

1    (Wilson Tr.).  Class I sales vary dramatically in different parts of the country, from California, where

2    Class I sales make up only about 15% of the pool, *see* Ex. 4 ¶ 30 (Sumner), to the Southeast and

3    Florida Federal Milk Marketing Orders ("FMMOs"), where Class I sales make up 65% and 85% of

4    the pool respectively, *see* Ex. 7 ¶ 30 & Ex. 2 (Cropp).

5        Finally, the most significant increase in OOPs during the class period came in February 2008,

6    when shifting consumer preferences led key retailers to demand that all of their milk be produced

7    without the synthetic growth hormone rBST.  *See* Ex. 6 at 133:14–143:12 (Wilson Tr.); Ex. 8 at

8    211:16–216:6 (Wegner Tr.); Ex. 3 ¶¶ 63–69 (Kaplan).  To raise the funds to incentivize more

9    farmers stop using rBST, many cooperatives began charging rBST-free OOPs ███████████ to

10   most of their Class I customers.  *Id.*  Dr. Sunding admits that this rBST-free related increase in OOPs

11   was <u>not caused</u> by the CWT Program.  Ex. 2 at 260:1–6 (Sunding Tr.).

12       **B.    Class Certification.**

13       In moving for class certification, Plaintiffs' expert Dr. John Connor proffered to the Court a

14   methodology for showing "antitrust impact and [] damages for each Class State, <u>independent of</u>

15   <u>national average data</u>."  ECF # 270 (Connor Supp.), ¶ 20 ("impact and damages can be reasonably

16   and plausibly determined for each Class State independent of national average data"); ¶ 23 (same).

17   If they failed to obtain data for any state, Plaintiffs planned to use data from nearby locations within

18   the same Federal Milk Marketing Order ("FMMO") as a surrogate, *id.* ¶¶ 2, 15, based on their

19   expert's conclusion that while OOPs may be highly correlated for locations within the same FMMO,

20   beyond that, the correlations weaken or even disappear entirely.  ECF # 272 (Connor Supp. Rbtl.), ¶¶

21   17-18.  Relying on that model, the Court granted Plaintiffs' motion for class certification.  Order,

22   ECF # 266, at 11.

23       **C.    Dr. Sunding's Opinions**

24       In contrast to the Plaintiffs' class certification model, Dr. Sunding did not attempt to estimate

25   the impact of the Program from data about the OOPs in that state. Instead, his Class I regression

26   model pools OOP data from 41 locations—28 in non-class states—and computes an <u>average</u> national

27   relationship between herd retirements and OOPs during the Program.  *See* Ex. 2 at 213:9–214:10

28   (Sunding Tr)  That effect is spread out (or "lagged," to use Dr. Sunding's term) across 24 monthly

2

increments that purportedly "capture the effect of the HRP [herd retirement program] on OOP over time." Ex. 1 ¶ 70 (Sunding).  To calculate damages for each class state, Dr. Sunding multiplies the 24 lagged effects by his estimate of the percentage of cows retired pursuant to the Program.[3]

In this model, a finding of "impact" in any given class state does not mean that OOPs increased in that state, or even that Dr. Sunding had reliable OOP data for that state.  Dr. Sunding finds impact and damages in every class state because his national average predicts that OOPs would have been higher wherever herd retirements occurred—and it becomes irrelevant if that particular state's OOPs did not change.  *See* Ex. 2 at 214:11–18 (Sunding Tr.).  This flawed methodology causes Dr. Sunding to estimate that the Program caused damages of ███████ in five states that, when tested separately, show no damages (California, Arizona, Massachusetts, Nebraska and Washington, DC), *see* Ex. 3 ¶¶ 104-05 (Kaplan), as well as ███████ in five other states for which he says there is no reliable OOP data at all, *id.* ¶ 108 & Table 2.[4]

## LEGAL STANDARD

"Rule 702 embodies the twin concerns of 'reliability' and 'helpfulness.'" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).  "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the central concern of Rule 702." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).  "[T]he district court acts as a 'gatekeeper,' excluding 'bad science' that does not carry sufficient indicia of reliability for admission under 702." *Metabolife Inter., Inc. v. Wornick*, 264 F.3d 832, 840–41 (9th Cir. 2001).  Plaintiffs bear the burden of proving that Dr. Sunding's opinions are both relevant and reliable. *Cooper*, 510 F.3d at 942; *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (exclusion of "hopelessly flawed" damages studies resting "on unsupported assumptions" was proper).

---

[3]  Specifically, Dr. Sunding calculated a percentage reduction in the herd in each state and its surrounding "cluster" of states, and multiplied that percentage by his lagged regression coefficients to calculate the overcharge in each class state.  *See* Ex. 2 at 124:19–125:16 (Sunding Tr.).

[4]  Dr. Sunding also created a Class II regression model similar to his Class I model, except it uses data from even fewer class states.  *See* Ex. 1 ¶ 75 (Sunding); Ex. 3 ¶¶ 135–37 (Kaplan).  Some ███ ███ of the ███████ in estimated Class II damages is for states with no Class II OOP data. *Id.*

3

## ARGUMENT

**I.     DR. SUNDING'S REGRESSION MODEL POOLS OOP DATA FROM HIGHLY DISSIMILAR STATES, PRODUCING UNRELIABLE RESULTS.**

Dr. Sunding's Class I and Class II regression models are utterly unreliable to show impact and damages from the Program in the class states.  There are substantial inter-state differences in the levels of OOPs, in the rates at which they changed during the class period, and in the underlying market conditions that cause OOPs to change.  Nonetheless, Dr. Sunding pooled all of his OOP data from class states and non-class states alike, calculated a single estimate of the relationship between OOPs and herd retirements, and then applied that estimate to each state without testing whether it was statistically justifiable to do so.  *See* Ex. 2 at 213:20–214:10; 227:13–228:8 (Sunding Tr.).  His resulting opinions are unreliable and should be excluded.

**A.     Dr. Sunding's Aggregation or Pooling of Data is Not Reliable.**

"[A]ggregated statistical data may be used where it is more probative than subdivided data." *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002).  However, "[u]nless the source material is fairly homogeneous, aggregation can distort patterns in the data."  Fed. Judicial Ctr, *Reference Manual on Scientific Evidence* 256 (3d Ed. 2011).  It is therefore standard practice in econometrics to test whether data from multiple sources can be pooled reliably.  *See* Ex. 3 ¶ 103 (Kaplan).  Similarly, courts accept pooling of data when it is appropriate but recognize the dangers of admitting into evidence expert testimony based upon improperly aggregated data.[5]  Dr. Sunding admits "there are a number of different tests that you can use [] to determine" the suitability of pooling data, *see* Ex. 2 at 222:14–223:3 (Sunding Tr.), and he has used those tests in other cases, such as when he disaggregated farm data from different parts of Kansas because "the pattern of economic activity was very different in [the] two regions."  *Id*. at 230:17–19; *see also* Ex. 9 at 8 (Sunding opinion in *Kansas*

---

[5]  *See Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.*, 49 F.Supp.3d 385, 405 (S.D.N.Y. 2014) ("Pooling problems arise when data from meaningfully different categories are combined together in a regression analysis."); *Abrams v. UPS of Am., Inc.*, 200 F.R.D. 424, 431 (E.D. Wis. 2001) ("[P]laintiffs' somewhat tendentious reliance on aggregate data illustrates the perils and misuses of statistical analysis," as aggregation "masks differences from district to district"); *Rudwall v. Blackrock, Inc.*, No. C 09-5176, 2011 WL 767965, *10 n.11 (N.D. Cal. Feb. 28, 2011) (improper to aggregate data from sources that were not "similarly situated and affected by common policies").

1 | *v. Nebraska*) (because water value varied by location, "basing damages on the average value of

2 | irrigation water leads to an overestimate of actual damages").

3 | But Dr. Sunding applied none of those techniques in this case. Ex. 2 at 222:14–223:3; 224:3–

4 | 226:6 (Sunding Tr.). He did not investigate whether the "pattern of economic activity" in individual

5 | class states, or across his entire group of states, was sufficiently similar to justify analyzing impact in

6 | every state together using a single, average estimate of the effect of herd retirements on OOPs.

7 | Likewise, he applied no recognized statistical test for the validity of his pooling. *Id.* at 227:13–228:8

8 | ("I didn't perform a statistical test, but that was something I considered."). Had he examined OOP-

9 | setting across his pool, Dr. Sunding would have seen that the "pattern of economic activity" in this

10 | case is far from consistent: OOPs are set locally based on local conditions, OOP levels differ

11 | markedly, OOPs in different states and cities do not move together, and, as his own model shows, the

12 | relationship between herd retirements and OOPs varies dramatically from state to state.

13 | 1.   Plaintiffs' class certification expert demonstrated that there is regional variation in

14 | OOP movements. Dr. Connor analyzed the relationship of OOPs in different geographic areas using

15 | some of the same OOP data used by Dr. Sunding. He found that OOPs in "geographically proximate

16 | (say, cities within 100 or 200 miles of each other) DFA cities have very high, positive correlations."

17 | *See* ECF # 272, ¶ 17. But he also found that OOPs in "DFA cities rather remote from one another

18 | tend to have lower, positive correlations," *id.*, and that in several cases, OOPs were not correlated at

19 | all, which he attributed to their being "in separate [F]MMOs." Ex. 10 at 56:9–57:6 (Connor Tr.).

20 | Dr. Sunding ignored this demonstrated regional variation in the movement of OOPs in using a single,

21 | 41-city, nation-wide pool of data. *Cf. Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 158 (N.D.

22 | Cal. 2004) ("*Dukes I*") (approving local aggregation, and distinguishing it from "aggregat[ion] . . . at

23 | the nation-wide level [which] is highly suspect.").

24 | 2.   OOPs in different states and regions are not established through common processes,

25 | or for common reasons. Aggregation of data is more likely to be reliable when it involves "groups

26 | which may be presumed to have been similarly situated and affected by common policies." *Eldredge*

27 | *v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.*, 833 F.2d 1334, 1340

28 | n.8 (9th Cir. 1987). The OOPs in disparate regions of the country are not set through any sort of

1   common policy or process.  To the contrary, OOPs are set locally, either by individual cooperatives

2   or regional MACs, responding to local conditions.  *Supra*, at 1.

3        The vast majority of Dr. Sunding's pooled data comes from areas in which OOPs are

4   determined by MACs, including many of his non-class states in the South and Mideast.  *Compare*

5   Ex. 1, Fig. 6 (OOP data sources map), *with* Ex. 11 (MACs map).  In contrast, seven of the class

6   states, which states account for the bulk of the claimed damages here—California, Oregon, Nevada,

7   Arizona, South Dakota, Nebraska and Kansas—are western states that do not have active MACs.  *Id.*

8   Given the tendency of OOPs to be higher and more prone to change in areas with effective MACs,

9   Dr. Sunding had no reason to assume that changes to OOPs in these class states without MACs

10  would be the same as the changes to OOPs in his national pool.

11       Dr. Sunding also chose to exclude from his analysis any OOP data that followed a pattern he

12  regarded as "uninformative," *see* Ex. 1 ¶¶ 62–63 & n.9 (Sunding), which in practice meant that he

13  excluded OOPs that tended to be very stable throughout the period of the Program.[6]  Tellingly, this

14  screen excluded nearly all of Dr. Sunding's OOP data from western cities:  San Francisco and Los

15  Angeles, CA; Phoenix, AZ; Delta, CO; Salt Lake City, UT; Boise, ID; Amarillo, TX; and Spokane,

16  WA.  *See* Ex. 1 ¶¶ 62–63 & n.9 (Sunding).  The data for these cities and states does show little OOP

17  movement during the class period.  Dr. Sunding has no basis to assume that he can reliably apply his

18  average pooled effect from his 41-city pool to predict the changes in OOPs in these states, and at the

19  same time declare that their OOP movements are so dissimilar from the other states as to require

20  their exclusion from his data set.  *See Bricklayers & Trowel Trades Intern. Pension Fund v. Credit*

21  *Suisse Sec. (USA) LLC*, 752 F.3d 82, 89-92 (1st Cir. 2014) (affirming exclusion of expert that

22

---

23  [6]  Dr. Sunding says he excluded this data due to his suspicion that the data was not accurate because
    it showed few OOP changes.  *See* Ex. 2 at 163:9–164:16 (Sunding Tr.).  That explanation fails.  First,

24  flat OOP data can reflect actual economic conditions in some locations.  *See* Ex. 6 at 177:3–8
    (Wilson Tr.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at 118:22–120:16 ▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dr. Sunding used DFA transactional records to confirm that OOPs were flat
    76.7% of the time in Nashville; nevertheless, he arbitrarily excluded data for Phoenix, which was

26  "flat" less than one percent more often.  *See* Ex. 2 at 177:3–178:10 (Sunding Tr.).  Second, much of
    the excluded data (including Phoenix and Boston) comes from the same USDA data that Dr. Sunding

27  relies upon for other locations, and he can provide no reason to believe that data was accurate for
    some cities but not others.  *See* Ex. 3 ¶ 105 n.265 (Kaplan).

28

1    "cherry-picked unusually volatile days and made them the focus of his study").  By this unjustified

2    cherry-picking and pooling, Dr. Sunding not only finds substantial "impact" in states with flat OOP

3    data, but he generally finds the largest impact per hundredweight in those states.  *See* Ex. 1, Table 5

4    (Sunding).  These estimates are divorced from reality and unreliable.[7]

5        3.    Dr. Sunding confirms that OOP data is not similar across the states for which he

6    pooled data.  Dr. Sunding uses state "fixed effects" in his model because he acknowledges local

7    differences in OOPs in different areas.  These "fixed effect" variables serve to isolate the extent to

8    which the size of an OOP is explained solely by the identity of the city in which it was measured.

9    *See* Ex. 1 ¶ 66 (Sunding).  Dr. Sunding found, for example, that even after considering all of his

10   "control variables," an OOP measured in Miami will tend to be $1.70 higher than would otherwise

11   have been expected, while an OOP measured in El Paso will be $1.33 lower.  *Id.* Appx. D (Sunding).

12   Dr. Sunding cannot justify assuming that, for example, a 1% herd reduction will have the same effect

13   on OOPs in a state with $0.15 OOPs, as in a state with $2.26 OOPs.  *See Johnson Elec. N. Am. Inc.*

14   *v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 283 (S.D.N.Y. 2000) (an "expert must have some

15   reliable basis for extrapolating from the available data").

16       4.    Dr. Sunding's model fails to find common impact when run against individual states

17   or regional groups of states.  To test the reliability of Dr. Sunding's pooling, Defendants' expert

18   David P. Kaplan ran Dr. Sunding's model against Dr. Sunding's OOP data in individual class states.

19   This is a common test of "the reliability of any 'pooled' model," and "is a standard technique used in

20   econometrics."  *See* Ex. 3 ¶ 103 (Kaplan).  When Mr. Kaplan performed this test, he found "no

21   positive and statistically significant relationship between [the] HRP variable and OOPs in California,

22

23   ───────────────
     [7]  Another regional variation that should have raised a caution flag about pooling are the significant
24   differences across the class states in Class I utilization, another known factor driving OOPs.  *See* Ex.
     3 ¶ 76 (Kaplan).  Dr. Sunding's pooled OOP data includes fifteen cities in the Southeast,
25   Appalachian and Florida FMMOs, where Class I utilization is the highest of anywhere in the country
     (~65% to ~85%), and where there are almost no class states.  *See* Ex. 1 Fig. 6 (Sunding); Ex. 7 at Ex.
26   2 (Cropp).  Most of the class states are in regions with far lower Class I utilization, including
     California (~15%), the Upper Midwest (~ 20%), the Pacific Northwest (~30%), and Arizona (~33%).
27   *See* Ex. 7 at Ex. 2 (Cropp); Ex. 4 ¶ 30 (Sumner).  Dr. Sunding conducted no statistical test for
     whether these different utilization rates had an effect on OOPs.  *See* Ex. 2 at 216:14–217:22
28   (Sunding Tr.).

Washington, D.C., and Nebraska." *Id.* ¶ 104. "In fact, I discovered that in California and Washington, D.C. the relationship between his HRP variable and OOPs is <u>negative and statistically significant.</u>" *Id.* (emphasis added). Similarly, when he used USDA OOP data for Phoenix and Boston "the HRP coefficient [is] negative and statistically significant for Boston," *id.* ¶ 105, and there is no statistically-significant relationship for Phoenix, *id.* These states in which the cities show no significant, positive relationship between herd retirements and OOPS account for some █ █ of Dr. Sunding's █ in Class I damages. *See* Ex. 1 Tables 9–10 (Sunding).[8] Whatever average relationship Dr. Sunding's model finds between herd retirements and OOPs when nationwide data is pooled, that same relationship does not exist in at least a third of class states, and there is insufficient data to confirm whether it exists in another third. Ex. 3 ¶ 108 (Kaplan).

Mr. Kaplan also ran Dr. Sunding's model against OOP data for the multi-state "clusters" that Dr. Sunding uses to estimate his herd retirement variable. *See id.* ¶ 107. When he did so, he "found no overcharges in eight of the total of 16 'clusters,' including California, Washington, D.C., Arizona, Massachusetts, Nevada, Oregon, South Dakota, and Vermont," *id.*, indicating that even with a widened set of data, Dr. Sunding cannot find impact consistently across the class states. *See also id.* ¶ 145 & Ex. 34 (similar problem for Dr. Sunding's Class II model).

Finally, Mr. Kaplan also showed that Dr. Sunding's model predicts a substantially different relationship between OOPs and herd retirements if the "pool" includes just OOP data from the thirteen locations in the class states, and not the twenty-eight additional cities Dr. Sunding uses from non-class states. Without data from non-class states, the damages predicted by Dr. Sunding's Class I model decline from █ to █ Ex. 3 ¶ 119 (Kaplan), and from █ to █ █ for Class II. *Id.* ¶ 144. Dr. Sunding is using what he estimates were higher OOP changes caused by Program in the <u>non-class states,</u> which are not at issue here, to improperly inflate his estimated damages in the class states.

5.  <u>Dr. Sunding's model fails a leading statistical test for when data may be pooled reliably</u>. "There are several tests for pooling problems, but many statisticians rely on the Chow test."

---

[8] In Tennessee, where Dr. Sunding finds █ in damages, his model finds no statistically significant relationship in one of the two cities for which there is data. *See* Ex. 3 ¶ 106 (Kaplan).

8

1  *Reed*, 49 F. Supp. 3d at 406; *see also Coates v. Johnson & Johnson*, 756 F.2d 524, 542 (7th Cir.

2  1985) (recognizing the Chow test is a "statistical test[] for whether two or more sets of data may be

3  grouped as a single sample in a statistical model"); *A & J Liquor Co., Inc. v. State Compensation Ins.*

4  *Fund*, 2003 WL 21419826, *40 (Cal. Sup. Ct. Jun. 17, 2003) (Chow test is "a relatively sophisticated

5  statistical test designed to determine the comparability" of two sets of data).[9]

6       In the context of this case, "[t]he Chow Test is designed to determine if the coefficients on

7  the independent variables for the Class States are statistically significantly different from those for

8  Non-Class States." Ex. 3 ¶ 117 (Kaplan). If they are, then "[s]uch a finding supports the conclusion

9  that Sunding should not have pooled data across Class and Non-Class States because the values of

10  the coefficients are different in the Class States compared to the Non-Class States." *Id.* Dr.

11  Sunding's pooled data fails the Chow test for both his Class I and Class II models. *Id.* ¶¶ 117, 144.

12  His pooled regression models do not constitute evidence that professionals in his field would

13  consider reliable, and they should be excluded. *See Reed*, 49 F. Supp. 3d at 506 (excluding pooled

14  regression that failed Chow test); *A & J Liquor Co.*, 2003 WL 21419826 at *40 (same).[10]

15               *         \*         \*         \**

16       For all of these reasons, Dr. Sunding's use of a nationwide pool of OOP data to estimate a

17  single, average effect of herd retirements on OOPs is a methodology that "ignores distinctions

18  crucial to arriving at a valid conclusion," *McGlinchy*, 845 F.2d at 807, and is inadmissible as a result.

19

20                     

[9]  In *Dukes I*, Judge Jenkins agreed that the Chow test "can be used to analyze whether two or more

21  sets of data may be aggregated as a single sample in a statistical model." 222 F.3d at 157. However,

the Court disagreed that the party sponsoring expert testimony should be required as a matter of

22  course "to successfully apply the Chow test before aggregating the data on a regional level," *id.*, and

that holding was affirmed on appeal. *Wal-Mart Stores, Inc. v. Dukes*, 603 F.3d 571 (9th Cir. 2010)

23  (*en banc*), *rev'd* 131 S.Ct. 2541 (2011). The issue here is not whether such a test is always required,

but whether an analysis based upon pooled data is sufficiently reliable to be admissible when it fails

24  the Chow test and bears other substantial indicia of unreliability.

25  [10]  Sometimes aggregating is defended because disaggregated samples are too small to show

statistical significance. No such claim can be made here. The OOP data for individual states and

26  multi-state "clusters" have more than enough observations ("degrees of freedom" per Dr. Sunding) to

support regression models that professional economists would regard as statistically reliable, and Dr.

27  Sunding has used data with fewer observations in his research. *See* Ex. 3 ¶¶ 104 n.264, 107 n.267

28  (Kaplan).

1  *See Reed*, 49 F. Supp. 3d at 405 (excluding opinion based on improperly pooled data); *Abrams*, 200

2  F.R.D. at 431 (same).

3  **II.     KEY INPUTS TO SUNDING'S MODEL ARE INACCURATE AND UNRELIABLE.**

4         Dr. Sunding's model relies upon (1) an unrealistic and untested assumption for his most

5  important input (the percentage of cows retired *as a result of* the Program); (2) erroneous California

6  OOP "data" that he created; and (3) data simulating a demand shock two years later than it occurred.

7  Because statistical "analysis is only as good as the data upon which it rest[s]," *Rowe Entm't, Inc. v.*

8  *Wm. Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP), 2003 WL 22124991, at *4 (S.D.N.Y. Sept. 15,

9  2003), Dr. Sunding's models based upon inaccurate and unreliable data should be excluded.

10        First, Dr. Sunding conducted no analysis to determine the key input to his model:  the

11  percentage of cows retired as a result of the Program.  Instead, he blindly adopted statistics presented

12  by a different economist, Dr. Scott Brown.  *See* Ex. 2 at 181:14–16 (Sunding Tr.) ("So for the herd

13  retirements by state by year and for the total herd size by state by year, that comes from Brown.").

14  However, Dr. Brown's estimate was not designed with courtroom admissibility in mind, *see* Ex. 12

15  at 208:16–19 (Brown Tr.), and his estimate of the reduction in cows attributable to the Program was

16  based on an unrealistic assumption that every retired cow would have remained in active production

17  but for the program's existence.  *Id.* at 210:7–9.  Dr. Brown conceded that other economists had

18  criticized this assumption, and that it was possible cows retired under the program would have been

19  culled anyway.  *Id.* at 211:9–16.

20        It is in fact more than just "possible" that some of the cows Dr. Brown counted would have

21  been retired even absent the Program: "[C]ulling or retiring dairy cows is a normal part of dairy

22  farming with some 25 to 30 percent of all dairy cows retired every year for reasons unrelated to the

23  HRP."  Ex. 3 ¶ 5 (Kaplan); *see also* Ex. 7 ¶ 8 (Cropp) (same).  "[O]ver 20 million dairy cows were

24  culled between 2003 and 2010 and only 2.5 percent of these cows were retired pursuant to the HRP."

25  Ex. 3 ¶ 35 (Kaplan); *see also* Ex. 2 at 63:22–66:15 (Sunding Tr.).  By assuming that every cow

26  retired under the program would have otherwise remained in active production, Dr. Brown attributes

27  to the Program tens of thousands of cow culls that would have occurred anyway.  Dr. Sunding not

28  only accepted that unrealistic assumption, he appeared to be unaware that it had been made.  *See* Ex.

10

2 at 114:12–17 (Sunding Tr.) (could not "remember where [Dr. Brown] got his data" on herd retirements); *id.* at 145:6–146:20 (no knowledge of Dr. Brown's assumptions).  Moreover, Dr. Sunding conceded that he made no attempt of his own to determine what percentage of cows were retired "because of the program." *Id.* at 146:22–147:3.  The key input to Dr. Sunding's model is therefore greatly inflated by an unreliable assumption that he never attempted to verify.[11]

Second, even though Dr. Sunding attributes nearly half of his damages total to OOP increases in California, his model relies upon California OOP "data" of his own invention.  Dr. Sunding had California OOP data available to him, but decided not to use it.  *See* Ex. 1 ¶ 63 n.69 (Sunding).  In its place, he created his own "data" by subtracting what he believed was the minimum price payable to California dairy farmers, from the price that they actually received.  *Id.* ¶ 59.  Dr. Sunding used in his regression the difference in these two figures as his Class I OOP for California.  *Id.*

Dr. Sunding's attempt to derive his own California OOP was ill-conceived and poorly executed.  *See* Ex. 4 ¶¶ 4, 11–18 (Sumner).  Dr. Sunding mistakenly believed that the price that California calls the "Base" price is the minimum price; in reality it is only a portion of the minimum price.  *Id.* ¶ 22.  Dr. Sunding admitted that he is not familiar with California's regulatory pricing scheme, and did not know the meaning of the different pricing categories.  *See* Ex. 2 at 203:14–205:8 (Sunding Tr.).  Daniel Sumner, Ph.D., a California dairy economist with substantial experience analyzing this data, *see* Ex. 4 ¶¶ 1–4 (Sumner), explained Dr. Sunding's mistake, *id.* ¶¶ 19–22, and re-calculated his purported "OOP" using the true minimum regulated price in California, *id.* ¶¶ 23–24.  He found that Dr. Sunding's method consistently produced a <u>negative</u> number, implying "that the price actually charged to California Class 1 processors was less than the minimum price." *Id.* ¶ 24.  Likewise, he found seasonal variation in OOPs that were completely inconsistent with actual California OOPs, which ███████████████  *Id.* ¶ 25.  Dr. Sunding's method of deriving California OOPs leads to impossible and counter-factual results having no relation to actual OOPs.

---

[11]  Notably, in estimating the effect of a Program that accounted for on average only 2.5% of cows slaughtered each year, Dr. Sunding's model ignores any effect of the other 97.5%.  Ex. 3 ¶ 94 (Kaplan).

1      Dr. Sunding's method also fails because he used as the starting point—the "mailbox" price

2   received by dairy farmers—which is influenced by OOPs on other classes of milk apart from Class I,

3   and by costs (e.g., hauling cost).  *See* Ex. 4 ¶¶ 28–29 (Sumner).  As a result, Dr. Sunding's "Class I

4   OOP" could change simply because farmers' costs increased or decreased, or because OOPs on other

5   classes of milk (not at issue in this litigation) increased or decreased.  *Id.* ¶¶ 31, 35.  "Simply put, Dr.

6   Sunding has created and used a set of data that could in no way serve in any regression estimation as

7   a substitute or proxy for data on the actual Class 1 OOPs in California."  *Id.* ¶ 36.

8      <u>Third</u>, Dr. Sunding acknowledges that increases in OOPs resulting from the shift in consumer

9   demand for rBST-free milk were not caused by the Program, *see* Ex. 2 at 260:1–6 (Sunding Tr.), and

10   he included an rBST variable in his model because he needed to control for those effects.  Ex. 1 ¶¶

11   65–66 (Sunding).  The factual record shows that the biggest change in rBST usage and OOPs

12   occurred in February 2008.  *Supra* at 2.  Dr. Sunding's rBST variable, however, places it in <u>2010</u>, the

13   year of his greatest claimed damages, in part because he relied upon USDA survey data that is

14   published every five years:  "Sunding's rBST variable reflects this sea change taking place two years

15   after it happened and, therefore, is not an accurate reflection of the movement to rBST-free milk in

16   the marketplace."  Ex. 3 ¶ 64 (Kaplan).  Given this mistiming, his rBST variable cannot reliably

17   measure the influence of rBST-free demand on OOPs.[12]

18      Plaintiffs bear the burden of proving that their expert relied upon data "of a type reasonably

19   relied upon by experts in the particular field."  *See Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 189,

20   197 (N.D. Cal. 2004) ("*Dukes II*"); Fed. R. Evid. 703.  Plaintiffs cannot make that showing as to Dr.

21   Sunding's herd retirement estimates, his self-generated California OOP "data," or his mistimed rBST

22   conversion data.   His use of this defective information undermines not only his estimated California

23   damages, but the reliability of his entire pooled regression—"garbage in, garbage out." *Kay v. First

24   Cont'l Trading Co.*, 976 F.Supp. 772, 776 (N.D. Ill. 1997); *see also McGlinchy*, 845 F.2d at 807–08

25   (affirming exclusion of damages opinion based upon "unsupported assumptions"); *MTX Commc'ns*

26

27   ───────────────────
[12]  This methodological error is distinct from the substantive issue raised in Defendants' summary
judgment motion that Plaintiffs may not recover damages for rBST-free OOPs because of Dr.

28   Sunding's concession that those OOPs were not caused by the Program.

1   *Corp. v. LDDS/WorldCom, Inc.*, 132 F.Supp.2d 289, 292-93 (S.D.N.Y. 2001) (excluding economic

2   expert who conducted no independent verification of information obtained from third-party); *Coffey*

3   *v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 976 (M.D. Tenn. 2002) (where expert opinion was based

4   upon untested assumptions, "like a house of cards, once those foundations are disproved, the whole

5   analysis collapses"), *aff'd* 89 Fed.Appx. 927 (6th Cir. 2003).

6   **III.    DR. SUNDING'S MODEL IS NOT GROUNDED IN REALITY.**

7          "Experts commonly extrapolate from existing data." *Gen. Elec. Corp. v. Joiner*, 522 U.S.

8   136, 146 (1997).  "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district

9   court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the

10  expert."  *Id.*  At bottom, that is what Dr. Sunding is offering—estimates of the impact of the Program

11  on OOPs that are connected to reality only on his say-so.

12         There are many indicia that Dr. Sunding's regression model is detached from any actual data

13  on OOPs.  He finds nearly half of his Class I damages ████████ out of ██████████ in 2010, a

14  year in which actual OOPs in the class states ██████████ from the year before or after.

15  *Compare* Ex. 1 Table 9 (Sunding), *with* Ex. 13 (USDA OOP data).  Dr. Sunding's basis for that

16  claim is his model's forecast that "but-for" the Program, OOPs would have plummeted in 2010,

17  including to impossible <u>negative</u> values in two states (California and Arizona). Ex. 5 (Sunding work

18  paper).  In other states, the model predicts declines unparalleled in any OOP data, including that in

19  Kansas, "but-for" OOPs would have ██████████ or almost in half. *Id.*  His model then

20  forecasts that just one year later, in 2011, OOPs in this "but-for" world would have miraculously

21  recovered—including increases of ████████████████████████

22  ██████ for reasons unrelated to the Program.  In short, half of his claimed Class I damages rest on

23  the proposition that but-for the Program, OOPs that were ██████████████ would have

24  undergone a one-year crash, followed by a dramatic recovery, making the same OOPs massive

25  "damages" one year and no harm the next.  And ████████ of his ████████ damage estimate for

26  2010 depends upon the proposition that OOPs in California and Arizona would have fallen to

27  negative levels that Dr. Sunding concedes are impossible in the "the real world." *See* Ex. 2 at 314:3–

28  316:7 (Sunding Tr.).  There is no record of any such boom-bust cycles in OOPs, and Dr. Sunding's

13

1    claim that such a cycle would have occurred in 2010 "but-for" the Program is pure *ipse dixit*,

2    unreliable and at odds with the factual record.  *See Brooke Group Ltd. v. Brown & Williamson*

3    *Tobacco Corp.*, 509 U.S. 209, 242 (1993) (disregarding expert evidence "not supported by sufficient

4    facts" or contradicted by undisputed record facts); *Laumann v. Nat'l Hockey League*, 12-cv-1817

5    (SAS), 2015 WL 3542322, at *11 (S.D.N.Y. May 29, 2015) (excluding expert whose "modeling of

6    demand in the [but-for-world]" was "largely untethered from the actual facts of this case" and

7    therefore unreliable).[13]

8         This detachment from reality is further borne out by the inconsistency between where Dr.

9    Sunding finds his greatest "impact" on OOPs, and the actual record of OOPs in those states.  The

10   largest impact is claimed to have occurred in the western states whose OOP data Dr. Sunding found

11   to exhibit little or no upward movement.  *Compare* Ex. 1 Table 5 (Sunding) (Average Annual Impact

12   of HRP on OOP), *with id.* Fig. 8 (graph of "flat" and excluded states).  By Dr. Sunding's measure,

13   actual OOPs in California <u>declined</u> each year from 2003 to 2009, falling from $0.90 /cwt at the

14   beginning of the Program to just <u>$0.01</u> /cwt.  *See* Ex. 5 (Sunding work paper).  Nevertheless,

15   California accounts for fully half of his damages estimate ($89 million combined in Class I and Class

16   II damages), dwarfing the estimates for states that actually saw OOPs increase.  There is simply "too

17   great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146;

18   *Laumann*, 2015 U.S. Dist. LEXIS 63744 at *48–*49 (same).

19        Dr. Sunding is not a dairy economist by training or by trade; he specializes in economic

20   analysis of natural resources, primarily water.  *See* Ex. 2 at 9:21–12:5; 17:7–24:13 (Sunding Tr.).

21   The model he used to estimate the effect of the Program on OOPs is one that he created solely for

22   use in this litigation, and its reliability to predict the relationship between OOPs and herd retirements

23   has never been tested in any non-litigation setting.  *See Daubert v. Merrell Dow Pharm., Inc*., 43

24   F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*") ("very significant fact to be considered is whether the

---

[13] *See also U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, No. 1:02-CV-1168 AJT/TRJ, 2014 WL 8037558, at *20 (E.D. Va. Dec. 24, 2014) (damages model unreliable because it predicted unrealistic changes in prime interest rates that were contradicted by actual record facts); *In re TMI Litig.*, 193 F.3d 613, 671 (3d Cir. 1999) (affirming exclusion of expert based upon unexplained discrepancies between the expert's predictions and actual data).

1   experts are proposing to testify about matters growing naturally and directly out of research they

2   have conducted independent of the litigation, or whether they have developed their opinions

3   expressly for purposes of testifying.").  The implausible results from Dr. Sunding's model are based

4   on, among other things, the specific problems discussed above, including pooling data from

5   dissimilar states and cities to yield a single estimate of the relationship between herd retirements and

6   OOPs; cherry-picking to exclude data from states where OOPs are change very little, and to add data

7   from states where they are more volatile; failing to control many other relevant factors, including

8   most obviously the far greater number of cows that were slaughtered outside the Program,  and

9   creating an inaccurate measure of California OOPs when the actual data was available to him and

10  showed a flat pattern inconsistent with his hypothesis.

11         Mr. Kaplan ran a number of tests on the sensitivity of the model's findings.  He showed, for

12  example, that when one includes a labor cost variable that Dr. Sunding testified he originally

13  intended to include, the damages estimate for the class states to fall to less than ▉▉▉▉▉ and is no

14  longer statistically significant.  Ex. 3 ¶ 120 (Kaplan).  Similarly, a properly timed rBST control

15  variable eliminates a finding of damages for <u>any</u> class state, *id.* ¶ 122, as would the use of yearly

16  fixed effects to control for other variables omitted from Dr. Sunding's model, *id.* ¶ 101; *see also id.*

17  ¶¶ 88–99 (discussing reasons to include yearly fixed effects).  Even just removing Dr. Sunding's

18  OOP data from non-class states and pooling OOPs from the states actually at issue in this litigation

19  would cause the estimated damages to drop by ▉▉▉▉▉▉▉▉▉ *Id.* ¶¶ 117–19.  The key is

20  not the specific sensitivities that Mr. Kaplan explored, but rather that the sensitivity of Dr. Sunding's

21  model to these changes illustrates that what he is holding out as a reliable measure of the impact of

22  the Program is, in reality, a poorly designed house of cards that falls away with the slightest of

23  changes.  "[W]here, as here, very minor changes in arbitrarily selected model parameters can entirely

24  alter the model's conclusions, that model is insufficiently robust to withstand the scrutiny of Rule

25  702." *Reed*, 49 F. Supp. 3d at 407; *McGlinchy*, 845 F.2d at 807 (affirming damages exclusion).

### CONCLUSION

27         For all of these reasons, Dr. Sunding's Class regression models are unreliable to show impact

28  or damages from the CWT Herd Retirement Program, and therefore inadmissible under Rule 702.

| | |
|---|---|
| 1 | Dated:  June 17, 2015 |

By: /s/ *Steven R. Kuney*
Steven R. Kuney (*pro hac vice*)
Email: skuney@wc.com
Kevin Hardy (*pro hac vice*)
Email*:* khardy@wc.com
Carl R. Metz (*pro hac vice*)
Email: cmetz@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Telephone: (202) 434-5000
Fax: (202) 434-5029

Jesse W. Markham Jr.
Email: jmarkham@bakerandmiller.com
BAKER & MILLER PLLC
One Embarcadero Center, Suite 500
San Francisco, California 94111
Telephone: (415) 646-8060
Fax: (415) 433-5994

W. Todd Miller (*pro hac vice*)
Email: tmiller@bakerandmiller.com
Lucy S. Clippinger (*pro hac vice*)
Email: lclippinger@bakerandmiller.com
Amber L. McDonald (*pro hac vice*)
Email: amcdonald@bakerandmiller.com
Ishai Z. Mooreville (*pro hac vice*)
Email: imooreville@bakerandmiller.com
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20037
Telephone: (202) 663-7820
Fax: (202) 663-7849

*Attorneys for Defendant Dairy Farmers of America, Inc.*

By: /s/ *Nathan P. Eimer*
Nathan P. Eimer (*pro hac vice*)
Email: neimer@eimerstahl.com
Scott C. Solberg (*pro hac vice*)
Email: ssolberg@eimerstahl.com
Daniel D. Birk (*pro hac vice*)
Email: dbirk@eimerstahl.com
Benjamin E. Waldin (*pro hac vice*)
Email: bwaldin@eimerstahl.com
EIMER STAHL LLP

16

224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

George A. Nicoud (SBN 106111)
Email: tnicoud@gibsondunn.com
Matthew S. Kahn (SBN 261679)
Email: mkahn@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-2933
Telephone: (415) 393-8200
Fax: (415) 393-8200

*Attorneys for Defendant Land O'Lakes, Inc.*

By: /s/ *Chong S. Park*
Chong S. Park (SBN 163451)
Email: cpark@steptoe.com
Kenneth P. Ewing (*pro hac vice*)
Email: kewing@steptoe.com
John J. Kavanagh (*pro hac vice*)
Email: jkavanagh@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902

Dylan Ruga
Email: druga@steptoe.com
Steptoe & Johnson LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Telephone: 310-734-3200
Fax: 310-734-3300

*Attorneys for Defendant National Milk
Producers Federation*

By: /s/ *Jill M. O'Toole*
Jill M. O'Toole (*pro hac vice*)
Email: Jotoole@goodwin.com
Eric Goldstein (*pro hac vice*)
Email: egoldstein@goodwin.com
SHIPMAN & GOODWIN LLP
One Constitution Plaza

17

1   Hartford, CT 06103
    Telephone: (860) 251-5000
2   Fax: (860) 251-5099

3   Diane Curran Polletta (*pro hac vice*)
4   Email: dpolletta@goodwin.com
    Sarah Josephine McGinley *(pro hac vice)*
5   Email: smcginley@goodwin.com
    SHIPMAN & GOODWIN, LLP
6   300 Atlantic Street , Third Floor
    Stamford, CT 06901
7   Telephone: (203) 324-8179
8   Fax: (203) 324-8199

9   Jan Nielsen Little (SBN 100029)
    KEKER & VAN NEST LLP
10  633 Battery Street
    San Francisco, CA 94111
11  Telephone: (415) 391-5400
12  Fax: (415) 397-7188
    Email: jnl@kvn.com
13
    *Attorneys for Defendant Agri-Mark, Inc.*
14
15  By: /s/ Edward R. Conan
    Edward R. Conan (*pro hac vice*)
16  Email: econan@bsk.com
    Clifford G. Tsan *(pro hac vice)*
17  Email: ctsan@bsk.com
    Suzanne O. Galbato *(pro hac vice)*
18  Email: sgalbato@bsk.com
    BOND, SCHOENECK & KING, PLLC
19  One Lincoln Center
20  Syracuse, NY 13202
    Telephone: (315) 218-8000
21  Fax: (315) 218-8100

22  William S. Farmer (SBN 46694)
23  Email: wfarmer@fbj-law.com
    Jacob P. Alpren (SBN 235713)
24  Email: jalpren@fbj-law.com
    FARMER BROWNSTEIN JAEGER, LLP
25  235 Montgomery St., Suite 835
    San Francisco, CA 94104
26  Telephone: (415) 795-2050
27  Fax: (415) 520-5678
    *Attorneys for Defendant Dairylea*
28  *Cooperative, Inc.*

18