UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JEFFREY S. WHITE, JUDGE

| | |
|---|---|
| MATTHEW EDWARDS, ET AL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFFS, <br><br> VS. <br><br> NATIONAL MILK PRODUCERS FEDERATION, AKA COOPERATIVES WORKING TOGETHER; DAIRY FARMERS OF AMERICA, INC.; LAND O'LAKES, INC.; DAIRYLEA COOPERATIVE INC.; AND AGRIMARK, INC., <br><br> DEFENDANTS. | NO. C 11-4766 JSW <br><br> OAKLAND, CALIFORNIA <br><br> FRIDAY <br> DECEMBER 16, 2016 <br> 9:00 O'CLOCK A.M. |

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

FOR PLAINTIFFS:       **HAGENS BERMAN SOBOL SHAPIRO, LLP**
715 HEARST AVENUE, SUITE 202
BERKELEY, CALIFORNIA 94710
            **BY:   JEFF D. FRIEDMAN, ESQUIRE**
AND

            **HAGENS BERMAN SOBOL SHAPIRO, LLP**
1918 EIGHTH AVENUE, SUITE 3300
SEATTLE, WASHINGTON 98101
            **BY:   STEVE W. BERMAN, ESQUIRE**

FURTHER APPEARANCES ON NEXT PAGE

**FURTHER APPEARANCES:**

**FOR DEFENDANT NATIONAL MILK PRODUCERS FEDERATION:**

**STEPTOE & JOHNSON, LLP**

1330 CONNECTICUT AVENUE, NW

WASHINGTON, DC 20036-1795

**BY:  JOHN J. KAVANAGH, III, ESQUIRE**


**FOR DEFENDANT DAIRY FARMERS OF AMERICA:**

**BAKER & MILLER LLC**

SUITE 500

ONE EMBARCADERO CENTER

SAN FRANCISCO, CALIFORNIA 94111

**BY:  JESSE W. MARKHAM, JR. ESQUIRE**


**FOR OBJECTOR JOSHUA HOLYOAK:**

COMPETITIVE ENTERPRISE INSTITUTE

1310 L STREET NW, 7TH FLOOR

WASHINGTON, DC 20005

**BY:  ANNA ST. JOHN, ATTORNEY AT LAW**


**FOR OBJECTOR MICHAEL O'BRIAN:**

**SAM MIORELLI, ESQUIRE**

764 ELLWOOD AVENUE

ORLANDO, FLORIDA 32804

FURTHER APPEARANCES ON NEXT PAGE

1    **FURTHER APPEARANCES:**

2    **OBJECTOR CHRISTOPHER ANDREWS (PRO SE)**

3    VIA TELEPHONE

4

5

6    *REPORTED BY:   KATHERINE WYATT, CSR 9866, RMR, RPR*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DECEMBER 16, 2016**                    **9:00 O'CLOCK  A.M.**

**P R O C E E D I N G S**

**THE COURT:**  GOOD MORNING, EVERYBODY.

PLEASE CALL THE CASE.

**THE CLERK:**  CALLING CASE NUMBER C-11-4766, MATTHEW

EDWARDS, ET AL VERSUS THE NATIONAL MILK PRODUCERS FEDERATION, ET

AL.

COUNSEL, PLEASE STEP FORWARD TO THE PODIUMS, AND STATE YOUR

APPEARANCES.

**MR. BERMAN:**  GOOD MORNING, YOUR HONOR.  STEVE BERMAN ON

BEHALF OF THE PLAINTIFFS IN THE PROPOSED SETTLEMENT CLASS.

**THE CLERK:**  PLEASE SPEAK INTO THE MIC.

**THE COURT:**  I HEARD YOU.  FOR THE FUTURE, PLEASE SPEAK

INTO THE MICROPHONE.

**MR. FRIEDMAN:**  GOOD MORNING, YOUR HONOR.  JEFF FRIEDMAN

FROM HAGENS BERMAN.

**THE COURT:**  ALL RIGHT.

**MR. MARKHAM:**  GOOD MORNING, YOUR HONOR.  JESSE MARKHAM,

BAKER & MILLER FOR DEFENDANT DAIRY FARMERS OF AMERICA.

**THE COURT:**  NICE TO SEE YOU, MR. MARKHAM.

**MR. MARKHAM:**  GOOD TO SEE YOU.

**MR. KAVANAGH:**  GOOD MORNING, YOUR HONOR.  JOHN KAVANAGH

FROM STEPTOE & JOHNSON, WASHINGTON, DC, FOR NATIONAL MILK

PRODUCERS FEDERATION.

1    **THE COURT:**  GOOD MORNING.

2    **MR. MARKHAM:**  GOOD MORNING.

3    **MR. MIORELLI:**  GOOD MORNING, YOUR HONOR.  I'M SAM

4    MIORELLI, SOLE PRACTITIONER, REPRESENTING OBJECTOR O'BRIAN.

5    **THE COURT:**  GOOD MORNING.

6    **MS. ST. JOHN:**  GOOD MORNING, YOUR HONOR.  ANNA ST. JOHN

7    WITH THE COMPETITIVE ENTERPRISE INSTITUTE FOR CLASS ACTION

8    FAIRNESS FOR JOSHUA HOLYOAK.

9    **THE COURT:**  GOOD MORNING.

10    I WOULD SUGGEST EVERYBODY BE SEATED AT COUNSEL TABLE BECAUSE

11    I'M GOING TO SAY A FEW THINGS.  I DON'T WANT TO TIRE PEOPLE OUT.

12    I ALSO UNDERSTAND WE HAVE A PERSON ON THE PHONE.

13    WOULD YOU PLEASE -- MR. ANDREWS, WOULD YOU PLEASE IDENTIFY

14    YOURSELF FOR THE RECORD?

15    **OBJECTOR ANDREWS (BY PHONE):**  YES, YOUR HONOR.

16    CHRISTOPHER ANDREWS, PRO SE OBJECTOR.

17    **THE COURT:**  ALL RIGHT.  WELCOME.  AND CAN YOU HEAR THE

18    COURT AND THE PEOPLE WHO SPOKE BEFORE?

19    **OBJECTOR ANDREWS (BY PHONE):**  YES, YOUR HONOR.

20    **THE COURT:**  ALL RIGHT, VERY WELL.  OKAY.  SO LET ME GO

21    FORWARD WITH MY REMARKS TO KIND OF SET THE SCENE HERE AND LAY OUT

22    THE STRUCTURE OF THIS PARTICULAR HEARING.

23    SO, THERE ARE TWO MOTIONS ON OUR CALENDAR TODAY:  THE

24    PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE CLASS ACTION

25    SETTLEMENT, WHICH IS DOCKET NUMBER 451, AND PLAINTIFFS' MOTION

FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS, WHICH IS DOCKET

NUMBER 436.

ALSO PENDING ARE TWO OTHER RELATED MOTIONS.  THE COURT FINDS

THAT ARGUMENT ON THESE MOTIONS IS UNNECESSARY, AND THE COURT

SHALL ADDRESS THEM ON THE PAPERS.

THOSE ARE THE FOLLOWING:  OBJECTOR CHRISTOPHER ANDREWS'

MOTION TO SUPPRESS, WHICH IS DOCKET NUMBER 455, AND PLAINTIFFS'

MOTION TO STRIKE OBJECTOR CONNER ERWIN'S REPLY TO PLAINTIFFS'

CONSOLIDATED RESPONSE TO OBJECTIONS, WHICH IS DOCKET NUMBER 466.

SO, AGAIN, AS TO THOSE TWO MOTIONS THAT THE COURT JUST

SUMMARIZED THERE WILL BE NO FURTHER ARGUMENT.  THE COURT WILL

DECIDE THOSE MATTERS ON THE PAPERS.

NOW, WHAT I WOULD LIKE TO DO IS OUTLINE THE PROCEDURE THAT I

INTEND TO FOLLOW TODAY.  FIRST, THE COURT WILL CONFIRM ON THE

RECORD WHO IS PRESENT, AND THEN THE COURT WILL OUTLINE SOME

TENTATIVE THOUGHTS ABOUT THE ISSUES PRESENTED AND THE GENERAL

QUESTIONS ON WHICH IT WOULD BE MOST HELPFUL FOR THE COURT TO HEAR

ARGUMENT.

THEN THE COURT WILL GIVE ANY CLASS MEMBERS WHO ARE PRESENT

AN OPPORTUNITY TO BE HEARD.  FINALLY, THE COURT HAS SOME

QUESTIONS FOR THE PARTIES.  AND AT THAT POINT I'LL BRING COUNSEL

UP.

ALL PARTIES AND OBJECTORS SHOULD BE AWARE THAT THIS COURT

DOES NOT PERMIT PARTIES TO REARGUE THE ISSUES PRESENTED IN THE

PAPERS.  ALL ARGUMENTS, OBJECTIONS AND OTHER BRIEFS SUBMITTED IN

WRITING WILL BE CONSIDERED AND SHOULD NOT BE REPEATED HERE.  AND

THE COURT IS FAMILIAR WITH ALL OF THE AUTHORITIES AND ARGUMENTS

MADE BY THE PARTIES IN THEIR WRITTEN DOCUMENTS.

SO PLEASE CONFINE YOUR ARGUMENTS TODAY TO RESPONDING TO THE

COURT'S QUESTIONS AND RESPONDING TO ISSUES RAISED IN ANOTHER

PARTY'S PAPERS TO WHICH YOU HAVE NOT YET HAD AN OPPORTUNITY TO

RESPOND.

SO NOW I'M GOING TO START WITH THE GENERAL TOPIC OF WHO IS

PRESENT.  AND BEFORE WE GET TO THAT, THE COURT HAS REVIEWED

WRITTEN OBJECTIONS FROM THE FOLLOWING PEOPLE: CHRISTOPHER

ANDREWS, NUMBER ONE, HAD SEVERAL OBJECTIONS, INCLUDING OBJECTIONS

REGARDING THE ELECTRONIC NOTICE PLAN, SUPPORTED BY VARIOUS

DOCUMENTS, INCLUDING A COPY OF A LETTER BY TODD P. HILSEE,

H-I-L-S-E-E, OF THE HILSEE GROUP, LLC, NUMBER ONE.  NUMBER TWO,

SUSAN M. SMYTHE, S-M-Y-T-H-E, CONCERNS REGARDING INVOLVEMENT OF

THE COMPASSION OVER KILLING GROUP IN DEVELOPING THIS CASE, AS

WELL AS THE NATURE OF THE REMEDY.

THREE, THOMAS M. MONTEITH, M-O-N-T-E-I-T-H.  MR. MONTEITH IS

A DAIRY FARMER WHO IS CONCERNED THAT PLAINTIFFS' CASE LACKS

MERIT.

FOUR, DEREK, D-E-R-E-K, ENGLAND.  MR. ENGLAND IS A DAIRY

FARMER WHO IS CONCERNED THAT THE REMEDY DOES NOT INCLUDE

INJUNCTIVE RELIEF AND HAS CONCERNS REGARDING HOW THE SETTLEMENT

WILL BE FUNDED BY DEFENDANTS.

FIVE, JOSHUA HOLYOAK, H-O-L-Y-O-A-K, REPRESENTED BY THE

CENTER FOR CLASS ACTION FAIRNESS.  AND HE MAKES AN OBJECTION

REGARDING THE SIZE AND CALCULATION OF THE REQUESTED FEE AWARD AND

AN OBJECTION REGARDING THE LACK OF END DATE IN THE CLASS

DEFINITION.

SIX, CONNER ERWIN, E-R-W-I-N, HAS AN OBJECTION REGARDING THE

SIZE AND CALCULATION OF THE REQUESTED FEE AWARD, OBJECTION

REGARDING THE AWARD OF A LUMP SUM FEE FOR COUNSEL TO DISTRIBUTE

AMONGST THEMSELVES.

SEVEN, MICHAEL ANTONIO OR TONY O'BRIAN, O-'-B-R-I-A-N,

OBJECTIONS REGARDING THE FOLLOWING:  A MISAPPREHENSION OF THE

WEST VIRGINIA CLASS.  I'M SORRY.  LET ME START OVER AGAIN.

FIRST, A MISAPPREHENSION THAT THE WEST VIRGINIA CLASS WAS

NEVER CERTIFIED.  A PROPOSED DIFFERENT -- PROPOSED DIFFERENT

PAYMENTS TO INDIVIDUAL AND INSTITUTIONAL PLAINTIFFS, INADEQUATE

INFORMATION REGARDING THE DISTRIBUTION PLAN, THE RELEASE OF THE

SETTLEMENT AGREEMENT, THE SIZE OF THE RECOVERY, THE POSSIBLE USE

OF GROCERY LOYALTY CARDS TO DISTRIBUTE FUNDS TO CLASS MEMBERS,

THE INCENTIVE AWARDS TO THE REPRESENTATIVE CLASS MEMBERS, THE

SIZE OF THE REQUESTED FEE AWARD, AND THE DISTRIBUTION OF A FEE

AWARD AMONG COUNSEL.

AND, FINALLY, NUMBER EIGHT, PAMELA A. SWEENEY,

S-W-E-E-N-E-Y, HAD NUMEROUS OBJECTIONS.  MS. SWEENEY HAS NOTIFIED

THE COURT THAT SHE DOES NOT INTEND TO APPEAR TODAY.  THE COURT

SHALL CONSIDER HER OBJECTIONS, AS WELL AS ALL THE OTHER

OBJECTORS' OBJECTIONS FULLY ON THE PAPERS.

1    NOW, ALTHOUGH COUNSEL HAS ANNOUNCED THEIR APPEARANCES, ARE

2  ANY OF THOSE INDIVIDUALS PRESENT DIRECTLY OR THROUGH COUNSEL?

3  THE COURT, OF COURSE, IS AWARE THAT OBJECTOR, CHRISTOPHER

4  ANDREWS, IS PRESENT BY TELEPHONE.

5    PLEASE IDENTIFY YOURSELF AND YOUR CLIENTS, OBJECTORS.  YOU

6  CAN COME FORWARD AND DO THAT, PLEASE.

7    **MR. MIORELLI:**  YOUR HONOR, I'M SAM MIORELLI, AND I

8  REPRESENT OBJECTOR O'BRIAN.

9    **THE COURT:**  OKAY.

10    **MS. ST. JOHN:**  GOOD MORNING, YOUR HONOR.  ANNA ST.

11  JOHN.  I REPRESENT JOSH HOLYOAK.

12    **THE COURT:**  OKAY.  THANK YOU VERY MUCH.

13    ARE THERE ANY OTHER CLASS MEMBERS PRESENT OTHER THAN THE

14  ONES IDENTIFIED, INCLUDING MR. ANDREWS, WHO WISH TO BE HEARD ON

15  ANY OBJECTIONS?

16    ANYBODY ELSE?  OKAY.

17    ALL RIGHT.  SO LET ME MOVE ON TO THE COURT'S TENTATIVE

18  ANALYSIS AND QUESTIONS.

19    THE COURT'S REVIEW OF THIS PROPOSED CLASS ACTION SETTLEMENT

20  IS GOVERNED BY RULE 23E OF THE FEDERAL RULES OF CIVIL PROCEDURE.

21  THAT RULE GENERALLY REQUIRES THE COURT TO, QUOTE:

22    "TO DETERMINE WHETHER A PROPOSED SETTLEMENT IS

23    FUNDAMENTALLY FAIR, ADEQUATE AND REASONABLE," UNQUOTE,

24  CITING HANLON, H-A-N-L-O-N, VERSUS CHRYSLER CORP., 150 F3RD 1011

25  AT 1026, NINTH CIRCUIT CASE DECIDED IN 1998.

1    QUOTE:

2         "IT IS THE SETTLEMENT TAKEN AS A WHOLE, RATHER THAN THE

3         INDIVIDUAL COMPONENT PARTS, THAT MUST BE EXAMINED FOR

4         OVERALL FAIRNESS," UNQUOTE, CITING FROM THE SAME HANLON

5    CASE.

6         AT THE FINAL APPROVAL STAGE, THE COURT BALANCES THE

7    FOLLOWING NINE EXHAUSTIVE FACTORS TO EVALUATE THE FAIRNESS OF THE

8    PROPOSED SETTLEMENT, QUOTE:

9         "THE LENGTH OF THE PLAINTIFFS' CASE; THE RISK,

10        EXPENSE, COMPLEXITY AND LIKELY DURATION OF FURTHER

11        LITIGATION, THE RISK OF MAINTAINING CLASS ACTION STATUS

12        THROUGHOUT THE TRIAL, THE AMOUNT OFFERED IN SETTLEMENT, THE

13        EXTENT OF DISCOVERY COMPLETED AT THE STAGE OF THE

14        PROCEEDINGS, THE EXPERIENCE AND VIEWS OF COUNSEL, THE

15        PRESENCE OF A GOVERNMENTAL PARTICIPANT, AND THE REACTION OF

16        THE CLASS MEMBERS TO THE PROPOSED SETTLEMENT," UNQUOTE.

17        AND THAT'S HANLON AT 150 F.3D AT 1026.

18        WITH REGARD TO ATTORNEYS' FEES, THE COURT CONSIDERS WHETHER

19   THE FEE AWARD REQUESTED IS REASONABLE IN THE CIRCUMSTANCES,

20   INCLUDING AMONG OTHER FACTORS, ONE:  THE RESULTS ACHIEVED; TWO,

21   THE RISK INVOLVED WITH THE LITIGATION; THREE, THE SKILL REQUIRED

22   AND QUALITY OF WORK BY COUNSEL; FOUR, THE CONTINGENT NATURE OF

23   THE FEE; AND, FIVE, AWARDS MADE IN SIMILAR CASES.

24        AND THERE THE COURT HAS REFERENCE TO VIZCAINO,

25   V-I-Z-C-A-I-N-O, VERSUS MICROSOFT, 290 F.3D, 1043 AT 1048 THROUGH

1    50, NINTH CIRCUIT CASE DECIDED IN 2002.

2         HAVING REVIEWED THE PAPERS, INCLUDING ALL OF THESE

3    OBJECTIONS, THE COURT IS TENTATIVELY INCLINED TO FIND THAT THESE

4    FACTORS STRONGLY FAVOR THE PROPOSED SETTLEMENT, LEAVING ASIDE FOR

5    THE MOMENT NOTICE AND DISTRIBUTION ISSUES.

6         THIS IS A HIGHLY-COMPLEX CASE THAT PRESENTED SIGNIFICANT

7    LEGAL ISSUES, CHALLENGES AND RISKS.  THE LITIGATION WAS AT AN

8    ADVANCED STAGE.  DISCOVERY WAS COMPLETED AND REVIEWED BY THE

9    PARTIES, PENDING MOTIONS AT THE TIME OF SETTLEMENT, INCLUDED

10   CHALLENGES TO PLAINTIFFS' EXPERT ON IMPACT AND DAMAGES UNDER THE

11   DAUBERT CASE, A MOTION FOR DECERTIFICATION THAT PRESENTED

12   COMPELLING LEGAL AND FACTUAL ISSUES NOT PRESENT AT THE TIME OF

13   CERTIFICATION, AND A MOTION FOR SUMMARY JUDGMENT.

14        IT WAS ENTIRELY POSSIBLE THAT THE CLASS WOULD RECOVER

15   NOTHING, EITHER DUE TO THE PENDING MOTIONS OR DUE TO THE OUTCOME

16   AT TRIAL, WHICH IS ALWAYS A RISK.

17        ADDITIONAL LITIGATION AND APPEALS WOULD BE TIME-CONSUMING

18   AND EXPENSIVE.  THE PARTIES HAVE PERSUASIVELY SHOWN THAT THE

19   SETTLEMENT WAS THE RESULT OF EXTENDED, INFORMED, GOOD FAITH

20   ARM'S-LENGTH NEGOTIATIONS WITH THE HELP OF A REPUTABLE NEUTRAL IN

21   A HARD-FOUGHT CASE.

22        IN LIGHT OF ALL THESE FACTORS, THE COURT IS TENTATIVELY

23   INCLINED TO HOLD THAT THE AMOUNT OF THE SETTLEMENT FUND IS

24   REASONABLE, LEAVING ASIDE AGAIN FOR THE MOMENT ISSUES OF

25   DISTRIBUTION, FEES, EXPENSES AND SO ON.

 1       ADDITIONALLY, ONLY EIGHT OBJECTIONS HAVE BEEN RECEIVED BY

 2   THE COURT.  THAT IS AN IMPRESSIVELY LOW NUMBER FOR A CLASS OF

 3   THIS SIZE, EVEN CONSIDERING THE LIMITATIONS OF THE NOTICE

 4   PROCEDURE.

 5       THE COURT DOES HAVE SOME CONCERNS ABOUT THE NOTICE AND PLAN

 6   OF DISTRIBUTION, AND LATER IN THE PROCEEDINGS WILL ASK ADDITIONAL

 7   QUESTIONS ABOUT THIS.

 8       NOW THAT THE NOTICE PROCEDURE OUTLINED BY PLAINTIFFS AND THE

 9   CLASS ADMINISTRATOR HAS BEEN PUT INTO EFFECT, THE COURT IS

10   TROUBLED BY THE FACT THAT APPROXIMATELY 25 PERCENT OF THE CLASS

11   RECEIVED NO NOTICE, AND MAYBE MORE, DEPENDING UPON THE MEANING

12   OF, QUOTE, "IMPRESSIONS," UNQUOTE, OF BANNER ADS.

13       MOREOVER, AS FOR THE FILING OF THE MOTION FOR FINAL

14   APPROVAL, THE NOTICE PLAN RESULTED IN ONLY 307,521 CLASS MEMBERS

15   SUBMITTING CLAIMS.  IN OTHER WORDS, LESS THAN HALF OF 1 PERCENT

16   OF THE APPROXIMATELY 73 MILLION CLASS MEMBERS.

17       IN OTHER WORDS, THE NOTICE AND DISTRIBUTION PLAN WILL RESULT

18   IN NO BENEFIT WHATSOEVER TO THE OVERWHELMING MAJORITY OF THE

19   CLASS, MORE THAN 99-AND-A-HALF PERCENT OF THE CLASS RECEIVING

20   NOTHING.

21       ON THE OTHER HAND, THERE'S A SIZABLE WINDFALL TO THOSE CLASS

22   MEMBERS WHO STEP FORWARD.  THE COURT NOTES THAT ITS CONCERNS

23   ABOUT THE PLAN OF NOTICE AND DISTRIBUTION WOULD LIKELY APPLY

24   EQUALLY IF THE CASE HAD PROCEEDED TO TRIAL AND PLAINTIFFS HAD

25   PREVAILED.

THESE CONCERNS ARE NOT PRIMARILY A RESULT OF THE SETTLEMENT ITSELF, BUT RATHER OF THE NOTICE AND DISTRIBUTION PLAN.  THE COURT WILL BE INTERESTED TO HEAR ARGUMENT ON WHETHER ADDITIONAL NOTICE MAY BE APPROPRIATE AND WORTHWHILE FROM A COST PERSPECTIVE TO ATTEMPT TO IMPROVE THESE NUMBERS, AND POSSIBLY TO REACH CLASS MEMBERS WHO MAY HAVE LIMITED OR NO INTERNET ACCESS.

THE COURT WOULD ALSO BE INTERESTED TO HEAR MORE ABOUT THE DISTRIBUTION PLAN.  PLAINTIFFS ORIGINALLY REFERRED TO THE POSSIBILITY OF A SECOND ROUND DISTRIBUTION REGARDING LOYALTY CARDS, GROCERY LOYALTY CARDS, BUT NOW APPEAR TO BELIEVE THAT COMPLETE EXHAUSTION OF THE FUNDS IN THE FIRST ROUND OF DISTRIBUTION WOULD BE MORE COST EFFECTIVE FOR THE CLASS.

THE COURT WOULD BE INTERESTED TO KNOW IF A GROCERY LOYALTY DISTRIBUTION WOULD HAVE THE EFFECT OF REACHING MORE CLASS MEMBERS.  THE COURT WILL ASK MORE QUESTIONS ABOUT THESE ISSUES LATER, BUT WANTED TO PROVIDE A PREVIEW OF THEM TO GUIDE THE OBJECTORS IN CONSIDERING WHAT TO ADDRESS.

THE COURT NOTES THAT VARIOUS OBJECTORS HAVE RAISED NUMEROUS OTHER ISSUES, SOME OF WHICH RELATE TO THE REQUESTED AWARD OF ATTORNEY'S FEES.

THE COURT IS TENTATIVELY INCLINED TO FIND THAT SOME OF THE OBJECTIONS ARE WELL-TAKEN AND THAT A FEE AWARD CLOSER TO THE NINTH CIRCUIT'S BENCHMARK IS APPROPRIATE HERE RATHER THAN THE FEE AWARD REQUESTED BY CLASS COUNSEL.  THOSE ISSUES, HOWEVER, HAVE BEEN WELL BRIEFED AND THE COURT DOES NOT WISH ANYONE TO REPEAT

1    WHAT WAS SAID IN THEIR PAPERS.

2         PLEASE AVOID ARGUMENT ON THIS ISSUE EXCEPT AS DIRECTLY

3    REQUESTED BY THE COURT.  ONE FINAL NOTE REGARDING TODAY'S ORAL

4    ARGUMENT.  THE PARTIES BRIEFED EXTENSIVELY WHICH OBJECTORS ARE OR

5    ARE NOT SO-CALLED, QUOTE, "PROFESSIONAL OBJECTORS," UNQUOTE.  THE

6    COURT DOES NOT NEED TO HEAR ARGUMENT ON THESE ISSUES.  THE COURT

7    WISHES TO HEAR, RATHER, SUBSTANTIVE DISCUSSION OF THE SETTLEMENT

8    AND THE MERITS OF THE PENDING MOTIONS AND OBJECTIONS TODAY, AND

9    NOT AD HOMINEM OR PERSONAL ATTACKS ON THE PEOPLE MAKING VARIOUS

10   ARGUMENTS.

11        SO NOW, I'M GOING TO LET THE OBJECTORS SPEAK.  THE COURT

12   WILL HEAR FIRST FROM ANY OBJECTORS WHO ARE PRESENT IN THE

13   COURTROOM AT THIS TIME REGARDING WHETHER -- REGARDLESS OF WHETHER

14   THESE OBJECTORS FILED WRITTEN RESPONSES.  AFTER THAT, THE COURT

15   WILL HEAR FROM OBJECTOR CHRISTOPHER ANDREWS, BY TELEPHONE.

16        AGAIN, I ASK COUNSEL AND MR. ANDREWS, WHEN IT'S YOUR TURN,

17   TO BE AS BRIEF AS POSSIBLE, AND DO NOT REPEAT ANYTHING IN YOUR

18   WRITTEN OBJECTIONS, WHICH THE COURT HAS READ AND CONSIDERED.

19        YOU SHOULD LIMIT YOUR COMMENTS TO RESPONSES TO PLAINTIFFS'

20   OPPOSITION OR THE QUESTION ABOUT THE DISTRIBUTION PLAN AND WHAT

21   ADDITIONAL NOTICE IS APPROPRIATE.

22        SO LET ME START NOW WITH HERE -- MAYBE THE FIRST ONE OF THE

23   OBJECTORS CAN COME FORWARD THROUGH COUNSEL AND ADDRESS THE COURT.

24        AND WOULD YOU MIND RESTATING ON YOUR NAME AND WHO YOU

25   REPRESENT?

1          **MR. MIORELLI:** THANK YOU, YOUR HONOR, GOOD MORNING, I'M

2     SAM MIORELLI.  I REPRESENT OBJECTOR O'BRIAN.  I JUST WANT TO

3     START OFF:  WE'RE WITHDRAWING THE WEST VIRGINIA ARGUMENT.  WE

4     APOLOGIZE FOR MISUNDERSTANDING ON THAT ONE.  AND THANK YOU FOR

5     YOUR COMMENTS ON THE AD HOMINEM ATTACKS.

6          THE FIRST THING WE WANT TO TALK ABOUT IS ON THIS NOTICE

7     PLAN.  AND WE THINK PART OF THE PROBLEM WITH THE NOTICE IS NOT

8     JUST HOW FEW PEOPLE RECEIVED THE NOTICE, BUT ALSO HOW OPAQUE THE

9     NOTICE WAS.

10          EVEN IF YOU SAW THE NOTICE, BECAUSE THE DISTRIBUTION PLAN

11    WAS SECRET AS FAR AS WHETHER YOU WOULD GET 1X OR 28X, AS CLASS

12    COUNSEL HAS CLAIMED NOW, AFTER THE OBJECTION AND OPT-OUT DEADLINE

13    HAS PASSED, AND ALSO BECAUSE SO MANY OF THE EXPERT REPORTS WERE

14    REDACTED.

15          AND THIS IS NOT AN ARGUMENT THAT THE COURT WAS NOT CAREFUL

16    IN DEALING WITH THE VARIOUS MOTIONS TO SEAL PARTS OF THE RECORD.

17    BUT AT THIS POINT CLASS MEMBERS HAVE TO HAVE AS PART OF ADEQUATE

18    NOTICE A REASONABLE WAY TO UNDERSTAND WHAT THEY ARE GIVING UP AS

19    FAR AS THEIR CLAIMS AND WHAT THEY MIGHT GET.

20          NOW, IF THIS WAS A PURE PRO RATA DISTRIBUTION I THINK THAT

21    THERE'S ADEQUATE CASE LAW THAT WOULD SUGGEST THAT MAYBE YOU SHRUG

22    YOUR SHOULDERS AND SAY:

23               "PRO RATA IS PRO RATA AND YOU WILL SEE WHAT YOU GET."

24          BUT THIS ISN'T PRO RATA.  THIS IS ACTUALLY CLASS COUNSEL

25    MAKING A DECISION AND PLAYING FAVORITES AMONGST THE VARIOUS CLASS

1    MEMBERS.  AND BECAUSE OF THAT IT MAKES IT MORE DIFFICULT, NAY

2    IMPOSSIBLE, FOR SOMEONE WHO GOES TO THE BOUGHT MILK WEBSITE HAVE

3    ANY IDEA WHAT THEY GET IF THEY JOIN THE SETTLEMENT OR IF THEY

4    DON'T JOIN THE SETTLEMENT.

5        AND WE THINK THAT'S WHAT MOTIVATES THE LOW CLAIMS RATE.  BUT

6    WE ALSO THINK THAT RENDERS THE NOTICE FUNDAMENTALLY INADEQUATE,

7    BECAUSE THERE'S NO WAY FOR AN AVERAGE CLASS MEMBER, PARTICULARLY

8    ONE WITHOUT REPRESENTATION OF COUNSEL, WHO MIGHT KNOW WHAT

9    HISTORICAL CLAIM RATES ARE, TO HAVE ANY IDEA WHAT THEY ARE GOING

10   TO GET BY SUBMITTING THIS FORM.

11       THE OTHER THING --

12       **THE COURT:**  ARE YOU GOING TO ADDRESS, HOWEVER, IF YOU

13   WERE IN THE COURT'S POSITION OR IF IT WAS UP TO YOU OR, MORE

14   IMPORTANTLY, WHAT THE LAW REQUIRES, HOW WOULD YOU CHANGE THE

15   NOTICE IN A WAY THAT WOULD -- IF NOT SATISFY YOUR CLIENT, AT

16   LEAST BE MORE LIKELY TO GAIN A GREATER -- WELL, TO GIVE -- TO

17   REACH A LARGER NUMBER OF CLASS MEMBERS.

18       **MR. MIORELLI:**  SO, YOUR HONOR, WE THINK IF THIS GETS TO

19   OUR ARGUMENT ABOUT POOR CLASS MEMBERS, WE THINK THAT THE FACT

20   THIS WAS ESSENTIALLY AN INTERNET-ONLY OPERATION REALLY GETS TO

21   THE CRUX OF THE PROBLEM.  AND CLASS COUNSEL INTENDS THIS TO BE AN

22   INTERNET-ONLY DISTRIBUTION OPERATION, AS WELL.

23       AND THAT TAKES OUT OF THIS, FUNCTIONALLY TAKES OUT OF THIS

24   SETTLEMENT EVERY POOR CLASS MEMBER.  THIS TAKES EVERYBODY WHO

25   ACTUALLY FELT THE PAIN OF DEFENDANTS' CARTEL, THE PEOPLE FOR WHOM

THE CHANGE IN THE PRICE OF MILK ACTUALLY IMPACTED THEIR LIVES,
WHICH IS PROBABLY NO ONE IN THIS COURTROOM.  NONE OF THE COUNSEL,
AT LEAST.  AND IT TELLS THEM:

   "YOU'RE TOO POOR TO GET ANYTHING OUT OF THIS."

 IF YOU ARE THE TYPE OF PERSON WHO MR. O'BRIAN, AS AN
ATTORNEY, BUT ALSO A PERSON OF COLOR, IS PARTICULARLY ATTENTIVE
TO, WHO SEES THIS SETTLEMENT AND WOULD USE THE RECOVERY FROM THE
SETTLEMENT, IF POSSIBLE, TO GO BUY MORE MILK, BECAUSE THAT'S WHAT
YOU NEED FOR YOUR FAMILY.  YOU DON'T HAVE ANY WAY TO DO THAT, AS
CLASS COUNSEL HAS PROPOSED.  AND YOU PROBABLY HAVE A VERY LIMITED
ABILITY TO EVEN FILE A CLAIM IN THE FIRST PLACE.

  **THE COURT:**  IS THAT BECAUSE YOU SAY -- SO HOW
SPECIFICALLY DOES THE POVERTY MANIFEST ITSELF?  IS IT NOT HAVING
ACCESS TO THE INTERNET?  IS IT NOT HAVING ACCESS TO COUNSEL?

 WHAT IS THE CAUSAL FACTOR BETWEEN POVERTY AND THE INABILITY
TO REACH PEOPLE LIKE YOUR CLIENT?

  **MR. MIORELLI:**  SO THE POVERTY ISSUE IS THEY DON'T HAVE
READY ACCESS TO THE INTERNET.

  **THE COURT:**  OKAY.

  **MR. MIORELLI:**  RIGHT?  SO THEY ARE NOT LIKELY TO HAVE
SEEN BANNER ADS.  AND THEY DON'T -- THEY ARE UNLIKELY TO WANT TO
USE THE RECOVERY FROM THIS, WHICH STEMS FROM THE PURCHASE OF A
CONSUMER STAPLE, A BASIC THAT THEY HAVE TO BUY TO FEED THEIR
FAMILY.

 AND THEY DON'T HAVE THE ABILITY, EVEN IF THEY OF ACCESS TO

1  THE INTERNET, TO USE THE RECOVERY TO BUY THE VERY THING THAT THEY

2  WERE DEFRAUDED FROM, BASICALLY, IN THE FIRST PLACE.

3      **THE COURT:**  WHY IS THAT?

4      **MR. MIORELLI:**  BECAUSE THE PROPOSED DISTRIBUTION IS AN

5  AMAZON GIFT CARD.  CAN'T BUY MILK THROUGH AMAZON.

6      IT'S A PAYPAL COUPON OF SOME SORT, SO, YOU KNOW, PAYPAL IS

7  MOST ASSOCIATED WITH EBAY.  YOU KNOW, THE OTHER ELECTRONIC MEANS,

8  A GOOGLE WALLET.  I DON'T EVEN HAVE GOGGLE WALLET, YOUR HONOR.

9      NONE OF THESE THINGS ARE THINGS WHERE IF YOU ARE POOR, IF

10  YOU ARE BUYING MILK WITH FOOD STAMPS OR OTHER SORTS OF GOVERNMENT

11  ASSISTANCE, IF YOU ARE GOING AND YOU ARE A LOWER INCOME PERSON,

12  NONE OF THESE ARE THINGS YOU HAVE ACCESS TO OR THAT YOU ARE

13  LIKELY TO HAVE ACCESS TO.

14      NOW, CLASS COUNSEL SAYS:

15      "YES, BUT MANY OF THEM DON'T HAVE CHECKING ACCOUNTS,

16      EITHER."

17      EXCEPT THE DIFFERENCE IS IF YOU HAVE A CHECK DRAWN ON A

18  MAJOR BANK, YOU CAN GO TO THE BANK AND PRESENT THE CHECK TO BE

19  CASHED.  AND EVEN IF THEY HAD TO GO TO THEIR OWN BANK, AND EVEN

20  IF THEIR OWN BANK CHARGED THEM A FEE, THERE WOULD STILL BE

21  SOMETHING LEFT.  SOMETHING IS NOT NOTHING.

22      **THE COURT:**  SO CUTTING TO THE CHASE, THEN, WHAT WOULD

23  YOU PROPOSE IF YOU WERE THE COURT?  WHAT WOULD YOU PROPOSE?  HOW

24  WOULD YOU CHANGE THIS THAT WOULD REACH PEOPLE LIKE MR. O'BRIAN?

25      **MR. MIORELLI:**  SO WE THINK THAT THERE SHOULD BE NOTICE

1    ACTUALLY AT THE GROCERY STORES AT THE POINT OF SALE.  AND THIS

2    GETS BACK TO THE NOTICE SHOULD BE TAILORED TO REACH THE PEOPLE

3    WHO BOUGHT IT.  RIGHT?  AND WHERE DID THEY BUY IT?  THEY BOUGHT

4    IT AT A GROCERY STORE.

5         SO WE THINK THAT THE NOTICE SHOULD HAVE INCLUDED POSTING AT

6    GROCERY STORES.  AND WE THINK THAT CLASS MEMBERS SHOULD HAVE THE

7    OPTION TO RECEIVE CASH.  AND IF THEY DON'T WANT TO MAIL CASH,

8    THEN YOU CAN DO A MONEY ORDER.  YOU COULD DO --

9         **THE COURT:**  OR MILK COUPONS.

10        **MR. MIORELLI:**  OR YOU COULD DO A CHECK.  WE'RE NOT

11   ARGUING FOR COUPONS, YOUR HONOR, BECAUSE WE THINK THERE'S A

12   SERIOUS PROBLEM WITH THE VALUE OF COUPONS.  BUT WE DO BELIEVE

13   THAT, ESPECIALLY IF CLASS COUNSEL WANTS TO CALL THIS A "CASH

14   RECOVERY," IT SHOULD BE CASH.  IT SHOULDN'T JUST BE A COUPON CODE

15   TO GET A GIFT CARD ON AMAZON.

16        AND WE'LL JUST POINT OUT THAT WHEN MR. O'BRIAN RAISED THIS,

17   CLASS COUNSEL'S RESPONSE IS JUST IPSE DIXIT.  TO SAY:

18             "WELL, YOU KNOW, OF COURSE THIS IS FAIR.  LOOK AT ALL

19        THIS MONEY."

20        BUT IT DOESN'T ACTUALLY GET TO THE QUESTION OF PEOPLE WHO

21   ARE POOR AND PEOPLE WHO THIS COURT SHOULD HAVE PARTICULAR CONCERN

22   FOR AS THEIR FIDUCIARY, IN LOOKING AT THIS CASE.

23        I'D LIKE TO TAKE A MOMENT TO THE TALK ABOUT THE RELEASE,

24   YOUR HONOR, SINCE WE WERE THE ONLY OBJECTOR THAT RAISED IT.

25        YOU KNOW, CLASS COUNSEL'S RESPONSE TO OUR RELEASE ARGUMENT

1    IS ESSENTIALLY A MASTERFUL USE OF THE BOLD FEATURE IN WORD.  BUT

2    IT DOESN'T ACTUALLY RESPOND TO THE PROBLEM, WHICH IS THE SECOND

3    HALF OF THE SENTENCE THAT WE ARGUED ABOUT SAYS THAT ANY OF THE

4    FACTS ALLEGED IN THE THIRD-AMENDED COMPLAINT ARE ALSO RELEASED.

5    ANY CLAIM ARISING OUT OF THOSE FACTS.

6         AND IF YOU LOOK AT THE THIRD-AMENDED COMPLAINT, IT SPENDS

7    THREE PAGES EXCLUSIVELY TALKING ABOUT THE FUNCTION OF THE DAIRY

8    INDUSTRY, ABOUT THE PRODUCTION OF MILK AND MILK PRODUCTS.  AND

9    THEN, THROUGHOUT THE REST OF THE EXTENDED COMPLAINT THERE'S

10   FREQUENT ADDITIONAL PARAGRAPHS TALKING ABOUT THE MERE FUNCTION OF

11   THE MILK INDUSTRY.

12        AND SO THOSE FACTS WOULD BE THE SAME FACTS THAT WOULD

13   UNDERLIE A CLAIM OF, SAY, PERSONAL INJURY OR ANY NUMBER OF STATE

14   LAW CLAIMS WHICH AREN'T ALLEGED IN THE COUNTS.

15        BUT BECAUSE THE FACTS ARE ALLEGED IN THE COMPLAINT AND

16   BECAUSE THE RELEASE SPECIFICALLY SAYS THAT THE RELEASE IS NOT

17   LIMITED TO THE COUNTS, BUT IT EXTENDS TO ALL OF -- ANY CLAIM

18   WHICH COULD ARISE FROM ANY OF THE FACTS ALLEGED IN THE COMPLAINT,

19   IT WOULD ESSENTIALLY RELEASE ALL OF THESE CLAIMS THAT NO ONE IN

20   THIS ROOM HAS CONTEMPLATED AS PART OF THIS LITIGATION, WHICH

21   MAKES THE RELEASE OVERBROAD.

22        AND THE CLASS COUNSEL ARGUMENT ABOUT RES JUDICATA IN FEDERAL

23   CLAIMS IS JUST A DIVERSION, BECAUSE THE RELEASE DOES NOT LIMIT

24   ITSELF TO FEDERAL CLAIMS.  THE RELEASE SAYS "ALL CLAIMS."  AND

25   "ALL CLAIMS" MEANS "ALL CLAIMS."  STATE LAW CLAIMS OR FEDERAL

1  CLAIMS, ANTITRUST CLAIMS, PERSONAL INJURY CLAIMS, ANY NUMBER OF

2  OTHER CLAIMS, MAYBE CONTRACTUAL CLAIMS.  THOSE WOULD ALL BE

3  RELEASED IN THIS OVERBROAD RELEASE.

4       AND WE BELIEVE THE COURT -- YOU COULD MODIFY THE RELEASE.

5  YOU COULD SAY:

6            "THE ONLY THING RELEASED ARE ANTITRUST CLAIMS."

7       THAT SOLVES THIS.

8       BUT OBVIOUSLY THE DEFENDANTS WANT A BROAD RELEASE, AND I

9  DON'T BLAME THEM FOR WANTING THAT, BUT THAT'S NOT WHAT THEY ARE

10  ENTITLED TO FOR WHAT THEY ARE PAYING.

11       AND THE LAST THING I WANT TO REALLY TALK ABOUT HERE IS THE

12  SIZE OF THE SETTLEMENT, YOUR HONOR.

13       AND, RESPECTFULLY, WITH REGARD TO THE COURT'S COMMENTS,

14  CLASS COUNSEL BEARS THE BURDEN OF PROVING THAT THE SIZE OF THE

15  SETTLEMENT IS ADEQUATE AND REASONABLE.  AND IN RESPONSE TO NOT

16  ONLY MY CLIENT'S OBJECTIONS, BUT THE WELL-FOUNDED OBJECTIONS OF

17  THE CENTER FOR CLASS ACTION FAIRNESS AND OBJECTOR ERWIN, WHICH WE

18  JOINED FOR THOSE ISSUES, BUT NOT THE OTHER OBJECTORS.  CLASS

19  COUNSEL'S RESPONSE IS ANOTHER IPSE DIXIT, WHICH IS TO SAY:

20            "WELL, WE SAY THAT ONE PARTICULAR EXPERT IS BETTER."

21       AND WHY?  WELL, THEY DON'T ACTUALLY SAY.  THEY SAY:

22            "WELL, BECAUSE WE SAY IT'S BETTER."

23       BUT THIS IS REALLY ALREADY A BATTLE-OF-THE-EXPERTS CASE.

24  AND OBJECTORS ARE ON JUST AS FIRM FOOTING TO POINT TO DEFENDANTS'

25  OWN EXPERTS THAT SAID:

1      "THIS IS A BILLION DOLLAR CASE."

2    AND SAY:

3      "WAIT A SECOND.  THIS ISN'T REASONABLE.  THIS ISN'T

4    ADEQUATE TO SETTLE A BILLION DOLLAR CASE FOR TWO OR THREE

5    PERCENT."

6    AND FURTHER ON THIS QUESTION OF THE TREBLE DAMAGES, WE AGREE

7    THE COURT IS NOT OBLIGATED TO CONSIDER TREBLE DAMAGES.  BUT THE

8    COURT IS ALSO NOT PROHIBITED FROM CONSIDERING TREBLE DAMAGES.

9    AND TREBLE DAMAGES ARE THE UNIQUE -- AND I WOULD SAY THE MOST

10   IMPORTANT -- CHARACTERISTIC OF AN ANTITRUST CLAIM.

11   AND SO FOR THE COURT, IF THE COURT IS NOT GOING TO CONSIDER

12   TREBLE DAMAGES IN CONSIDERING WHETHER THIS IS REASONABLE AND

13   ADEQUATE, THERE SHOULD BE A VERY GOOD REASON.  NORMALLY, YOU

14   WOULD THINK OF THIS GOOD REASON BEING THAT THE DEFENDANTS

15   OBVIOUSLY DON'T HAVE THE ABILITY TO PAY.  BUT THAT'S NOT BEEN

16   ALLEGED.

17   CLASS COUNSEL HAS ACTUALLY NOT BORNE THEIR BURDEN AGAIN HERE

18   OF EXPLAINING WHY TREBLE DAMAGES SHOULDN'T BE CONSIDERED.  AND SO

19   THIS IS -- THIS IS PART OF OUR FUNDAMENTAL COMPLAINT ABOUT THE

20   PAPERS ON THE RECORD SO FAR IS THAT THERE'S A LOT OF "WE SAY IT,

21   AND SO THEREFORE IT'S TRUE."  IT'S IPSE DIXIT.

22   BUT THERE IS VERY LITTLE EXPLANATION FOR WHY ONE EXPERT

23   SHOULD BE BELIEVED OVER THE OTHER.  AND EVEN THE EXPERTS' REPORTS

24   THEMSELVES, WHAT PART ISN'T REDACTED -- AND WE BELIEVE THEY

25   SHOULD BE COMPLETELY UNREDACTED AND AVAILABLE FOR THE CLASS

1   MEMBERS TO SEE AT THIS POINT -- EVEN THEY ARGUE THAT THEY SHOULD

2   BE BELIEVED OVER THE OTHER ONE.  BUT, THEN, YOU KNOW, ALL OF A

3   SUDDEN THE SETTLING PARTIES COME IN AND THEY POINT TO THE

4   SMALLEST ONE AND SAY:

5           "WELL, THAT'S THE ONE WE SHOULD BELIEVE."

6       WELL, WHY?  THERE'S NOTHING IN THE RECORD THAT EXPLAINS WHY.

7   AND THAT'S NOT WHAT THE COUNSEL HAS AS THEIR BURDEN.

8       AND THEN, JUST THE FINAL THING ON THIS, YOU KNOW, THE

9   HIGH SULFUR CASE REGARDING THE SPLIT OF ATTORNEYS' FEES.  WE

10  AGREE WITH THE CENTER FOR CLASS ACTION FAIRNESS AND OBJECTOR

11  ERWIN ABOUT THE 25 PERCENT.  BUT THE HIGH SULFUR CASE IS REALLY

12  ON POINT HERE.

13      CLASS COUNSEL HAS ACTUALLY NOT IN THEIR PLEADINGS ALLEGED

14  THAT THERE IS ALREADY AN AGREEMENT ABOUT HOW TO SPLIT THE FEES.

15  AND SO THE COURT SHOULD NOT JUST ALLOW THEM TO SAY:

16          "WELL, WE'LL FIGURE IT OUT LATER."

17      RULE 23H REQUIRES THE COURT TO BE THE ONE THAT DECIDES THESE

18  ISSUES.  AND WE BELIEVE THAT THAT MEANS THAT THE CLASS NEEDS TO

19  HAVE ACCESS TO THE STUFF TO BE ABLE TO RESPOND TO IT.  BECAUSE IF

20  ONE OF THE PLAINTIFFS' FIRMS HAS AGREED TO SOME SORT OF REDUCTION

21  IN THEIR FEE FOR SOME PARTICULAR REASON, THAT REDUCTION SHOULD BE

22  FAIR GAME FOR THE CLASS TO SAY:

23          "WHY DON'T WE GET THAT MONEY, AS OPPOSED TO ONE OF THE

24      OTHER LAWYERS?"

25      WITH THAT, YOUR HONOR, I THINK WE'LL RELY ON OUR WRITTEN

1  STUFF.  THANK YOU.

2          **THE COURT:**  THANK YOU.  AND THE WAY I'M GOING TO DO

3  THIS, BEFORE I HEAR FROM MS. ST. JOHN I'LL HEAR THE RESPONSES OF

4  CLASS COUNSEL AND THE DEFENDANTS, IF THEY WISH TO RESPOND.

5          **MR. BERMAN:**  THANK YOU, YOUR HONOR. STEVE BERMAN.

6      LET ME TAKE THE LAST POINT -- ONE OF THE LAST POINTS FIRST,

7  AND THAT IS THE SIZE OF THE SETTLEMENT.

8      I THINK THE OBJECTOR DOES NOT FULLY APPRECIATE THE ECONOMICS

9  OF WHAT WAS AT STAKE HERE.

10      NOW, DR. BROWN, THE DEFENDANTS' EXPERT WHO KIND OF SET UP

11  THIS PROGRAM, CALCULATED THAT THE TOTAL INCREASED FUNDS FOR THE

12  COOPERATIVES WAS A BILLION DOLLARS. BUT OF THAT BILLION DOLLARS,

13  AND AS A MATTER OF LAW, MOST OF THAT IS PROTECTED BY THE FILED

14  RATE TARIFF DOCTRINE.

15      SO THE ONLY AMOUNT THAT WE COULD GET WAS THE OVER ORDER

16  PREMIUM.  AND THAT'S A MUCH SMALLER AMOUNT.  WE ORIGINALLY PUT IN

17  A CLASS DECLARATION OF DR. CONNOR, WHO HAD A MUCH HIGHER NUMBER.

18  ALL DR. CONNOR WAS TRYING TO DO WAS TO SAY:

19          "HERE'S A PRELIMINARY ESTIMATE.  I'M AT THE CLASS

20          CERTIFICATION STAGE.  IT'S NOT THE MERITS STAGE.  I COULD

21          SHOW THE COURT THAT WE CAN DO THIS FOR ALL CLASS MEMBERS."

22          AFTER THE DEFENDANTS OPPOSED DR. CONNOR AND DID DAUBERT

23  MOTIONS, FRANKLY THEY EDUCATED US.  AND SO WE HIRED AN EXPERT,

24  DR. SUNDING, MORE SCHOOLED IN REGRESSION ANALYSIS.  AND HE DID A

25  REGRESSION ANALYSIS.  HE CAME UP WITH $180 MILLION IN DAMAGES.

1    THAT WAS THE REPORT.  THAT WAS THE REPORT BEFORE YOUR HONOR

2   WHILE YOU WERE CONSIDERING THE DECERTIFICATION PAPERS AS WELL AS

3   THE DAUBERT PAPERS.  THAT IS THE REPORT THAT WE WERE GOING TO GO

4   TO TRIAL WITH.

5        AND SO WHEN WE ASKED YOU TO MEASURE WHAT WE RECOVERED FOR

6   THIS CLASS WE HAVE TO GO WITH THE REPORT THAT WAS IN EXISTENCE

7   THAT WE WERE GOING TO GO TO TRIAL ON, BECAUSE THAT'S WHAT YOU'RE

8   EVALUATING:  WHAT IS THE SETTLEMENT WORTH COMPARED TO WHAT THE

9   PLAINTIFFS COULD HAVE GOTTEN AT TRIAL?

10        SO WE'VE GOTTEN APPROXIMATELY A 30 PERCENT SETTLEMENT.  AND

11   IN MY EXPERIENCE IN THIS DISTRICT, 30 PERCENT IS VERY HIGH FOR AN

12   ANTITRUST CASE.

13        IF YOU LOOK AT THE LCD CASES AND THE CATHODE RAY TUBE CASES.

14   AND I'M CURRENTLY INVOLVED IN ODD AND BATTERIES.  THOSE

15   SETTLEMENTS ARE COMING IN BETWEEN -- OFTEN BETWEEN 15 AND

16   20 PERCENT.

17        SO WE GOT AN EXTRAORDINARY HIGH PERCENTAGE HERE FOR A CASE

18   THAT WAS EXTREMELY COMPLEX, AS YOU NOTED.  AND, IN FACT, AS I WAS

19   THINKING ABOUT TODAY -- WE WERE TALKING IN THE LOUNGE -- THERE'S

20   REALLY NO DECISIONS ON THE CAPPER-VOLSTEAD ACT FOR THE LAST 80

21   YEARS.  VERY FEW.

22        SO IF WE HAD WON AT TRIAL, THESE ARE TOUGH ISSUES.  THEY

23   WOULD HAVE GONE UP TO THE NINTH CIRCUIT, AND THEY WOULD HAVE GONE

24   UP TO THE SUPREME COURT.  AND THE CLASS WOULD HAVE WOUND UP

25   WAITING FOR YEARS FOR THAT RESULT.

1    SO, TURNING TO THE ISSUE OF THE FEE SPLIT, I DON'T

2   UNDERSTAND THAT ISSUE.  ONCE YOU AWARD US WHATEVER YOU ARE GOING

3   TO AWARD US, WE'RE NOT ASKING FOR ANY REDUCED AMOUNT SO I DON'T

4   UNDERSTAND WHY THE CLASS MEMBERS WOULD CARE HOW WE SPLIT UP AMONG

5   OURSELVES.

6    AND, IN FACT, WHAT WE'RE DOING HERE IS WHAT HAS BEEN DONE IN

7   DOZENS OF ANTITRUST CASES IN THIS DISTRICT:  YOU AWARD A LUMP SUM

8   AND THE LAWYERS WORK IT OUT.  AND I GUARANTEE YOU IF THERE'S ANY

9   ISSUES THEY WILL COME BACK WITH RESPECT TO THE WORKOUT.  AND

10   THAT'S HAPPENED IN SOME CASES LIKE THE LCD CASE.

11    WE DISTINGUISHED THE HIGH SULFUR CASE IN OUR BRIEF.  AND YOU

12   MADE IT CLEAR YOU DON'T WANT US TO REPEAT THAT, SO I WILL NOT DO

13   THAT.

14    SO THAT GETS TO THE ISSUE OF NOTICE.  ON THE ISSUE OF

15   NOTICE, YOUR HONOR, WE UNDERSTAND THAT OUR OBLIGATION IS TO TRY

16   TO GET NOTICE OUT TO AS MANY CLASS MEMBERS AS POSSIBLE.  NOW,

17   NOTICE CAN NEVER BE PERFECT UNLESS YOU HAVE A CASE LIKE A CAR

18   CASE WHERE THE AUTOMOBILE MANUFACTURER MAY ACTUALLY HAVE A LIST

19   OF THE FOLKS IN THE CLASS AND WE CAN DO A DIRECT MAIL.

20    OBVIOUSLY, THIS IS NOT THAT KIND OF CASE.  AND SO WHAT WE

21   TRIED TO DO WAS TO SPEND OUR MONEY EFFICIENTLY.  AND WE DID A

22   PRESS RELEASE THAT WOULD HAVE GONE OUT TO THE NATIONAL NEWS

23   MEDIA.  AND THEN, WE DID FOCUS PRIMARILY ON INTERNET ADVERTISING,

24   BECAUSE WE FELT THE VAST BULK OF THE CLASS WOULD HAVE ACCESS TO

25   THE INTERNET.

1    SO THE ALTERNATIVE -- YOU ASKED WHAT COULD WE DO.  WE COULD

2    DO PUBLICATION.  WE COULD DO A USA TODAY.  WE COULD DO SOME OF

3    THE OTHER PERIODICALS.  IT'S VERY EXPENSIVE, AND FRANKLY I DON'T

4    THINK IT'S VERY EFFECTIVE.  I DON'T KNOW IF YOU'VE EVER LEAFED

5    THROUGH A USA TODAY OR SOMETHING, BUT I HAVE OCCASIONALLY.  AND I

6    JUST DON'T THINK THAT VERY MANY CLASS MEMBERS ACTUALLY UTILIZE

7    THOSE IN A WAY THAT IS AS FUNCTIONAL AS THE INTERNET ADVERTISING

8    THAT WE DID.

9    THE OTHER THING IN TERMS OF DISTRIBUTION THAT I THINK IS

10   ACTUALLY OF BENEFIT TO THE CLASS HERE IS WE ARE CONCERNED THAT

11   OFTENTIMES IN THESE WHAT I WOULD CALL "SMALL DOLLAR" CONSUMER

12   CASE, AND THERE'S NOT A LOT OF DOLLARS FOR EACH CONSUMER, BUT THE

13   AGGREGATE NUMBER IS LARGE.  CONSUMERS DON'T DO ANYTHING BECAUSE

14   THEY DON'T WANT TO TAKE OUT THE TIME TO FILL OUT A CLAIM FORM.

15   AND THE COST OF WRITING CHECKS AND MAILING CHECKS IS VERY

16   EXPENSIVE.  IT'S A DOLLAR OR MORE.

17   SO RIGHT NOW WE HAVE 447,000 PLAINTIFFS.  IT'S GONE UP SINCE

18   OUR PAPERS.  447,331 IN TERMS OF CLAIMS.  AND WHAT WE DID WAS WE

19   WENT -- AND I THINK IT'S ONE OF THE FIRST TIMES IT'S EVER BEEN

20   DONE -- WE HIRED THIS FIRM CALLED "SIPREE."

21   AND SIPREE, IF THE CLASS MEMBER GIVES US SOME ACCOUNT

22   INFORMATION, WE'LL BE ABLE -- I MEAN SOME INFORMATION, E-MAIL.

23   THAT'S ALL WE NEED IS E-MAIL.  WE'LL BE ABLE TO JUST SEND THEM A

24   CHECK THROUGH THE ELECTRONIC WIRES.  THEY DON'T HAVE TO DO

25   ANYTHING.

1     SO WE'RE ACTUALLY GOING TO HAVE A VERY ROBUST DISTRIBUTION.

2 IT WILL ALL BE USED UP.  THERE WILL BE NO LOYALTY CARDS.  WE

3 DON'T NEED TO DO THAT.  SO WE'RE ACTUALLY GETTING THE MONEY OUT

4 TO THE CLASS.

5     SO THE ALTERNATIVE -- AND IF ANY CLASS MEMBER -- I MEAN, WE

6 COULD CHANGE.  IF ANY CLASS MEMBER WROTE TO US AND SAID THEY WANT

7 A CHECK, WE COULD MAIL THEM A CHECK.  BUT I DON'T REALLY SEE A

8 GOOD ALTERNATIVE OR A GOOD USE OF MONEY TO NOW GO AND PUBLISH IN

9 A BUNCH OF NEWSPAPERS IN THE HOPES THAT WE'RE GOING TO FIND SOME

10 PEOPLE OUT THERE.

11     AND I SYMPATHIZE WITH PEOPLE WHO DON'T HAVE ACCESS TO IT,

12 BUT I JUST DON'T THINK IT'S GOING TO BE VERY COST EFFECTIVE.

13     NOW, YOU MENTIONED SOMETHING ABOUT THE CLAIMS RATE.  THE

14 CLAIMS RATE IN CONSUMER SETTLEMENTS LIKE THIS IS LOW.  IT'S

15 ALWAYS LOW.  A HIGH CLAIMS RATE WOULD BE 3 PERCENT.  AND SO OUR

16 CLAIMS RATE IS BELOW THAT.  BUT, STILL, THERE'S -- YOU KNOW, BY

17 THE TIME WE GET DONE WE'RE GOING TO HAVE A HALF MILLION PEOPLE

18 WHO ARE ACTUALLY GOING TO GET CHECKS IN THE MAIL.

19     SO I THINK THAT IS FAIRLY GOOD PARTICIPATION FOR A LOW

20 DOLLAR KIND OF SETTLEMENT LIKE THIS.

21     **THE COURT:**  ARE THEY GOING TO GET CHECKS IN THE MAIL OR

22 AN AMAZON CARD OR PAYPAL CREDIT?

23     **MR. BERMAN:**  THEY'RE GOING TO GET CASH, RIGHT?

24     MR. FRIEDMAN HAS DESIGNED THIS.  DO YOU MIND IF I LET HIM

25 EXPLAIN IT TO THE COURT?

1    **THE COURT:**  WELL, WHY DON'T YOU FINISH YOUR DISCUSSION,

2   AND I'LL CERTAINLY HEAR FROM MR. FRIEDMAN.

3    **MR. BERMAN:**  I'M DONE, UNLESS YOU HAVE FURTHER

4   QUESTIONS.

5    **THE COURT:**  ALL RIGHT.  VERY WELL.

6    ALL RIGHT.  WOULD YOU SAY YOUR NAME FOR THE RECORD, PLEASE?

7    **MR. FRIEDMAN:**  YES, YOUR HONOR, JEFF FRIEDMAN ON BEHALF

8   OF THE CLASS.

9    **THE COURT:**  YES.

10    **MR. FRIEDMAN:**  TO ANSWER THE COURT DIRECTLY IT'S NOT

11   CHECKS.  IT IS AN ELECTRONIC PAYMENT.  AND THE INNOVATIVE ELEMENT

12   TO THIS, YOUR HONOR -- AND WE SPENT TIME BECAUSE OF THESE VERY

13   ISSUES -- IS TO TRY AND REDUCE THE TRANSACTIONAL COST TO CLASS

14   MEMBERS TO MAXIMIZE THE RETURN.

15    AND SO WHAT ENDS UP HAPPENING IS ALL YOU NEED IS AN E-MAIL

16   ADDRESS.  AND WITH AN E-MAIL ADDRESS YOU'LL RECEIVE AN E-MAIL.

17   THE E-MAIL WILL ALLOW YOU TO CHOOSE AMONGST WHETHER YOU WANT TO

18   RECEIVE IT ON AMAZON, ON PAYPAL, ON EVEN ACH IN AN ACCOUNT, IF

19   YOU CHOSE TO DO IT THAT WAY.

20    SO THE CLASS MEMBER WOULD BE ABLE TO UTILIZE WHATEVER METHOD

21   THEY WANTED TO TO RECEIVE CASH.  THAT CASH CAN BE USED IN ANY

22   WAY.  I MEAN, AMAZON.  NOW YOU CAN BUY MILK THROUGH AMAZON.  YOU

23   CAN GET GROCERIES THROUGH AMAZON.  YOU CAN BUY A MILK PRODUCT IF

24   YOU CHOOSE TO DO IT THROUGH STARBUCKS.

25    THIS WAS ONE OF THE WAYS IN WHICH WE THOUGHT WE COULD MAKE

1    IT EXTREMELY EFFICIENT AND ACCESSIBLE FOR CLASS MEMBERS.

2         AND LIKE MR. BERMAN SAID, IN THE ALTERNATIVE IN TERMS OF OUR

3    EXPERIENCE WITH CHECKS, IS THAT IF YOU THINK ABOUT IT, IT WOULD

4    END UP COSTING THE CLASS HUNDREDS OF THOUSANDS, IF NOT MILLIONS

5    OF DOLLARS TO END UP DOING A CHECK CAMPAIGN.  AND THEN, WHAT ENDS

6    UP HAPPENING, YOUR HONOR, IS THAT MANY CHECKS PEOPLE DON'T HAVE

7    ACCOUNTS, OR THEY THROW IT AWAY.  AND SO THERE'S A LOT OF

8    BREAKAGE.

9         AND WHAT HAPPENS WITH THAT, YOUR HONOR, WHEN THERE'S A LOT

10   OF BREAKAGE THERE'S A RESIDUAL, WHICH WE EITHER THEN HAVE TO,

11   ONCE AGAIN, MAIL THE CHECKS OUT AGAIN TO THE OTHER -- TO THE

12   CLASS MEMBERS WHO RECEIVED CHECKS IN THE FIRST INSTANCE, OR

13   ESCHEAT MONEY OR DO A CY-PRES, OR ALL THESE OTHER THINGS THAT

14   HAVE BEEN CHALLENGED BEFORE.

15        THE BEAUTY OF THIS, YOUR HONOR, IS NOT ONLY IS IT LOW COST,

16   BUT TO THE EXTENT ANYONE ELECTS NOT TO USE IT.  SO YOU COULD HAVE

17   PEOPLE WHO SAY:

18         "I'M NOT GOING TO OPEN A PAYPAL ACCOUNT," IF THEY DON'T

19   WANT TO OR USE AN AMAZON ACCOUNT IF THEY DON'T WANT TO.  THE

20   BEAUTY OF THIS, YOUR HONOR, IS WHATEVER THE TOTAL NUMBER OF

21   PEOPLE WHO ELECT TO UTILIZE THE SYSTEM, AND WE'RE ABLE TO

22   COSTLESSLY SEND THE REMAINING MONEY PRO RATA TO EVERYONE SINGLE

23   PERSON, COSTLESSLY.

24        AND WE'RE EVEN ABLE TO, YOUR HONOR, IS THAT IF A CLASS

25   MEMBER GIVES AN E-MAIL ADDRESS AND THEY DON'T CHECK THE BOX IN

1 TERMS OF SAYING "I WANT TO HAVE AN AMAZON ACCOUNT," SIPREE HAS

2 THE ABILITY, WE UNDERSTAND IT, FOR SOME BODY OF PEOPLE WITH

3 CERTAIN E-MAIL ADDRESSES AND AMAZON ACCOUNTS OR PAYPAL ACCOUNTS

4 THAT EXIST TO SEND THE MONEY, REGARDLESS. THEY CAN STILL

5 POPULATE THE MONEY INTO YOUR ACCOUNT.

6 SO THIS HAS A TREMENDOUS BENEFIT OF BEING ABLE TO DISTRIBUTE

7 THE MONEY EFFICIENTLY.

8 THE COURT, I THINK, ALSO RAISED THE QUESTION ON THE LOYALTY

9 CARD PROGRAM IN SUPERMARKETS. SO WE INVESTIGATED THAT. AND THE

10 ISSUE, YOUR HONOR, IS ONE OF THIS COST BENEFIT ANALYSIS. IN OUR

11 INITIAL INVESTIGATION THIS HAS NOT BEEN -- THIS LOYALTY PROGRAM

12 IS NOT ONE THAT HAS BEEN DONE, TO OUR KNOWLEDGE, WHEN WE STARTED

13 INVESTIGATION THIS IN ANOTHER CLASS ACTION.

14 AND SO WHEN WE STARTED TO INVESTIGATE IT IT TURNED OUT THAT

15 INITIAL SCOPING OF THE COST CONSERVATIVE -- WELL, IT'S NOT

16 CONSERVATIVE, BUT ON THE LOW END WE BELIEVED IT WAS AT LEAST

17 $500,000. AND WE THINK THAT WHEN ALL IS SAID AND DONE IT COULD

18 END UP BEING A MILLION OR MORE DOLLARS IN TRANSACTIONAL COSTS TO

19 CLASS MEMBERS.

20 WHAT THAT WOULD THEN ONLY DO, YOUR HONOR, IS CREATE SOME

21 ISSUES THAT IF IT COULD BE EFFECTIVE IT MAY ONLY BE IN LARGE

22 POPULATED AREAS WHERE THERE WERE SOPHISTICATED MARKETS THAT HAD

23 THE ABILITY TO IMPLEMENT THE PROGRAM. NOT NECESSARILY IN RURAL

24 AREAS OR ISSUES THAT WE ARE SYMPATHETIC TO IN TERMS OF HAVING

25 CLASS MEMBERS WHO MAY NOT HAVE INTERNET ACCESS OR ONLY ARE SMALL

1   GROCERY STORES.

2       THERE WOULDN'T BE ENOUGH MONEY TO POPULATE IT IN A

3   SIGNIFICANT WAY ACROSS 16 JURISDICTIONS IN TERMS OF POPULATING

4   WITH ENOUGH MARKETS TO GET ENOUGH REACH; THAT WITH THE AMOUNT OF

5   MONEY THAT WAS LEFT, GIVEN THE FACT THAT WE HAVE 450,000 AND

6   CLAIMING CLAIMANTS ONLINE THAT WE WILL BE ABLE TO DIRECTLY SEND

7   MONEY TO, THEN THE MONEY LEFT TO DISTRIBUTE ACROSS THE 16

8   JURISDICTIONS INTO SUPERMARKETS ENDED UP BEING A SMALL DOLLAR

9   AMOUNT.

10      AND SO WE HAD TO BALANCE THE SMALL DOLLAR AMOUNT THAT WOULD

11  BE LEFT TO DISTRIBUTE IN THIS LOYALTY PROGRAM WITH POTENTIALLY

12  SPENDING A MILLION OR MORE OF THE CLASS'S MONEY TO TRY AND DO IT.

13      AND SO, THERE'S TENSION THERE, YOUR HONOR.  WE THOUGHT

14  THROUGH IT.  IT WAS NOT A BLIND DECISION.  BUT IT WAS ONE WHERE

15  WE WERE SERIOUSLY ENTERTAINING THE DIFFERENT COSTS AND BENEFITS

16  TO THE CLASS MEMBERS.

17      AND THEN, I THINK IN TERMS OF THE ONE COMMENT WAS ALSO MADE

18  ABOUT THE NOTICE -- SORRY TO CIRCLE BACK TO IT -- BUT I THINK

19  THERE WAS A COMMENT ABOUT JUST POSTING NOTICE IN SUPERMARKETS.

20  YOU CAN'T JUST GO INTO A SUPERMARKET AND SAY:

21          "I WANT TO POST A NOTICE."  THERE'S -- ONE, YOU HAVE TO

22  GET PERMISSION TO BASICALLY SAY THERE'S A CLASS ACTION

23  SETTLEMENT, AND TO GET A SUPERMARKET CHAIN TO POST A NOTICE ABOUT

24  CLASS ACTION SETTLEMENTS IN THE MARKET.

25      AND FROM OUR EXPERIENCE, RETAILERS ARE VERY RESISTANT TO

1   USING ANY ADVERTISEMENTS FOR CLASS ACTIONS OR CLASS ACTION

2   SETTLEMENTS AT THE POINT OF SALE.

3      AND SO IT'S NOT JUST FACILE AND EASILY DONE WHERE WE CAN

4   JUST POST NOTICE IN SUPERMARKETS.  IT SOUNDS GOOD.  BUT EVEN

5   SETTING ASIDE THE COST, THE ABILITY TO EVER GET APPROVAL AND

6   WIDESPREAD APPROVAL TO ADVERTISE A CLASS ACTION SETTLEMENT INSIDE

7   OF A MARKET IS JUST PURELY SPECULATIVE, IN OUR EXPERIENCE VERY

8   DIFFICULT TO EVEN ENVISION COULD HAPPEN.

9      THE FINAL COMMENT I WILL TRY TO MAKE, YOUR HONOR, IS THAT WE

10  BELIEVE THAT THERE'S THE IMPRESSIONS ARE OVER A HUNDRED MILLION

11  IMPRESSIONS THAT HAVE BEEN SEEN ON THE WEBSITE, WHICH MEANS

12  EFFECTIVELY THAT EYEBALLS OR UNIQUELY UNIQUE EYEBALLS HAVE BEEN

13  SEEN IN MILLIONS AND MILLIONS AND MILLIONS OF POTENTIAL CLASS

14  MEMBERS.  AND THAT THE NUMBER OF IMPRESSIONS FAR EXCEEDS THE

15  CLASS NUMBER, THE CLASS MEMBER SIZE.

16      **THE COURT:**  SO THE DEFINITION OF "IMPRESSION" IS WHAT?

17  SOMEBODY OPENED THE PAGE THAT CONTAINED THE AD?

18      **MR. FRIEDMAN:**  OR THE AD GOES ACROSS THE SCREEN AND THE

19  PERSON IS ON THE PAGE THAT THE AD GOES ACROSS THE SCREEN.

20      **THE COURT:**  IS IT A STATIC SITUATION?  IN OTHER WORDS,

21  DOES THE BANNER GO ACROSS DIFFERENT PAGES OR ONLY ON ONE

22  PARTICULAR PAGE?

23      **MR. FRIEDMAN:**  IT IS NOT ONLY ON ONE PARTICULAR PAGE,

24  YOUR HONOR.  AND I DON'T KNOW THE ALGORITHM.  WE'RE NOW BEYOND

25  ME.  BUT BASED ON ALGORITHM KEY -- AND THEY OPTIMIZE THIS, YOUR

HONOR, IN TERMS OF POTENTIAL PEOPLE WHO WOULD LOOK, IS THAT IT
WOULD POP-UP ON DIFFERENT PAGES DEPENDING ON WHAT YOU WOULD OPEN
UP ON THE PAGE.

    **THE COURT:**  SO THE DEFINITION OF "IMPRESSION" THEN
MEANS THAT THE BANNER PASSED -- WHEN SOMEBODY HAD THAT PAGE OPEN
ON WHICH THE BANNER MOVED OR WAS SHOWN, THAT WOULD COUNT AS AN
IMPRESSION.

    **MR. FRIEDMAN:**  YOU ARE RIGHT, YOUR HONOR.

    **THE COURT:**  WHETHER OR NOT THEY CLICKED THROUGH OR DID
ANYTHING WITH IT.

    **MR. FRIEDMAN:**  CORRECT, YOUR HONOR.  BUT ACTUALLY JUST
LIKE A NEWSPAPER, WHICH WE CAN'T EVEN MEASURE, WE ONLY KNOW THAT
SOMEONE HEARS THE CIRCULATION SIZE OF A NEWSPAPER.  AND,
THEREFORE, WE COULD SAY:

    "THIS IS THE CIRCULATION SIZE.  THERE WAS A AD IN USA
    TODAY."

BUT TO BE ABLE TO SAY WHETHER THEY READ IT OR NOT, WE HAVE
NO IDEA.  SO IT'S TELLING US SIMILAR TO A PUBLICATION IN TERMS OF
ITS CIRCULATION.  AND SO WE KNOW THE CIRCULATION IS THERE'S TENS
AND TENS OF MILLIONS THAT THE BANNER WAS CIRCULATED TO IN TERMS
OF UNIQUE EYEBALLS.

    **THE COURT:**  OKAY.  THANK YOU.

    **MR. FRIEDMAN:**  THANK YOU. ANY OTHER QUESTIONS, YOUR
HONOR?

    **THE COURT:**  NO, I WILL LATER ON.  BUT I WANT TO HEAR

1    AND GET ALL THE ARGUMENTS ON THE RECORD.

2        SO THE NEXT THING, I'LL ASK MR. MARKHAM:  DO YOU HAVE

3    ANYTHING YOU WANT TO SAY ON BEHALF OF THE DAIRY FARMERS.

4            **MR. MARKHAM:**  I THINK MY COLLEAGUE, MR. KAVANAGH MAY

5    WANT TO.

6            **THE COURT:**  PLEASE.  AND YOU DON'T NEED TO REPEAT WHAT

7    WAS SAID IN TERMS OF "ME, TOO." I'M GOING TO CONSIDER ALL THE

8    ARGUMENTS AS SUBSTANTIVE ARGUMENTS.

9            **MR. KAVANAGH:**  THANK YOU, YOUR HONOR. I'LL BE BRIEF.

10       THE ONLY THING THAT WE WANTED TO ADDRESS WAS THE ISSUE THAT

11   THE RELEASE WAS OVERBROAD.  THE RELEASE WAS SOMETHING THAT WE HAD

12   BARGAINED FOR.  AND THE RELEASE WAS PART OF WHAT WE BARGAINED FOR

13   FOR THE PAYMENT OF THE 52 MILLION.  SO WE DON'T THINK IT WAS

14   OVERBROAD AND WE THINK IT WAS PART OF THE OVERALL SETTLEMENT.

15           **THE COURT:**  ALL RIGHT.  THANK YOU.

16       ALL RIGHT.  I'LL NOW HEAR FROM MR. HOLYOAK BY HIS ATTORNEY,

17   MS. ST. JOHN.

18       AND, AGAIN, YOU DON'T NEED TO REPEAT ANYTHING.  IN OTHER

19   WORDS, YOU'RE NOT GIVING UP ANY ARGUMENT BY SAYING:  "WELL, I

20   WANT TO SAY ME, TOO.  OR, YOU KNOW, GO TEAM GO" ON THIS

21   PARTICULAR ISSUE.

22       IF YOU HAVE NEW -- BECAUSE WE'RE TRYING TO BASICALLY GET TO

23   THE RIGHT RESULT.  AND I JUST WANT THE SUBSTANTIVE ARGUMENTS AND

24   INFORMATION SO THAT THE COURT CAN MAKE A CORRECT RULING.

25           **MS. ST. JOHN:**  THANK YOU, YOUR HONOR.  AND I APPRECIATE

1    THOSE REMARKS.  I WILL LIMIT MY COMMENTS TODAY TO RESPOND TO A

2    FEW POINTS THAT PLAINTIFFS MADE IN THEIR RESPONSE TO OBJECTIONS.

3            **THE COURT:**  GREAT.

4            **MS. ST. JOHN:**  FIRST IN RESPONSE TO OUR ARGUMENT THAT

5    NOTICE AND ADMINISTRATIVE EXPENSES SHOULD BE INCLUDED IN THE

6    DENOMINATOR AND LITIGATION EXPENSES SHOULD BE EXCLUDED FROM THE

7    NUMERATOR, PLAINTIFFS CITE MORENO DON AND ONLINE DVD, TO ARGUE

8    THAT CLASS COUNSEL DOESN'T INCREASE EXPENSES IN ORDER TO INCREASE

9    THEIR FEES.  AND THAT'S NOT REALLY THE ISSUE.  IT'S CERTAINLY

10   TRUE THAT NOT EVERY CLASS COUNSEL CRAVENLY AND CONSCIOUSLY THINKS

11   THAT WAY.  BUT THE ISSUE IS ONE OF MISALIGNED INCENTIVES.

12           YOU KNOW, IT CAN SUBCONSCIOUSLY AFFECT SPENDING DECISIONS.

13   THEY ARE IN THE BEST POSITION TO REIGN IN COST, AND THEY SHOULD

14   BE INCENTIVIZED TO DO SO.  TO GIVE A CONCRETE EXAMPLE, IF YOU

15   HAVE AN EXPERT REPORT OR AN EXPERT WHO SUBMITS A BILL FOR HALF A

16   MILLION DOLLARS, THAT'S $133,000 IN FEES FOR CLASS COUNSEL, IF

17   THAT EXPERT MAY, SHOULD HAVE BEEN 20 PERCENT MORE EFFICIENT.

18   CLASS COUNSEL KNOWS THAT IF THEY GO TO THAT EXPERT AND ASK HER TO

19   REDUCE THE BILL ACCORDINGLY, THEY ARE GOING TO LOSE $26,000 IN

20   FEES.

21           AND SO IT IS ABOUT A ALIGNING INCENTIVES PROPERLY TO REACH

22   THE BEST RESULT FOR THE CLASS.  I'LL ALSO NOTE THAT MORENO

23   INVOLVED A LODESTAR CALCULATION IN ITS STATUTORY FEE CASE

24   INVOLVING CIVIL RIGHTS.  AND ONLINE DVD IS VERY CLEAR THAT COURTS

25   HAVE DISCRETION IN CALCULATING FEES ON EITHER THE NET OR THE

1   GROSS FUND.

2      CLASS COUNSEL ALSO TAKES ISSUE IN OUR CALLING THE SETTLEMENT

3   A MEGA FUND. DIFFERENT COURTS AND SCHOLARS CONSIDER $50 MILLION

4   A MEGA FUND. OTHERS DON'T. IT DOESN'T REALLY MATTER WHAT YOU

5   CALL IT. IT'S STILL A LARGE $50 MILLION FEE.

6      AND YOU STILL HAVE THE SAME RATIONALE FOR REDUCING THE

7   PERCENTAGE AS THE SIZE OF THE SETTLEMENT INCREASES. IT WASN'T

8   THREE TIMES HARDER.

9      IT DIDN'T TAKE THREE TIMES LONGER TO LITIGATE THIS CASE WITH

10   73 MILLION CLASS MEMBERS THAN IT WOULD IN A CASE INVOLVING 24

11   MILLION CLASS MEMBERS. SO YOU DO GET THAT WINDFALL EFFECT AT THE

12   EXPENSE OF THE CLASS.

13      CLASS COUNSEL ALSO TAKES ISSUE WITH HOLYOAK POINTING OUT THE

14   CASES THEY CITE IN WHICH A COURT AWARDED 33 PERCENT FEES ARE ONLY

15   SMALLER FUNDS. BUT THE LARGER SETTLEMENTS THEY CRITICIZE US FOR

16   NOT POINTING TO IN OUR OBJECTION ARE ALSO MULTIPLE TIMES SMALLER

17   THAN THE $50 MILLION SETTLEMENT FUND HERE.

18      IN FOOTNOTE 80 OF THEIR RESPONSE THEY POINT TO CASES

19   INVOLVING $15 MILLION OR LESS AS THE COURT REQUIRES SETTLEMENTS

20   THAT JUSTIFY THE 33-AND-THIRD PERCENT REQUEST HERE.

21      IF THERE WERE LARGER SETTLEMENT FUNDS WHERE COURTS HAD

22   AWARDED 33-AND-A-THIRD PERCENT FEES YOU CAN BET THEY WOULD HAVE

23   CITED THEM.

24      FINALLY, TURNING TO OUR OBJECTION THAT A SETTLEMENT CLASS

25   THAT RUNS THROUGH THE PRESENT IS IMPROPER, PLAINTIFFS CLAIM THAT

1  THE END DATE IS EFFECTIVELY SUPPLIED IN THE RELEASE TO THE

2  SETTLEMENT AGREEMENT BECAUSE THE RELEASE IS LIMITED TO THE

3  EFFECTIVE DATE OF THE SETTLEMENT AGREEMENT OR THE EXECUTION DATE.

4      BUT THE RELEASE IS BROADLY WORDED TO INCLUDE FUTURE CLAIMS.

5  SO YOU STILL HAVE CLASS MEMBERS, LATE-PURCHASING CLASS MEMBERS

6  WHO BECAME PART OF THE CLASS AFTER THE OBJECTION AND OPT-OUT

7  DEADLINE WHO WERE STILL RELEASING THEIR CLAIMS.

8      AND SO WE THINK THAT'S IMPROPER AND THE CLASS DEFINITION

9  SHOULD BE REVISED ACCORDINGLY.

10         **THE COURT:**  THANK YOU VERY MUCH, COUNSEL.

11         **MS. ST. JOHN:**  THANK YOU.

12         **THE COURT:**  ALL RIGHT.  I'LL HEAR MR. BERMAN, IF YOU

13  WISH TO RESPOND TO MR. HOLYOAK'S OBJECTION, ARGUMENT.

14         **MR. BERMAN:**  THANK YOU, YOUR HONOR.  STEVE BERMAN.

15  YOUR HONOR, SINCE COUNSEL ADDRESSED THE FEE ISSUE I WOULD MAKE MY

16  POINT ON YOUR REMARKS ABOUT THE FEE ISSUE.

17         **THE COURT:**  GO FOR IT.

18         **MR. BERMAN:**  OKAY.  YOU INDICATED THAT YOUR TENTATIVE

19  THINKING WAS TO AWARD US 25 PERCENT WHERE WE'RE ASKING FOR

20  33 PERCENT.  AND I RESPECTFULLY DISAGREE WITH THE TENTATIVE FOR

21  THE FOLLOWING REASONS.  IF I LOOK AT THE CASE THAT MY FIRM HAD IN

22  FRONT OF YOU BICKLEY VERSUS SCHNEIDER, WHICH YOU DID AWARD

23  33 PERCENT, AND I COMPARE THAT CASE WITH THE RISKS IN THIS CASE

24  AND THE AMOUNT OF TIME THAT WE'VE BEEN LITIGATING AND THE

25  RECOVERY THAT WE'VE ACHIEVED FOR THE CLASS, I DON'T UNDERSTAND

1  WHY THIS CASE WOULD FARE WORSE.

2  **THE COURT:**  WELL, LET ME JUST SAY IN FAIRNESS TO

3  EVERYBODY HERE THE WAY I'M STRUCTURING THIS MAY BE A LITTLE

4  AWKWARD I WANT TO GET ALL THE ARGUMENTS, AND THEN I WANT TO HAVE

5  DIRECTED QUESTIONS ON PARTICULAR ISSUES, SOME OF WHICH YOU HAVE

6  ADDRESSED, SOME OF WHICH YOU HAVEN'T.

7  BUT IN FAIRNESS MY SILENCE DOESN'T MEAN I'M NOT ENGAGED OR

8  DON'T HAVE THESE QUESTIONS, BUT I WANT TO GET YOUR ARGUMENTS AND

9  RESPONSES.

10  THEN I'M GOING TO TAKE A BREAK, ACTUALLY, AND SORT OF MAKE

11  SURE THAT I HAVE ALL THE QUESTIONS ASKED THAT HAVE NOT YET BEEN

12  RESPONDED TO.

13  **MR. BERMAN:**  THEN I'LL RESPOND TO HER POINT ABOUT THE

14  METHOD OF CALCULATING, AND THEN THAT WILL BE ALL I NEED TO SAY,

15  UNLESS YOU HAVE FURTHER QUESTIONS.

16  **THE COURT:**  ALL RIGHT.

17  **MR. BERMAN:**  THE ONLINE DVD CASE SUGGESTS THAT THE

18  METHOD WE'RE USING IS APPROPRIATE.  IT'S THE METHOD THAT HAS BEEN

19  GENERALLY FOLLOWED THAT THIS DISTRICT.  AS WE CITED TO YOU JUDGE

20  CHEN IN THE CARRIER IQ CASE, ANOTHER CASE OF MINE.  THE CENTER

21  MADE AN OBJECTION, AND HE OVERRULED IT.

22  WE DIDN'T CITE TO YOU -- AND I CAN GET IT IF YOU ARE

23  INTERESTED -- BUT IN PECOVER VERSUS EA SPORTS, WHICH IS CITED FOR

24  OTHER REASONS IN OUR PAPERS, THERE'S A CASE THAT -- AN ANTITRUST

25  CASE IN FRONT OF JUDGE WILKEN.  AND THE CENTER MADE THE SAME

1    OBJECTION ABOUT THE DENOMINATOR ISSUE, AND JUDGE WILKEN OVERRULED

2    IT.

3         THE NOTION THAT WE SOMEHOW LOOK AT THE EXPERT COSTS AS A

4    PROFIT CENTER FOR US IS WILDLY OUT OF TOUCH WITH THE REALITY OF

5    BEING A PLAINTIFF'S LAWYER.

6         I THINK OUR EXPERT EXPENSES HERE WERE OVER $2.8 MILLION.

7    MOST OF IT WAS FOR EXPERTS.  AND I CAN TELL YOU WHEN MR. FRIEDMAN

8    WOULD CALL ME UP AND SAY:

9              "I NEED ANOTHER HUNDRED.  I NEED ANOTHER 250," IT WAS

10   NOT A PLEASANT CONVERSATION.  IT'S NOT:

11             "OH, GREAT.  WE'RE GOING TO MAKE MONEY OFF OF THIS."

12   THIS IS CASH GOING OUT OF THE DOOR.  AND WE'RE A CONTINGENT FEE

13   FIRM AND WE DON'T HAVE CASH COMING IN EVERY MONTH.

14        SO THERE'S NO PADDING GOING ON WITH RESPECT TO EXPERTS

15   BECAUSE WE THINK WE'RE GOING TO MAKE A BUNCH OF MONEY OFF OF

16   THAT.

17             **THE COURT:**  THANK YOU.

18        **MR. BERMAN:**  THAT'S ALL I HAVE, YOUR HONOR.

19             **THE COURT:**  THANK YOU.  MR. FRIEDMAN, YOU WANT TO ADD

20   ANYTHING?

21        **MR. FRIEDMAN:**  OTHER THAN TO CONFIRM I DO RECEIVE THOSE

22   PHONE CALLS.

23             **THE COURT:**  WE'LL AGREE TO THAT.

24        ALL RIGHT.  ANYTHING FROM THE DEFENSE SIDE WITH RESPECT TO

25   MR. HOLYOAK'S ARGUMENTS?

1          **MR. KAVANAGH:**  NO, YOUR HONOR.

2          **THE COURT:**  MR. MARKHAM?

3          **MR. MARKHAM:**  NO, YOUR HONOR.

4          **THE COURT:**  ALL RIGHT.  SO LET'S NOW MOVE ON TO

5    MR. CHRISTOPHER ANDREWS ON THE PHONE.

6        I'LL GIVE YOU AN OPPORTUNITY, MR. ANDREWS, TO MAKE WHATEVER

7    ARGUMENT YOU WISH TO MAKE THAT HAS NOT BEEN ADDRESSED BEFORE AND

8    IN THE PAPERS.  SO YOU HAVE THE FLOOR NOW.

9          **OBJECTOR ANDREWS (BY PHONE):**  THANK YOU VERY MUCH, YOUR

10   HONOR, FOR ALLOWING ME TO APPEAR TODAY VIA TELEPHONE.  I KNOW

11   IT'S NOT COMMON.

12       TWO THINGS OR A COUPLE OF THINGS.  ONE, I HEARD THAT A

13   POTENTIAL RECIPIENT OF AN AWARD COULD ALSO RECEIVE IT BY ACH,

14   WHICH OBVIOUSLY ADDRESSES MY CONCERN THE FACT THAT PEOPLE WHO

15   DON'T HAVE ELECTRONIC AVAILABILITY TO RECEIVE FUNDS WOULDN'T BE

16   ABLE TO GET ANYTHING.  SO THAT KIND OF TAKES AWAY MY CONCERN

17   THERE.

18       THE SECOND THING MR. BERMAN BROUGHT UP WAS THE FACT THAT HE

19   TALKED ABOUT IMPRESSIONS, WHICH IS WHAT THE COURT ALSO BROUGHT

20   UP.  I WOULD REQUEST THAT THE COURT REVIEW THE SUBMISSION.  IT'S

21   NOT IN FRONT OF ME RIGHT NOW.  IT WAS LIKE A 25 OR 30-PAGE

22   OVERVIEW FROM A NOTICE EXPERT.  MILLIONS AND MILLIONS OF PEOPLE

23   DO NOT SEE THAT INTERNET NOTICE BASED ON THE PERCENTAGES.

24       THE NEXT THING IS -- WHICH THE COURT BROUGHT UP -- IS IF

25   THIS NOTICE IS DEFECTIVE, THAT IN ITSELF VIOLATES RULE 23.

1    THERE IS A CASE OUT THERE, UNION ASSET MANAGEMENT HOLDING AG

2  VERSUS DELL, INC., 669 F.3D 632 641.  IT'S FROM THE FIFTH CIRCUIT

3  IN 2012, WHERE THAT WAS --  THAT SETTLEMENT WAS REJECTED BECAUSE

4  OF A LOW CLAIMS TAKE RATE.

5    AND THE MOST RECENT ONE, WHICH I DON'T HAVE RIGHT IN FRONT

6  OF ME, IS THE REMINGTON TRIGGER CASE WHERE THEY HAD 13 OR

7  14-MILLION RIFLES AND ONLY 2,000 PEOPLE WHO HAD --

8        **THE COURT:**  MR. ANDREWS, WOULD YOU MIND SLOWING DOWN?

9        **OBJECTOR ANDREWS (BY PHONE):**  OH, SURE.

10        **THE COURT:**  MAKE BELIEVE THIS IS A -- WHICH IT IS -- A

11  WRITTEN EXERCISE RATHER THAN AN ORAL ONE.  AND THE COURT REPORTER

12  IS GREAT, BUT HER FINGERS ARE BEGINNING TO SMOKE I SEE FROM HER

13  MACHINE THERE.  SO JUST SLOW DOWN A LITTLE.  WE'LL GIVE YOU AS

14  MUCH TIME AS YOU NEED.

15        **OBJECTOR ANDREWS (BY PHONE):**  SURE.  I'LL SLOW DOWN.

16        **THE COURT:**  THANK YOU.

17        **OBJECTOR ANDREWS (BY PHONE):**  SO THE UNION ASSET

18  MANAGEMENT CASE IS ONE THAT IS IN THE FIFTH CIRCUIT, NOT THE

19  NINTH.

20    THERE IS THE REMINGTON CASE THAT JUST WAS REJECTED NOT TOO

21  LONG AGO, WITHIN A COUPLE OF MONTHS, WHERE THEY ONLY HAD LIKE

22  2000, 3,000 CLAIMS TO FIX THE TRIGGERS ON DEFECTIVE RIFLES OUT OF

23  13 MILLION, AND THAT WAS REJECTED.

24    SO I THINK IF THE COURT IS GOING TO FIND THAT THE NOTICE IS

25  DEFECTIVE, IT CAN'T APPROVE THE SETTLEMENT UNDER RULE 23.  IT

1 WOULD ALSO VIOLATE DUE PROCESS.  IF THERE'S 73 MILLION PEOPLE AND

2 WE'VE 500,000 FILING AND WE HAVE A NOTICE PROGRAM THAT IS ALL

3 INTERNET-BASED AND MAYBE POINT -- MAYBE 1 PERCENT OF THE TOTAL

4 IMPRESSIONS ARE ACTUALLY VIEWED, I DON'T SEE HOW THE COURT COULD

5 APPROVE IT.

6        **THE COURT:**  SO WHAT WOULD YOU PROPOSE, MR. ANDREWS?  I

7 MEAN CLEARLY, ASSUMING THAT THE PLAINTIFFS HAVE CARRIED THEIR

8 BURDEN IN ALL OTHER ASPECTS OF THIS, AND LET'S ASSUME THAT THE

9 NOTICE IS LACKING OR DEFICIENT UNDER THE RULE, HOW WOULD YOU FIX

10 IT SO THAT IT WOULD BE -- WOULD IT ESSENTIALLY MEET THE LEGAL

11 PRINCIPLES IN THE CASES THAT YOU CITE TO THE COURT?

12        **OBJECTOR ANDREWS (BY PHONE):**  THAT'S A REALLY GOOD

13 QUESTION THAT'S BEEN GOING THROUGH MY MIND AS I'VE BEEN LISTENING

14 TO THE PEOPLE WHO HAVE COME IN FRONT OF ME.

15    I GOT THE IMPRESSION FROM LISTENING IS THAT IT SEEMS LIKE

16 THE BURDEN OF PROOF HAS SHIFTED TO THE OBJECTORS TO TRY TO COME

17 UP WITH THE ANSWER.

18        **THE COURT:**  NO.  THAT'S NOT ACCURATE.  I'M ONLY ASKING

19 BECAUSE THE COURT'S TRYING TO MAKE THE CORRECT DECISION.  SO ANY

20 INPUT FROM PEOPLE WHO HAVE A STAKE -- AND THE COURT WILL DECIDE

21 LATER WHO HAS THE BURDEN AND WHAT THE LEGAL PRINCIPLES ARE.

22    BUT I WOULD LIKE TO GET YOUR VIEWS ABOUT IS IT -- AGAIN, THE

23 BURDEN IS WHAT THE BURDEN IS.  I'M NOT GOING TO CHANGE THE BURDEN

24 OR SHIFT IT.  IS THERE SOMETHING THAT YOU HAVE IN MIND THAT YOU

25 THINK WOULD BE ESSENTIALLY BETTER?

1        **OBJECTOR ANDREWS:**  AS FAR AS NOTIFYING CLAIMANTS --

2   AND, AGAIN, I UNDERSTAND CLASS COUNSEL'S CONCERN ABOUT THE COSTS

3   OF NOTICE.  IT'S OBVIOUS THEY DON'T WANT TO SPEND A FORTUNE

4   NOTIFYING CLIENTS.  BUT AT THE SAME TIME HOW WOULD YOU DO IT?  DO

5   YOU SUBPOENA RECORDS FROM A BIG BOX STORE LIKE A COSTCO AND, SAY,

6   TRY AND FIND OUT THE CREDIT CARD INFORMATION?  PEOPLE WHO HAVE

7   PAID ELECTRONICALLY FOR THEIR PURCHASES, WHICH WOULD INCLUDE

8   MILK?

9        IT'S A REALLY GOOD QUESTION.  I JUST THINK THAT MAYBE CLASS

10  COUNSEL DIDN'T THINK THE WHOLE THING THROUGH, AND THEY HAVE COME

11  UP WITH -- YOU KNOW, THEY HAVE GOT ONE ANSWER, AND THAT'S IT,

12  WHICH OBVIOUSLY DOESN'T WORK.

13       SO AT THIS POINT I'D HAVE TO DEFER TO THE COURT TO DETERMINE

14  WHAT MIGHT BE THE BEST ACTION TO TAKE AS FAR AS NOTICING PEOPLE

15  WHO WOULD -- WHO ARE LEGALLY ENTITLED TO SOME OF IT.

16            **THE COURT:**  ALL RIGHT.  ANYTHING ELSE?

17            **OBJECTOR ANDREWS (BY PHONE):**  JUST, AGAIN, THANKS FOR

18  ALLOWING ME TO APPEAR BY TELEPHONE.  I KNOW IT'S NOT COMMON.

19            **THE COURT:**  YOU'RE WELCOME.  ALL RIGHT.

20       LET ME HEAR FROM MR. BERMAN IN RESPONSE TO MR. ANDREWS'

21  ARGUMENT.  OR MR. FRIEDMAN.

22            **MR. FRIEDMAN:**  THANK YOU, YOUR HONOR.  I DON'T WANT TO

23  BELABOR THE NOTICE ISSUE, BUT I KNOW THE COURT IS FOCUSED ON IT.

24  FIRST -- AND IT DOESN'T CHANGE THE NUMBERS DRAMATICALLY, BUT I

25  JUST WANT THE COURT TO HAVE THE RIGHT CONCEPTUALIZATION HERE,

WHICH IS IN -- SO WE SUBMITTED A DECLARATION BY MR. VASQUEZ,

ALAN VASQUEZ.  AND MR. VASQUEZ IS A NOTICE EXPERT.  HE'S BEEN

DOING THIS FOR DECADES.  AND AS THE COURT KNOWS, THE TEST IS BEST

PRACTICABLE NOTICE.  IT IS THE ENEMY -- PERFECTION CANNOT BE THE

ENEMY OF THE GOOD.

AND WE'RE NOT CLAIMING THAT IT'S PERFECT, BUT THE HOUSEHOLD

NUMBERS ARE 38 MILLION.  THAT'S A HOUSEHOLD NUMBER BECAUSE YOU

MAY HAVE THE FATHER OR THE WIFE OR WHOMEVER IS BUYING THE

GROCERIES, AND SO THEREFORE IT IS A SMALLER NUMBER.  IT'S STILL A

BIG NUMBER.

BUT WHAT YOU HAVE TO BALANCE -- AND THAT'S WHAT I'M SIMPLY

TRYING TO ARTICULATE FOR THE COURT -- IS THAT IT'S NOT A MATTER

THAT WE DIDN'T THINK THROUGH THIS.  IT'S A MATTER OF WE DEVOTED

EXTENSIVE RESOURCES IN THE WAY THAT WE ARE GOING TO REACH THE

MOST EYES.

AND THE FACT THAT WE HAVE MORE THAN 70 TO 75 PERCENT, AT

LEAST, AND EVEN IF YOU LOOK AT AND START TALKING ABOUT NOT JUST

THE BANNER IMPRESSIONS, YOUR HONOR, OF 179 MILLION, WHICH IS IN

PARAGRAPH 21 OF MR. VASQUEZ'S DECLARATION, BUT THEN YOU ALSO LOOK

AT, YOUR HONOR, THAT YOU ALSO HAD FACEBOOK PAGE AND TEXT LINKS.

AND AS OF NOVEMBER, YOUR HONOR, THERE WERE 4.481 MILLION

IMPRESSIONS.  AND THEN, WE ALSO HAD ALSO TWITTER, YOUR HONOR.

AND THERE WERE MORE THAN 916,000 IMPRESSIONS.

AND SO, YOUR HONOR, WE BASICALLY HAVE A STATEMENT BY

MR. VASQUEZ IN THE RECORD IN PARAGRAPH 21 THAT THERE WAS A REACH

1    OF A MINIMUM OF 75 PERCENT OF THE ADULT RESIDENTS IN THE STATES

2    AND THE DISTRICT OF COLUMBIA.

3         AGAIN, PARAGRAPH 21.  AND THIS WOULD BE DOCUMENT 451-3, YOUR

4    HONOR.  AND SO WHAT YOU HAVE ON THE DETAILED FACTS BEFORE THE

5    COURT IS THAT YOU HAVE A FACTUAL BASIS IN THE RECORD OF

6    75 PERCENT OR MORE, WHICH IS EQUAL TO OR GREATER THAN MOST ALL

7    CASES WITH THE EXCEPTION OF THOSE VERY UNIQUE CASES, YOUR HONOR,

8    WHEN WE HAVE THE ACTUAL PURCHASE RECORDS THAT CAN BE TIED TO

9    INDIVIDUALS.

10            **THE COURT:**  WHAT INFERENCE, IF ANY, CAN OR SHOULD THE

11   COURT DRAW FROM AN EVIDENTIARY PERSPECTIVE FROM THE NUMBER OF

12   IMPRESSIONS VERSUS THE NUMBER OF CLAIMS EMANATING FROM THOSE?

13            **MR. FRIEDMAN:**  YOUR HONOR, AND SO IT WOULD BE THE SAME

14   THING IF I TOLD YOU IN THE OLDEN DAYS WE GOT A HUNDRED -- WE GOT

15   A PUBLICATION NOTICE IN USA TODAY THAT HAD IMPRESSIONS OF A

16   HUNDRED MILLION PEOPLE.  AND THEN, THE CLAIMS RATE WAS WITHIN THE

17   CLAIMS RATE THAT WE HAVE HERE, WHICH IS STANDARD.  IT'S

18   UNFORTUNATE, BUT IT'S STANDARD.

19        AND SO WHAT THE ANSWER IS IS THAT VERY FEW PEOPLE ARE

20   ANIMATED TO ACT.  AND THAT'S -- AND WHAT WE FIND IS THAT WHEN THE

21   DOLLAR NUMBERS -- MR. BERMAN'S VERY EXPERIENCED IN THE TOYOTA

22   CASE -- WHEN THE DOLLAR NUMBERS ARE LARGE YOU GET LARGER NUMBERS,

23   BUT THEY ARE STILL SMALL RELATIVE TO WHAT THEY SHOULD BE.  IT'S

24   THE REALITY OF IT.

25            **THE COURT:**  PUTTING IT ANOTHER WAY, IF SOMEBODY IS

1    GOING TO GET FIVE OR TEN BUCKS OUT OF IT, THEY SAY:  "IT'S NOT

2    WORTH MY TIME."

3           **MR. FRIEDMAN:**  CORRECT.  THAT'S EXACTLY RIGHT, YOUR

4    HONOR.  SO WHAT WE'VE DONE -- AND I'M NOT TRYING TO TOOT OUR OWN

5    HORN -- BUT WHAT WE'VE DONE IS A COUPLE OF THINGS TO TRY TO

6    REDUCE THAT FRICTION.

7           ONE:  THE ONLINES CLAIMS FORM, IT IS LITERALLY YOU FILL IN A

8    BOX, YOU PUT IN THE E-MAIL ADDRESS.  THAT'S IT.  YOU PUT IN YOUR

9    NAME, YOUR E-MAIL ADDRESS.  YOU CHECK THAT YOU BOUGHT.  THAT'S

10   IT.  THERE'S NO PAPERWORK REQUIRED.  THERE'S NOTHING.

11          AND THEN, TO GET PAST THE ISSUE OF CHECKING ACCOUNT OR ANY

12   OF THOSE ISSUES, WE MAKE IT SEAMLESS IN TERMS OF GETTING THAT

13   E-MAIL ADDRESS AND BEING ABLE TO LITERALLY DRIVE PAYMENTS TO

14   EVERY SINGLE HUMAN BEING WHO RECEIVES THAT E-MAIL ADDRESS.

15          AND WHAT WE'RE HOPING, WHAT WE'RE HOPING IS THAT THE LONG

16   ARC OF THIS TYPE OF EASY CLAIM FORM, EASY ACCESS IN TERMS OF

17   FINANCIALLY SAYING:  "YOU HAD TO DO NOTHING FOR 10, 15, $20.  ALL

18   YOU HAD TO DO WAS PUT IN AN E-MAIL ADDRESS."

19          THAT THE HUMAN CONDITION OVER TIME WILL START ACTING MORE TO

20   SAY:  "IT'S THIS EASY."

21          AND SO, I MEAN, I'LL TELL YOU PERSONALLY, MY WIFE HAS A

22   DISTRIBUTION LIST.  AND SHE SENT NOTICE TO A WHOLE BUNCH OF

23   MOTHERS' GROUPS AND DROVE A HUNDRED CLAIMS.  AND SAID:  "WOW,

24   THIS IS INCREDIBLY EASY."

25          AND SO, BUT THESE PEOPLE DON'T KNOW TO ACT OTHER THAN SEEING

THINGS.  AND IT IS NOT PART OF THE DEFECTIVENESS OF THE NOTICE.

IT'S PART OF JUST CONDITIONING PEOPLE OVER TIME THAT IT'S WORTH

IT TO TAKE A MINUTE OR 30 SECONDS.  IT'S LITERALLY 30 SECONDS TO

FILL OUT THE FORM, YOUR HONOR.

**THE COURT:**  ALL RIGHT.  THANK YOU.

ALL RIGHT.  MR. BERMAN, DO YOU WANT TO ADD ANYTHING?

**MR. BERMAN:**  JUST VERY BRIEFLY ON THIS CLAIMS RATE

ISSUE, YOUR HONOR.  MR. FRIEDMAN IS RIGHT, AND I'LL GIVE YOU AN

EXAMPLE HOW RIGHT HE IS.

SO IN THE TOYOTA UNINTENDED ACCELERATION CASE, PEOPLE WHO

SOLD THEIR CAR AND HAD A DIMINUTION IN VALUE, NOW THE CAR IS THE

SECOND MOST IMPORTANT ASSET.  YOU'D THINK PEOPLE WOULD BE

INTERESTED IN MAKING A CLAIM.

AND THE MINIMUM YOU WOULD GET WAS 5,000, AND THE MAXIMUM YOU

CAN GET, I THINK, WAS $10,000.  REAL MONEY.  CLAIMS RATE WAS LESS

THAN 5 PERCENT.  I WAS ASTOUNDED.

SO NOW HERE WE'RE TALKING ABOUT TEN TO $50.  SO THE FACT THE

CLAIMS RATE IS WHERE IT IS I AM ACTUALLY PLEASED FROM MY

EXPERIENCE THAT THERE'S OVER 450,000 SO FAR.

**THE COURT:**  ALL RIGHT.  THANK YOU.  ANYTHING FROM THE

DEFENSE SIDE?

**MR. MARKHAM:**  NO.  NO, YOUR HONOR.

**MR. KAVANAGH:**  NO.

**THE COURT:**  ALL RIGHT.  THANK YOU.  ALL RIGHT.  WHAT

I'M GOING TO DO NOW HAVING COVERED THE OBJECTORS, I'M GOING TO

1   TAKE A BRIEF RECESS.  I WANT TO CONSIDER THE RESPONSES OF

2   EVERYBODY AND MAKE SURE MY QUESTIONS ARE TIMELY, HAVE NOT BEEN

3   RESPONDED TO, AND THAT I GET DOWN TO SOME OTHER ISSUES THAT THE

4   COURT WISHES TO ADDRESS.

5        SO LET'S TAKE A FEW MINUTES, RELAX, AND WE'LL COME BACK.

6            **MR. BERMAN:**  THANK YOU, YOUR HONOR.

7            (THEREUPON, A RECESS WAS TAKEN.)

8            **THE CLERK:**  REMAIN SEATED AND COME TO ORDER.  COURT IS

9   AGAIN IN SESSION.

10           **THE COURT:**  REMAIN SEATED.

11       CAN I HAVE CLASS COUNSEL AT THE PODIUM, PLEASE?

12       SO I APPRECIATE COUNSEL'S PATIENCE.  I WAS TRYING TO

13  ASSIMILATE AND ABSORB EVERYBODY'S ARGUMENTS AND TO FINE TUNE THE

14  QUESTIONS THAT I HAD PLANNED TO ASK COUNSEL.  AND NOW THAT I'VE

15  HEARD YOUR ARGUMENTS SOME OF THE QUESTIONS HAVE BEEN ANSWERED.

16  SOME OF THEM I WANTED A LITTLE BIT FURTHER RESPONSE.

17       SO FIRST THING, ON THE SETTLEMENT, JUST FOR THE RECORD IN

18  LIGHT OF SOME OF THE ISSUES BRIEFED, HAVE THE PARTIES OR COUNSEL

19  MADE ANY PAYMENT TO ANY OBJECTOR OR POTENTIAL OBJECTOR IN THIS

20  CASE?

21           **MR. BERMAN:**  WE HAVE NOT, YOUR HONOR.

22           **THE COURT:**  ALL RIGHT.  NOW, ONE OF MR. O'BRIAN'S

23  OBJECTIONS RELATES TO THE LACK OF AVAILABLE INFORMATION REGARDING

24  THE NOTICE AND CLAIMS PROCESS.

25       THE COURT HAS THREE QUESTIONS ABOUT THAT.  FIRST, RESPONDING

1    TO MR. O'BRIAN'S OBJECTION THAT THE CLASS MEMBERS MAY NOT BE

2    MAKING CLAIMS BECAUSE THEY DON'T KNOW WHAT THE POSSIBLE RECOVERY

3    MAY BE, AND FEAR THAT IT MAY BE DE MINIMIS AND NOT WORTH THEIR

4    TIME.

5         WOULD IT BE POSSIBLE TO PUT SOME INFORMATION ON THE CLASS

6    WEBSITE TO MAKE THIS SOMEWHAT MORE CLEAR TO CLASS MEMBERS

7    VIEWING THE WEBSITE?  FOR EXAMPLE, COULD THE WEBSITE INCLUDE AN

8    ESTIMATE OF A RANGE OF APPROXIMATE DOLLAR VALUE THAT A CLASS

9    MEMBER MIGHT EXPECT TO RECEIVE UPON SUBMITTING A CLAIM WITH AN

10   APPROPRIATE DISCLAIMER THAT THE NUMBER MAY CHANGE DEPENDING UPON

11   HOW MANY CLAIMS ARE FILED?

12        THIS COULD EITHER BE UPDATED ON A REGULAR BASIS OR POSSIBLY

13   AUTOMATICALLY UPDATED VIA AN ALGORITHM AS CLAIMS ARE FILED.

14        **MR. BERMAN:**  WE CAN DO THAT, YOUR HONOR.

15        **THE COURT:**  OKAY.  THANK YOU.  ALL RIGHT.  I GUESS I'M

16   OBLIGED AS A FIDUCIARY TO ASK:  I ASSUME THE COST OF THIS WOULD

17   NOT BE SIGNIFICANT.

18        **MR. BERMAN:**  I DO NOT BELIEVE IT WOULD BE.

19        **THE COURT:**  OKAY.  GREAT.  THAT WORKS WELL.

20        ALL RIGHT.  HOW LONG WOULD IT TAKE TO IMPLEMENT THAT CHANGE

21   OR THAT PROCESS?

22        **MR. BERMAN:**  WELL, WE NOW KNOW -- YOU KNOW, WE HAVE A

23   NUMBER OF CLAIMS.  RIGHT?  I THINK WHAT WE WOULD HAVE TO DO IS TO

24   PROCESS THOSE CLAIMS TO FIGURE OUT HOW MANY WERE NOT HOUSEHOLDS

25   SO WE GET AN IDEA OF HOW THIS THING MAY SHAKE OUT.  BUT I DON'T

1    THINK IT SHOULD TAKE MORE THAN A WEEK TO TEN DAYS.

2              **THE COURT:**  ALL RIGHT.  LET'S SAY TEN DAYS FROM NOW,

3    MS. OTTOLINI.

4              **THE CLERK:**  SO THAT WOULD BE BY DECEMBER 27TH.

5              **THE COURT:**  AND THAT'S TO UPDATE THE CLASS WEBSITE WITH

6    RESPECT TO THE POSSIBLE VALUE OF THE CLAIMS.

7             **MR. BERMAN:**  AND I'M SPEAKING WITHOUT CONSULTING WITH

8    THE EXPERTS.

9              **THE COURT:**  I UNDERSTAND.

10             **MR. BERMAN:**  OKAY.

11             **THE COURT:**  IF IT NEEDS TO CHANGE YOU CAN CERTAINLY

12   SUBMIT A REQUEST FOR THE COURT, WHICH THE COURT WOULD, OF COURSE,

13   BE VERY AMENABLE TO.

14      SECOND QUESTION ON THIS ISSUE OF RELATING TO MR. O'BRIAN'S

15   OBJECTIONS.  COULD YOU PLEASE EXPLAIN TO THE COURT HOW PLAINTIFFS

16   DECIDED UPON THE DIFFERENCE IN THE SIZE OF THE AWARDS TO

17   INSTITUTIONAL AND INDIVIDUAL CLASS MEMBERS?

18      AND I'LL SAY THAT THE EXISTENCE OF SOME DIFFERENCE IS

19   INTUITIVE TO THE COURT, BUT WHAT IN THE RECORD SUPPORTS THE

20   SPECIFIC DIFFERENCE IN THE AWARD SIZES THAT WILL BE MADE.

21             **MR. BERMAN:**  ONE OF THE ENTITIES -- ONE OF THE

22   PLAINTIFFS WAS AN ENTITY:  BOYS AND GIRLS CLUB FROM CHICAGO.  AND

23   WE LOOKED AT THEIR EXPENDITURES VERSUS WHAT THE AVERAGE HOUSEHOLD

24   WAS.  AND THEIR EXPENDITURES WERE 28 TIMES THE AVERAGE HOUSEHOLD.

25   AND THAT'S HOW WE CAME UP WITH THE 28 TIMES.

1          **THE COURT:**  NOW, IS THAT IN THE RECORD?

2          **MR. BERMAN:**  IT IS IN THE RECORD.

3          **THE COURT:**  OKAY.  WHERE CAN THE COURT FIND THAT?  DO

4     YOU KNOW OFFHAND?  I'LL FIND IT, BUT --

5          **MR. BERMAN:**  I WILL -- IF IT'S OKAY WITH YOU, I'LL FIND

6     IT AND E-MAIL THAT TO THE CHAMBERS.

7          **THE COURT:**  NO, FILE IT.  E-FILE THE DOCUMENT.  WE

8     DON'T DO E-MAIL HERE.

9          **MR. BERMAN:**  OKAY.  THAT'S FINE.

10          **THE COURT:**  LAST QUESTION ON THIS ISSUE IN RESPONSE TO

11     MR. O'BRIAN'S OBJECTIONS.  IN THE INTEREST OF TRANSPARENCY, EVEN

12     THOUGH IT APPEARS THAT NO GROCERY LOYALTY DISTRIBUTION WILL BE

13     MADE, COULD YOU PLEASE EXPLAIN HOW THAT WOULD HAVE WORKED AND, IN

14     GENERAL, WHAT THE COSTS WERE ASSOCIATED WITH THAT TYPE OF -- THE

15     COURT DOESN'T UNDERSTAND HOW THAT WOULD ACTUALLY WORK.

16          **MR. BERMAN:**  OKAY.  AGAIN, COULD I YIELD TO MR.

17     FRIEDMAN, WHO DESIGNED THAT?

18          **THE COURT:**  PLEASE.

19          **MR. BERMAN:**  OKAY.

20          **THE COURT:**  FOR EXAMPLE, I KNOW THAT WE HAVE THESE

21     SAFEWAY CARDS.  THEY DON'T HAVE MONEY ON THEM.  BUT THEY HAVE

22     JUST FOR YOU, FOR EXAMPLE, OR THEY SPIT OUT A COUPON AT THE END

23     THAT SAYS:

24          "HEY, IT'S YOUR LUCKY DAY.  YOU CAN GET X, Y, Z," AND

25     YOU GET THAT COUPON.  IS THAT WHAT YOU'RE TALKING ABOUT?  AND

1   WHAT WOULD BE THE COST ASSOCIATED THAT?

2        **MR. FRIEDMAN:** YES, YOUR HONOR. SO LET ME DESCRIBE THE

3   CONCEPT, BECAUSE IT WENT -- IT DIDN'T GET INTO THE EXECUTION

4   PHASE, BUT HERE'S THE CONCEPT. AND THE CONCEPT WAS -- AND WE

5   TALKED TO EXPERTS IN COUPON MARKETING. AND IT IS SO, FOR

6   EXAMPLE, THE COURT RAISED SAFEWAY CARD. AND YOU WOULD --

7   ESSENTIALLY WE WOULD WORK WITH PROGRAMS THAT WOULD EFFECTIVELY

8   WHEN YOU SWIPED OR WENT TO THE MARKET AND BOUGHT A PRODUCT, AND

9   WE WERE TRYING TO SEE IF YOU COULD EVEN BE A CLASS PRODUCT

10  BECAUSE THAT WAS PART OF THE DIFFICULTY, TO ENSURE THAT IT WAS A

11  CLASS PRODUCT: MILK OR A SPOONABLE MILK ITEM, DAIRY ITEM, THAT

12  YOU WOULD GET AN AUTOMATIC DEDUCTION OFF OF YOUR TOTAL BILL. AND

13  THAT'S WHAT IT WOULD BE IS THAT ANYONE WHO USED A PHONE NUMBER

14  FOR A SAFEWAY CARD, LET'S SAY, WOULD GET A $5 REDUCTION.

15     IF YOU SPENT $80 OR $90, WHATEVER THE NUMBER WAS, YOU WOULD

16  SIMPLY GET A REDUCTION IN YOUR BILL.

17       **THE COURT:** OKAY. WHAT ARE THE IMPEDIMENTS TO DOING

18  THAT? IS IT COST OR IS IT YOU HAVE TO GET, AS YOU SAID, WITH THE

19  IN-STORE ADVERTISING YOU WOULD HAVE TO GET THE PARTICULAR STORES

20  TO COOPERATE?

21       **MR. FRIEDMAN:** CORRECT. IT WAS BOTH OF THOSE, YOUR

22  HONOR. SO YOU WOULD HAVE TO -- THE COST AS LEAST $500,000 TO A

23  MILLION DOLLARS WITHOUT REALLY FULLY SCOPING THE ISSUE. THEN IT

24  WAS HAVING AN AGREEMENT BY THE GROCERY STORES. THEN, THERE WAS

25  ALSO, YOUR HONOR, PROBLEMS OR CHALLENGES, I SHOULD SAY, BECAUSE

1   YOU HAD TO ALLOCATE DOLLARS TO EACH GROCERY STORE CHAIN.

2       AND SO THEN YOU'D HAVE TO MAKE SURE THAT YOU WOULD ALLOCATE

3   IT APPROPRIATELY FOR THE CHAIN.  AND THEN, IT WOULD BE A LOT OF

4   THESE PROGRAMS DON'T OPERATE WHERE THEY DO AN AUTOMATIC

5   DEDUCTION.  AND SO WE'D HAVE TO MAKE SURE THAT THAT AUTOMATIC

6   DEDUCTION WAS CAPPED FOR EACH STORE SO THAT IT DIDN'T IN SOMEHOW

7   GO BEYOND THE MONEY THAT EXISTED FOR THE PROGRAM.

8       AND SO THERE WERE TECHNICAL CHALLENGES THAT WERE BOTH IN

9   TERMS OF WHETHER WE COULD SUCCESSFULLY DO IT, AS WELL AS WHAT THE

10  COST ULTIMATELY WOULD HAVE BEEN.  WE DIDN'T HAVE ENOUGH

11  VISIBILITY TO BE SURE THAT WE WEREN'T GOING TO SPEND FAR IN

12  EXCESS OF EVEN THE 500,000 OR MILLION DOLLARS.

13          **THE COURT:**  ALL RIGHT.  NEXT POINT.  AND THIS IS --

14  REALLY, IT'S SORT OF A QUESTION, BUT IT'S ALSO ESSENTIALLY A

15  DIRECTION.

16      THE COURT WOULD LIKE TO GET A -- COUNSEL HAS, BECAUSE WE'RE

17  OBVIOUSLY SOME PERIOD OF TIME BEYOND WHEN THE BRIEFING WAS

18  COMPLETED, BUT CERTAIN ADDITIONAL REPRESENTATIONS WERE MADE WITH

19  RESPECT TO SOME NUMBERS, STATISTICS.  SO I'D LIKE TO GET A BRIEF

20  UPDATED VASQUEZ DECLARATION, OR ANY OTHER KNOWLEDGEABLE PERSON,

21  TO PROVIDE THE UPDATED NUMBERS REGARDING IMPRESSIONS, CLAIMS

22  FILED AND THE NUMBERS THAT HAVE BEEN DISCUSSED HERE TODAY.  AND

23  THE QUESTION WOULD BE HOW LONG WOULD IT TAKE FOR -- COULD YOU DO

24  THAT WITHIN THE SAME TEN-DAY PERIOD?

25          **MR. BERMAN:**  WE WILL TRY.

1   **THE COURT:** VERY WELL. AGAIN, WE'LL SET TEN DAYS.

2   SAME TEN-DAY PERIOD, SAME DEADLINE. BUT IF IT NEEDS TO BE MOVED

3   WE'LL MOVE IT. WE'RE TRYING TO BE DEFERENTIAL TO ALL THE PARTIES

4   HERE.

5   NOW, TURNING TO THE ISSUES RAISED REGARDING THE SCOPE OF THE

6   RELEASE, THE COURT APPRECIATES THE DEFENDANTS' POINT THAT THE

7   SCOPE OF THE RELEASE WAS AN IMPORTANT BARGAINED-FOR ELEMENT IN

8   THE SETTLEMENT NEGOTIATIONS.

9   HOWEVER, COULD THE PARTIES PLEASE RESPOND MORE SPECIFICALLY

10  TO THE ISSUE RAISED BY MR. O'BRIAN, SPECIFICALLY: DO THE PARTIES

11  AGREE THAT BECAUSE THE RELEASE INCORPORATES ALL THE FACTUAL

12  ALLEGATIONS OF THE COMPLAINT, INCLUDING A BASIC OUTLINE OF THE

13  MILK INDUSTRY, IT MAY SWEEP FAR MORE BROADLY THAN THE CLAIMS OR

14  POTENTIAL CLAIMS IN THIS ACTION, ENCOMPASSING TOTALLY UNRELATED

15  FEDERAL AND STATE CLAIMS THAT RELATE TO THE MILK INDUSTRY,

16  INCLUDING PRODUCT LIABILITY TYPE CLAIMS?

17  **MR. BERMAN:** MY READING OF THE RELEASE, WHICH SAYS:

18  "IN ANY WAY ARISING OUT OF, IN CONNECTION WITH, OR

19  RELATING TO ALLEGATIONS DESCRIBED IN THE COMPLAINT," THAT'S

20  THE RELEASED CONDUCT. I DON'T UNDERSTAND HOW -- AND I'D BE

21  SHOCKED IF THE DEFENDANTS TOOK THE POSITION, AND MAYBE THEY COULD

22  TELL YOU THIS, AND IT WOULD BE ON THE RECORD -- THAT SOMEONE WHO

23  HAD PERSONAL INJURY SOMEHOW -- FIRST OF ALL, I DON'T KNOW HOW A

24  PERSONAL INJURY COULD ARISE FROM PRICE-FIXING. BUT LET'S ASSUME

25  SOMEONE SLIPPED ON MILK SOMEWHERE THAT WAS BEING TRANSPORTED BY

ONE OF THE DEFENDANTS.

**THE COURT:** OR THE MILK WAS ADULTERATED, FOR EXAMPLE.

**MR. BERMAN:** YES. I DON'T BELIEVE THAT THAT WOULD EVEN BE CLOSELY RELEASED BY THIS, AND I THINK THEY WOULD CONFIRM THAT.

**THE COURT:** ALL RIGHT. WELL, LET'S HEAR FROM THE PROVERBIAL HORSE'S MOUTH, OR FROM THE MILKMAN'S MOUTH, IF YOU WILL.

**MR. MARKHAM:** THANK YOU, YOUR HONOR. FIRST OF ALL, THIS IS FAIRLY STANDARD LANGUAGE. IT'S AN OLD PROBLEM. THE DEFENDANTS NEED TO BUY GLOBAL PEACE. WE CAN'T HAVE A GUIDO SAVERI COMING IN WITH ANOTHER COMPLAINT, WHICH IS ALWAYS A PROBLEM. WE NEED A SCOPE OF RELEASE THAT COVERS THAT.

AS THE COURT HAS ACKNOWLEDGED, THIS WAS NEGOTIATED IN DEPTH AND IN GOOD FAITH BETWEEN THE PARTIES. THIS WASN'T A GIVEAWAY. THIS IS WHAT WE BOUGHT.

**THE COURT:** WELL, FOR MY DETERMINATION, MR. MARKMAN, IS WHAT IS THE "THIS" YOU BOUGHT? DID YOU BUY PEACE FROM ANY POSSIBLE -- PUT IT MORE SPECIFICALLY: DID YOU BUY PEACE ONLY FROM ANTITRUST-TYPE CLAIMS, OR DO YOU BELIEVE YOU BOUGHT PEACE FROM ALL POSSIBLE CLAIMS THAT CAN BE MADE BY ANY CLASS MEMBER AGAINST THE MILK INDUSTRY.

**MR. MARKHAM:** WELL, YOUR HONOR, FOR EXAMPLE, A CATTLEMAN WITH A WORKERS' COMP CLAIM ISN'T BARRED FROM BRINGING THAT CLAIM UNDER THIS RELEASE. THERE'S NO REASONABLE READING OF THIS LANGUAGE.

1    WHEN WE REFER TO -- WHEN THE DOCUMENT REFERS TO THE

2   ALLEGATIONS IN THE COMPLAINT, AND IT ALSO DOES POINT TO THE

3   CAUSES OF ACTION AND THE CONDUCT AND SPECIFICALLY MENTIONS THE

4   CONDUCT OUT OF WHICH IN THE ALL ARISES -- THAT'S WHAT THIS IS

5   INTENDED TO, AND I THINK DOES CAPTURE.  IF YOU TRY AND CABIN IT

6   IN, YOU RUN THE RISK -- FIRST OF ALL, I'M NOT HERE AUTHORIZED BY

7   ANY OF THE DEFENDANTS TO NEGOTIATE ANOTHER RELEASE, SO I CAN'T

8   AGREE TO THAT.  THE COURT CAN IMPOSE WHATEVER THE COURT CHOOSES

9   TO IMPOSE, OF COURSE.

10   BUT ONE OF THE PROBLEMS IS IF YOU TRY TO CABIN IT IN AND

11   SAY:  "WELL, THESE ARE THE SPECIFIC, YOU KNOW, TYPES OF CLAIMS

12   AND SO ON," THERE'S ALWAYS A GAP.  AND SO THAT SAYS "INCLUDED,

13   BUT NOT LIMITED TO, YOU KNOW, CLAIMS FOR UNFAIR COMPETITION AND

14   THE LIKE."

15   BUT THE INTENT OF THIS, TO ANSWER YOUR QUESTION, IS NOT TO

16   FORECLOSE THE CATTLEMAN'S WORKERS' COMP CLAIM.  IT'S NOT TO

17   FORECLOSE SOMEBODY WHO HAS, YOU KNOW, A TAINTED PRODUCT CLAIM.

18   THE OTHER THING YOU'LL NOTICE ABOUT THIS IS THE CUTOFF FOR

19   THIS IS LAST AUGUST.  I THINK, YOU KNOW, IN PRACTICAL TERMS WHAT

20   ARE WE REALLY CONCERNED ABOUT HERE?  IF SOMEBODY HAS A TAINTED

21   MILK CLAIM, A, IT'S NOT, I THINK, FAIRLY COVERED BY THIS.  AND,

22   B, ONE WOULD HAVE THOUGHT THAT THAT WOULD BE ALIVE NOW.

23   **THE COURT:**  UNLESS SOMEBODY TRIED TO GET A MONOPOLY ON

24   TAINTED MILK, FOR EXAMPLE.

25   **MR. MARKHAM:**  THERE'S THAT.  IF SOMEONE WANTS A

1 MONOPOLY ON TAINTED MILK, WE WILL HAVE TO FIGURE OUT WHERE THAT'S

2 COMING FROM.

3      **THE COURT:** WELL, I THINK YOU HAVE ADEQUATELY RESPONDED

4 TO THAT. THANK YOU.

5     ALL RIGHT. NEXT QUESTION. LIKEWISE, COULD THE PARTIES

6 ADDRESS MR. HOLYOAK'S CONCERNS ABOUT THE RELEASE; THAT THE

7 RELEASE OF FUTURE CLAIMS COMBINED WITH THE LACK OF EXPRESSLY

8 STATED END DATE IN THE CLASS DEFINITION IS OVERBROAD?

9      **MR. BERMAN:** I THINK MR. MARKHAM JUST RESPONDED.

10      **THE COURT:** I THINK THAT'S CORRECT. YOU DID.

11     NEXT QUESTION. NOW, WE'LL GO TO ATTORNEYS' FEES. SO CLASS

12 COUNSEL REQUESTS A FEE AWARD OF ONE-THIRD OF THE SETTLEMENT FUND,

13 OR $17,333,333. THEY ASSERT THAT THIS IS THE EQUIVALENT TO AN

14 IMPUTED MULTIPLIER OF 2.7 ON THE LODESTAR CALCULATION OF

15 $6,470,731.

16     THE COURT IS TENTATIVELY INCLINED TO AWARD AN UPWARDS

17 ADJUSTMENT TO THE LODESTAR IN SOME AMOUNT DUE AS THE COURT

18 EXPRESSED AT THE BEGINNING OF THIS HEARING IN SOME AMOUNT DUE TO

19 THE RISK TAKEN ON BY CLASS COUNSEL ON A CONTINGENCY BASIS, THE

20 COMPLEXITY OF THE ISSUES AND THE SIZE OF THE RECOVERY FOR THE

21 CLASS COMPARED TO PLAINTIFFS' TOTAL ESTIMATED DAMAGES.

22     HOWEVER, IN CONSIDERING AN UPWARDS ADJUDGMENT TO A LODESTAR,

23 THE FOREMOST FACTOR TO BE CONSIDERED IS THE, QUOTE, "BENEFIT

24 ATTAINED FOR THE CLASS," UNQUOTE. AND I'M CITING THERE IN RE:

25 BLUETOOTH HEADSET PRODUCTS LIABILITY LITIGATION, 654 F.3D, 935 AT

1    942, DECIDED BY THE NINTH CIRCUIT IN 2011.

2          UNDER THIS FACTOR, MAY THE COURT CONSIDER ONLY THE SIZE OF

3    THE RECOVERY OR MAY THE COURT ALSO CONSIDER LIMITATIONS OF THE

4    NOTICE AND DISTRIBUTION PLAN AND THE LACK OF BENEFIT TO THE MORE

5    THAN 99 PERCENT OF CLASS MEMBERS WHO HAVE NOT FILED A CLAIM?

6          **MR. BERMAN:**  AND MY ANSWER WOULD BE:  YOU HAVE THE

7    DISCRETION TO CONSIDER ANY OF THOSE FACTORS.  BUT I THINK THE

8    RIGHT ANSWER HERE IS TO LOOK AT THE PERCENTAGE OF RECOVERY THAT

9    WE GOT FOR THE CLASS OF THEIR AGGREGATE DAMAGES.  AND THE REASON

10   I SAY THAT, YOUR HONOR, IS IF YOU START FOCUSING ON HOW MUCH EACH

11   INDIVIDUAL CONSUMER GETS IN THIS CASE, 10, 20, 30, $40, AND YOU

12   SAY:  "WELL, YOU ARE ONLY GIVING THE CLASS MEMBERS A RELATIVELY

13   SMALL AMOUNT OF MONEY," THEN YOU'RE DISINCENTIVIZING US FROM

14   BRINGING THESE KINDS OF CASES.

15         AND THE VERY PURPOSE, SOME WOULD SAY, OF RULE 23 IS TO

16   ENCOURAGE LAWYERS TO COME FORWARD FOR SMALL DOLLAR CLAIMS,

17   RECOGNIZING THAT THERE'S A HARM, AN AGGREGATE HARM TO SOCIETY

18   THAT IS VERY LARGE HERE.

19         **THE COURT:**  ALL RIGHT.  BUT YOU AGREE THAT THE ISSUE

20   BOTH IN DECIDING -- IN CONSIDERING, YOU KNOW, THE CONSIDERATION

21   THAT THE COURT WOULD GIVE TO THE ISSUE THAT IT JUST STATED, THE

22   COURT MAY GIVE CONSIDERATION TO THIS ISSUE, BOTH IN DECIDING

23   WHETHER TO APPROVE THE SETTLEMENT AND IN CALCULATING THE

24   MULTIPLIER AND THE LODESTAR; IS THAT CORRECT?

25         **MR. BERMAN:**  I AGREE.

1          **THE COURT:**  ALL RIGHT.  NOW, MAY THE COURT CONSIDER

2    SOME NOTION OF PROPORTIONALITY IN TERMS OF THE MODERATE BENEFIT

3    TO THE MINORITY OF THE CLASS COMPARED TO THE VERY HIGH END AWARD

4    REQUESTED BY COUNSEL, EITHER UNDER EXISTING LAW OR WITHIN THE

5    COURT'S DISCRETION?

6          **MR. BERMAN:**  I HAVE NOT FOUND A CASE THAT SAYS THAT.

7          **THE COURT:**  ALL RIGHT.  AND IS THAT -- YOU BELIEVE

8    THAT'S BECAUSE YOU'RE VERY EXPERIENCED IN THIS AREA THAT IT'S

9    COMPLETELY WITHIN THE COURT'S REASONABLE DISCRETION?

10          **MR. BERMAN:**  I DON'T THINK THE COURT HAS EVER DONE WHAT

11   YOU'RE DOING.

12          **THE COURT:**  I HAVEN'T DONE IT.  I'M JUST ASKING THE

13   QUESTIONS AT THIS POINT.

14          **MR. BERMAN:**  THE COURT HASN'T DONE WHAT YOUR QUESTION

15   IMPLIES FOR THE REASON I STATED EARLIER.  THIS IS THE SOCIETAL

16   BENEFIT OF GOING AFTER THE LARGE DOLLARS EVEN IF IT MEANS VERY

17   SMALL DOLLARS TO ANY INDIVIDUAL CONSUMER.

18       AND CAN I GO BACK ON THE --

19          **THE COURT:**  LET ME JUST KIND OF JUMP BACK AT YOU ON

20   THAT, BECAUSE YOU MENTIONED, AND I ACCEPT YOUR REPRESENTATION,

21   THAT IN THESE KINDS OF CASES IF YOU GET 3 PERCENT RESPONSE THAT'S

22   QUITE EXCELLENT.  AND IN THIS CASE ALTHOUGH IT'S LESS, IT'S STILL

23   PRETTY SUBSTANTIAL.

24       THE FLIP SIDE OF THE SOCIETAL BENEFIT IDEA IS THAT WHEN

25   COUNSEL TAKES ON THESE CASES THEY BASICALLY KNOW THAT THERE'S

1  GOING TO BE ULTIMATELY A RELATIVELY SMALL RETURN TO THE ENTIRE

2  CLASS.  AND, THEREFORE, THEY ARE AT RISK TO GETTING SOMETHING

3  LESS THAN A VERY HIGH END ATTORNEYS' FEES AWARD.  IS THAT RIGHT?

4          **MR. BERMAN:**  THAT'S CORRECT.  WE KNEW THAT THE AMOUNT

5  OF MONEY THAT ANY ONE PERSON MIGHT GET HERE MIGHT BE SMALL.

6          **THE COURT:**  AND THE CONCOMITANT RESULT MIGHT BE A

7  REDUCTION IN FEES IF THE COURT WERE TO APPLY SOME ESSENTIALLY

8  PROPORTIONAL ANALYSIS.

9          **MR. BERMAN:**  THAT'S NOT A RISK THAT I THOUGHT, BECAUSE

10  I DON'T THINK A COURT HAS DONE THAT.  AND THE REASON IS THE

11  FOLLOWING.  AND I'M GLAD TO GIVE YOU THE CASES ON THIS, BECAUSE

12  YOU'RE RAISING INTRIGUING QUESTIONS THAT REALLY WERE NOT BRIEFED.

13      THERE ARE CASES THAT SAY THAT THE VERY PURPOSE OF HAVING

14  PRIVATE ATTORNEYS DO ANTITRUST CLASS ACTIONS IS TO DETER

15  MISCONDUCT BY THE DEFENDANTS AND TO ACT AS PRIVATE ATTORNEY

16  GENERALS.

17      SO IF WE WERE GOING TO START A SYSTEM WHERE YOU WOULD GRADE

18  US BY HOW MUCH EACH INDIVIDUAL CONSUMER GOT, YOU WOULD BE GOING,

19  IN ALL DUE RESPECT, COMPLETELY CONTRARY TO THOSE NOTIONS:  A

20  PRIVATE ATTORNEY GENERAL AND DETERRENCE.

21      HERE WHEN I LOOKED AT THE CASE TO TAKE IT, I WAS SHOCKED

22  THAT THE DEFENDANTS HAD BRAZENLY CONSPIRED TO RAISE PRICES OF A

23  PRODUCT EVERYONE IN AMERICA USES.  AND SO I WANTED TO RIGHT A

24  WRONG.

25      AND I REALIZED THAT IT MAY BE A SMALL RECOVERY, BUT, A:  WHY

1    SHOULD WE LET THEM GET AWAY WITH IT?  AND, B:  THERE'S GOING TO

2    BE SOME DETERRENT EFFECT, I WOULD THINK, AFTER WHAT THEY HAVE

3    BEEN THROUGH, BOTH IN PAYING OUT THE SETTLEMENT, MILLIONS AND

4    MILLIONS OF DOLLARS, AND THE PROTRACTED LITIGATION THEY HAVE ALL

5    GONE THROUGH.

6          **THE COURT:**  WELL, LET ME ASK MAYBE A MORE DIRECT

7    QUESTION, BECAUSE YOU MAY HAVE ANSWERED THIS, BUT I'M NOT SURE I

8    HAVE THE SPECIFIC ANSWER.

9          SO, THE QUESTION IS:  WHAT IS COUNSEL'S BEST ARGUMENT THAT

10   THE COURT SHOULD AWARD A HIGHER AMOUNT OF FEES HERE THAN THE

11   NINTH CIRCUIT'S 25 PERCENT BENCHMARK?  PLEASE TALK ABOUT THE

12   WAYS, IN RESPONDING TO THE COURT'S QUESTION, IN WHICH THE RECORD

13   IN THIS CASE AND THE RECOVERY TO THE CLASS SUPPORTS A HIGHER

14   AWARD HERE, NOT ABOUT WHAT WAS DONE IN OTHER, YOU KNOW, CASES.

15         **MR. BERMAN:**  OKAY.  SO, WHEN I LOOK AT THE NINTH

16   CIRCUIT LAW, THE RODRIGUEZ CASE, FOR EXAMPLE, AND FRANKLY ALL THE

17   CASES THAT WE CITED IN OUR BRIEF, IN MEASURING THE SUCCESS OF

18   CLASS COUNSEL, THE COURT LOOKS AT THE TOTAL AMOUNT OUT THERE.

19   NOT THE AMOUNT CLAIMED, BUT THE TOTAL AMOUNT OUT THERE.  IN THIS

20   CASE IT WAS $52 MILLION.

21         NOW, WHY SHOULD THERE BE AN UPWARD ADJUSTMENT?  WE DON'T

22   ALWAYS ASK FOR AN UPWARD ADJUSTMENT.  YOU MAY THINK WE DO, BUT WE

23   DON'T.

24         SO, FOR EXAMPLE, IN JUDGE ROGERS' COURTHOUSE, IN THE

25   BATTERIES CASE, WE'RE ASKING FOR 25 PERCENT.  WHY?

1  PRECERTIFICATION.  THE SETTLEMENT AMOUNT IS NOT AS HIGH AS THIS

2  ONE IS, 30 PERCENT VERSUS 15 TO 20 IN THE BATTERIES CASE.  SO WE

3  DIDN'T THINK AN UPWARD ADJUSTMENT WAS APPROPRIATE.

4      AND IN THAT CASE IN BATTERIES WE'RE AT AN EARLY STAGE.  THIS

5  CASE, THIS CASE WAS EVE OF TRIAL.  NEXT THING WAS TRIAL.  NOT

6  MANY CLASS CASES GET THIS FAR.

7      IT WAS EXTRAORDINARILY COMPLEX.  THERE WERE 12 EXPERT

8  REPORTS.  THE DEFENDANTS HAD HIRED PROFESSOR MURPHY FROM CHICAGO,

9  ONE OF THE LEADING ECONOMISTS IN THE COUNTRY.  THEY HAD A SPECIAL

10  ECONOMIST JUST ON CALIFORNIA DAIRY PRICING.

11      THIS WAS AN EXTRAORDINARILY CUTTING EDGE ECONOMIC EXERCISE.

12  I DON'T HOW FAR YOU GOT INTO THE DAUBERT PAPERS AND THE

13  DECERTIFICATION --

14      **THE COURT:**  OH, I GOT WAY INTO IT.  I WAS ABOUT TO RULE

15  ON IT, SO I WAS PRETTY CLOSE TO RULING ON IT.

16      **MR. BERMAN:**  SO I DON'T HAVE TO PREACH TO YOU HOW

17  COMPLEX IT WAS.

18      **THE COURT:**  RIGHT.

19      **MR. BERMAN:**  AND SO WHEN I LOOK AT YOUR SUGGESTION THAT

20  IT'S A 25 PERCENT BENCHMARK -- THAT WAS WHAT YOU INDICATED WHEN

21  YOU CAME OUT -- THAT WOULD GIVE US A MULTIPLE OF 2.O.  THIS IS

22  NOT, IN MY EXPERIENCE, A 2.O CASE.  THIS IS ON THE HIGHER END

23  BECAUSE OF THE PERCENTAGE OF RECOVERY WE GOT AND THE RISK WE TOOK

24  HERE.  AS YOU KNOW FROM READING THOSE PAPERS, WHAT WE HAD TO GET

25  THROUGH WAS EXTRAORDINARILY RISKY AND EXTRAORDINARILY COMPLEX.

1  AND IT TOOK A GREAT DEAL OF WORK THAT, IN MY VIEW, SPEAKS TO AN

2  UPWARD ADJUSTMENT.

3  **THE COURT:**  IT'S ALWAYS AN INTERESTING ISSUE BECAUSE

4  YOU TALK ABOUT PROVIDING INCENTIVE TO COUNSEL, SUCH AS YOURSELF,

5  TO TAKE THESE CASES, AND ASSUME THE RISK.  THE OTHER SIDE OF THE

6  COIN IT DEPENDS UPON WHETHER THE GLASS IS HALF FULL OR HALF

7  EMPTY, BECAUSE YOU COULD SAY THE NUMBERS WE'RE TALKING ABOUT,

8  EVEN 25 PERCENT, IS NOT, TO MIX DIFFERENT COMMODITIES HERE,

9  CHOPPED LIVER HERE.  IT'S A PRETTY SUBSTANTIAL AMOUNT OF MONEY

10 WE'RE TALKING ABOUT.

11 BUT I THINK THE THING IS -- SO YOU'VE IDENTIFIED THOSE

12 FACTORS THAT YOU URGE UPON THE COURT WOULD MAKE THIS ESSENTIALLY

13 AN EXCEPTIONAL RESULT RESULTING IN A SIGNIFICANTLY HIGHER

14 LODESTAR THAN THE PRESUMPTIVE ONE THAT THE NINTH CIRCUIT SEEMS TO

15 TALK ABOUT.

16 AND, AGAIN, I'M TRYING TO PRESENT IT IN THE WAY SO WHEN I GO

17 BACK TO CONSIDER THOSE ARE THE FACTORS THAT YOU ARE URGING; IS

18 THAT CORRECT?

19 **MR. BERMAN:**  THAT'S CORRECT, YOUR HONOR.

20 **THE COURT:**  ALL RIGHT.  VERY WELL.  LET'S MOVE ON NOW

21 TO -- WAS THERE SOMETHING ELSE YOU WANTED TO SAY ON THIS POINT?

22 OKAY.  ON INCENTIVE AWARDS, THIS IS WILL BE EASIER

23 QUESTIONS, I THINK.

24 AS THE PLAINTIFF REQUESTS $5,000 INCENTIVE AWARDS FOR EACH

25 OF THE 18 NAMED CLASS REPRESENTATIVES, FOR A TOTAL OF $90,000.

1   THE COURT IS MINDFUL OF THE NINTH CIRCUIT'S INSTRUCTIONS THAT THE

2   COURT MUST BE VIGILANT IN GUARDING AGAINST CONFLICTS OF INTEREST

3   IN CLASS ACTION SETTLEMENTS BECAUSE OF THE UNIQUE DUE PROCESS

4   CONCERNS FOR ABSENT CLASS MEMBERS WHO ARE BOUND BY THE COURT'S

5   JUDGMENTS.

6        AND I HAVE IN MIND HERE I'M CITING RADCLIFFE,

7   R-A-D-C-L-I-F-F-E VERSUS EXPERIAN INFORMATION SOLUTIONS, 715 F.3D

8   1157 AT 1168 IN THE NINTH CIRCUIT DECIDED IN 2013.

9        DID ANY COUNSEL HAVE ANY AGREEMENT WITH A NAMED CLASS

10  REPRESENTATIVE REGARDING INCENTIVE AWARDS PRIOR TO THE SETTLEMENT

11  AGREEMENT ITSELF?

12           **MR. BERMAN:**  THEY DID NOT, YOUR HONOR.

13           **THE COURT:**  ALL RIGHT.  SO JUST, FOR EXAMPLE, WAS THERE

14  ANY AGREEMENT -- I'LL JUST BE MORE SPECIFIC FOR THE RECORD --

15  REGARDING INCENTIVE AWARDS IN ANY OF THE RETAINER AGREEMENTS

16  BETWEEN CLASS COUNSEL AND THE CLASS REPRESENTATIVES AS IS

17  PROSCRIBED IN RODRIGUEZ VERSUS WEST PUBLISHING, 563 F.3D 948, THE

18  NINTH CIRCUIT CASE IN 2009?

19           **MR. BERMAN:**  I CAN ONLY SPEAK TO MY RETAINER

20  AGREEMENTS, AND I WILL REACH OUT TO OTHER COUNSEL AND REPORT

21  BACK.  BUT MY RETAINER AGREEMENTS SAY:

22           "WE'LL ASK THE COURT TO COMPENSATE YOU FOR YOUR TIME

23      AND HARD WORK, IF YOU DO ANY.  NO PROMISES."

24           **THE COURT:**  ALL RIGHT.  IF YOU WOULDN'T MIND IN A

25  TEN-DAY PERIOD SUBMIT SOME SORT OF EITHER DECLARATION, OR

1  REPRESENTATION WOULD BE ADEQUATE FOR THE COURT, AS TO THAT

2  PARTICULAR FACT SO THE RECORD IS COMPLETE AND IT ADDRESSES WHAT

3  THE NINTH CIRCUIT REQUIRES THIS COURT TO ADDRESS.

4        **MR. BERMAN:**  I WILL BE GLAD TO, YOUR HONOR.

5        **THE COURT:**  ALL RIGHT.  SO ARE THERE ANY OTHER MATTERS

6  THAT YOU WISH TO BRING UP AT THIS POINT?

7        **MR. BERMAN:**  NO, SIR.

8        **THE COURT:**  ALL RIGHT.  ANY OTHER MATTERS FROM DEFENSE

9  COUNSEL?

10       **MR. MARKHAM:**  NO, YOUR HONOR.

11       **THE COURT:**  ALL RIGHT.  AND THE COURT BELIEVES THAT IT

12 IS DULY ADDRESSED IN THE ARGUMENT AND IT HAS THE INFORMATION IT

13 NEEDS FROM THE INDIVIDUAL OBJECTORS.  AS YOU CAN HEAR, I

14 EXPLICITLY ADDRESSED THOSE CONCERNS TO COUNSEL.

15     I FEEL THAT I HAVE ENOUGH INFORMATION TO MAKE A FINAL

16 DECISION WHICH I WILL NOW GO ABOUT DOING AS SOON AS I GET TO THE

17 ADDITIONAL FINAL INFORMATION THAT THE COURT HAS REQUESTED FROM

18 COUNSEL.

19     AND THE COURT APPRECIATES COUNSEL'S FLEXIBILITY IN

20 RESPONDING TO THE QUESTIONS ON THE FLY.

21     THANK YOU VERY MUCH, COUNSEL.

22     THE MATTER IS SUBMITTED.

23     DO YOU WANT TO SAY SOMETHING?

24       **MR. FRIEDMAN:**  NO, I WAS GOING TO SAY THANK YOU.

25       **MR. BERMAN:**  THANK YOU FOR YOUR TIME, YOUR HONOR.

1          **THE COURT:**  THANK YOU.

2      THE MATTER IS SUBMITTED.

3      I'M GOING TO TAKE A SHORT BREAK SO WE CAN GET COUNSEL FOR

4  THE CASE MANAGEMENT CONFERENCE TO HAVE A CHANCE TO SETTLE IN.

5          (THEREUPON, THIS HEARING WAS CONCLUDED.)

6  STENOGRAPHY CERTIFICATION

7          "I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER."
8          DECEMBER 29, 2016
           /S/ KATHERINE WYATT
9  _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25