1

2

3

4

5

6

7

8

9

10

11

12

**UNITED STATES DISTRICT COURT**

13

**NORTHERN DISTRICT OF CALIFORNIA**

14

**OAKLAND DIVISION**

15

| | |
|---|---|
| MATTHEW EDWARDS, et al., individually and on behalf of all others similarly situated, | Case No. 11-CV-04766-JSW |
| | [consolidated with 11-CV-04791-JSW and 11-CV-05253-JSW] |
| Plaintiffs, | |
| v. | CLASS ACTION |
| NATIONAL MILK PRODUCERS FEDERATION, aka COOPERATIVES WORKING TOGETHER; DAIRY FARMERS OF AMERICA, INC.; LAND O'LAKES, INC.; DAIRYLEA COOPERATIVE INC.; and AGRI-MARK, INC., | [~~PROPOSED~~] **ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** AS MODIFIED |
| | Date:      December 16, 2016 |
| | Time:      9:00 a.m. |
| | Dept:      Courtroom 5 |
| Defendants. | Judge:     Hon. Jeffrey S. White |
| | Dkt. No. 451 |

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

Now before the Court is Plaintiffs' Motion for Final Approval of Class Action Settlement. The parties have reached terms of settlement of a class action as set forth in the Settlement Agreement.[1]  The Court has considered the parties' papers, relevant legal authority, the record in this case, and arguments made at the hearing on this matter, and the Court hereby GRANTS the motion. The Court hereby finally approves the settlement of this action and finds that it is, in all respects, fair, reasonable and adequate to class members pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Moreover, the notice given to class members fully and accurately informed them of all material elements of the proposed settlement, constituted the best practicable notice, and fully met the requirements of Rule 23 and all applicable constitutional requirements.

## I.   BACKGROUND

The Court included a detailed discussion of the procedural history of the case and the litigation efforts in its concurrent Order granting the motion for attorneys' fees and costs.[2]

### A.   Settlement Class

The proposed settlement class is defined in terms of the classes already certified:[3]

> All consumers who, from 2003 to the present, as residents of
> Arizona, California, District of Columbia, Kansas, Massachusetts,
> Michigan, Missouri, Nebraska, Nevada, New Hampshire, Oregon,
> South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin,
> indirectly purchased milk and/or other fresh milk products
> (including cream, half & half, yogurt, cottage cheese, cream
> cheese, and/or sour cream) for their own use and not for resale.

The class representatives each "support the settlement as reasonable, adequate, and fair to all class members."[4]

### B.   Settlement Consideration

The total settlement amount is $52 million in cash – with no reversion of any undistributed funds to the defendants.[5]

---

[1] ECF No. 428-1, Ex. A.

[2] ECF No. 436.

[3] ECF No. 428-1, Ex. A (settlement agreement, at ¶ 1); ECF Nos. 266 & 287 (class certification orders).

[4] ECF No. 436-7 (compendium of class representative declarations, at ¶ 11).

[5] ECF No. 428-1, Ex. A (settlement agreement, at ¶ 18).

**C.      Release of Claims**

If the settlement becomes final, plaintiffs and class members who have not opted out will release all federal and state law claims against the defendants relating to the conduct alleged in plaintiffs' complaint.[6]

**D.      Notice to the Class**

The proposed notice plan was carried out pursuant to the Court's preliminary approval order.

*Dedicated case website and phone line.*  On September 2, 2016, Sipree made the case website publicly available.[7]  As of that date, it posted the full settlement agreement, the operative complaint, the Court's order granting class certification, the preliminary approval papers, including this Court's order granting preliminary approval, the long form notice, and the claims form.[8]  On October 14, 2016, the website was updated to include plaintiffs' motion for attorneys' fees, costs, and service awards for class representatives, including the declarations in support, which were filed on that same date.[9]  A toll-free automated telephone support line was also activated by Gilardi to provide notice to the Class in both English and Spanish.[10]

*Online advertising.*  The notice administrators engaged in an extensive Internet advertising campaign, including:

    a.   Search based ads and display network ads on Google, resulting in 1,397,721 impressions with 7,653 clicks through to the case website;[11]

    b.   Targeted banner advertising through Xaxis, resulting in 179,414,848 impressions with 106,540 clicks through to the case website;[12]

    c.   Advertising through Facebook.com, resulting in 4,481,222 impressions with 89,327 clicks through to the case website;[13] and

    d.   Advertising through Twitter.com, resulting in 916,431 impressions with 8,166 clicks through to the case website.[14]

These numbers were provided by class counsel on December 2, 2016, and indeed, the numbers may have improved since that date.

---

[6] *Id.* (settlement agreement, at ¶ 15).

[7] Declaration of Ramon Qiu Regarding Implementation of Class Notice Plan ("Qiu Decl."), ECF No. 451-2 at ¶ 3.

[8] *Id.*

[9] *Id.*

[10] Declaration of Alan Vasquez Regarding Implementation of Class Notice Plan ("Vasquez Decl."), ECF No. 451-3 at ¶ 25.

[11] *Id.*, ¶¶ 19-20.

[12] *Id.*, ¶ 21.

[13] *Id.*, ¶ 22.

*Press Release.* On September 2, 2016, Gilardi issued a party-neutral nationwide press release about the settlement through PR Newswire.[15]

As of December 2, 2016,
In total, the indirect notice efforts generated over 186 million impressions, directing over 211,000 clicks through to the case website[16] and a total of 533,934 visits.[17] Gilardi estimates that at least 75 percent of the class received notice of the settlement.[18] And, of those millions of people, there was a single opt out and only eight objections—most of which were filed by serial objectors.

### E.   CAFA Notices

Pursuant to the settlement agreement, on August 31, 2016, defendants sent notice to the appropriate federal and state officials pursuant to the Class Action Fairness Act. No Attorney General has submitted a statement of interest or objection in response to these notices.[19]

### F.   Plan of Distribution

As of November 10, 2016, 307,396 class members had submitted claims online,[20] and an additional 125 class members had submitted paper claim forms.[21] As of November 22, 2016, 363,444 class members had submitted claims online. The claims period did not close until January 31, 2017.[22]

By this time, the claims number had increased to exceed 3.8 million. See Dkt. No. 482. The simple claims form permits class members to opt for cash, without proof of purchase, to be distributed in fixed amounts, depending of the level of purchases. The claim form requires an email address, so that the cash can be distributed electronically, in order to maximize the settlement funds going to class members, and minimize administrative expenses and uncashed checks.[23] The claims deadline was extended through February 21, 2017 for all class members who requested a paper claims form on or prior to the claims deadline. See Dkt. No. 482.

Those submitting a claim for cash will receive an electronic notification via email that will permit them to choose an online account, *e.g.,* an Amazon, PayPal, or Google Wallet account, into which the money can be distributed. Any class member whose claim form identifies it as purchasing milk and fresh milk products in an amount that exceeds normal household purchases will receive a

---

[14] *Id.*, ¶ 23.

[15] *Id.*, ¶ 24.

[16] *Id.*, ¶ 31.

[17] Qiu Decl., ¶ 4.

[18] Vasquez Decl., ¶ 31.

[19] Declaration of Elaine T. Byszewski in Support of Motion for Final Approval of Class Action Settlement ("Byszewski Decl."), ECF No. 451-1 at ¶ 2.

[20] Qiu Decl., ¶ 4.

[21] Vasquez Decl., ¶ 28.

[22] ECF No. 430 (order granting preliminary approval, ¶ 16).

[23] Byszewski Decl., ¶ 3; Qiu Decl., ¶ 5.

higher fixed amount.  The fixed amounts to be paid to class members shall be determined once the number submitting claims for cash has been determined, with the goal of complete exhaustion of funds,[24] using a multiplier of 28 for the higher fixed amount, based on named plaintiff discovery demonstrating this was the relationship between the average annual expenditure by consumer households versus an entity making purchases not for resale.  Precision as to the specific products purchased throughout the class period was not required to minimize administrative expense.  But the two tier distribution based on levels of milk product purchases ensures equity among class members.[25]  Thus, funds will be distributed to class members based on: (1) the level of purchases – either an individual making normal household purchases or an entity making purchases that exceed normal household purchases; and (2) the number of valid claims filed.

### G.    Costs of Settlement Administration

The settlement agreement specifies that the portion of the common fund going towards settlement notice and distribution shall not exceed $2 million.[26]  This is ~~exceedingly~~ reasonable given that there are approximately 73 million class members to whom notice must be disseminated and, upon election, cash distributed.  Plaintiffs have been able to minimize projected administrative expenses related to settlement through the use of a simple claims form, to trigger distribution of fixed amounts, to be delivered using electronic means by Sipree.  Each of these elements has enabled plaintiffs to maximize the amount of cash going directly to class members.[27]

The notice program has cost $759,205.98 to implement,[28] and the Court's order granting preliminary approval already provided for payment of these administrative costs.[29]  Thus, as contemplated by the settlement agreement, there is $1,240,794.02 remaining to pay for distribution costs.  The Court approves the remainder specified by the settlement agreement, as reasonably

---

[24] *Id.*, ¶¶ 4-5.  *See also In re Online DVD Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015) (affirming use of claimant-fund-sharing settlement and rejecting objectors' argument that the "notice was deficient for failing to provide an estimate as to how much of an award each claimant would receive" and instead holding that the notice "did not need to and could not provide an exact forecast of how much each class member would receive").  Internal citations and quotations omitted and emphasis added throughout, unless otherwise indicated.

[25] Byszewski Decl., ¶¶ 4-5; *see also* Qiu Decl., ¶ 5.

[26] ECF No. 428-1, Ex. A (settlement agreement, ¶ 20).

[27] Byszewski Decl., ¶ 7; Qiu Decl., ¶ 5.

[28] Vasquez Decl., ¶ 29; Qiu Decl., ¶ 7.  Since the $709,205.98 incurred in notice related expenses, an additional $50,000 was incurred to be paid pursuant to the Court's preliminary approval order.  As a result, $1,240,794.02 remains for distribution.

[29] ECF No. 430.

1  necessary to pay for the costs related to distribution.  These costs are presently estimated to be only
2  $240,000,[30] because the proposed claimant fund sharing will exhaust funds and thereby avoid the
3  potential loyalty card phase, which would have cost as much as $500,000 to implement.[31]

**II.   ~~ARGUMENT~~ ANALYSIS**

It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution."[32]  Indeed, "there is an overriding public interest in settling and quieting litigation" and this is "particularly true in class action suits."[33]

In addition to ensuring compliance with Rule 23 and CAFA notice requirements, the Court exercises its "sound discretion" when deciding whether to grant final approval.[34]  In so doing, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned."[35]

**A.   Plaintiffs Have Complied with Rule 23 Notice Requirements**

Rule 23(e)(1) requires that a court approving a class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal."[36]  A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."[37]

---

[30] Qiu Decl., ¶ 8.

[31] Byszewski Decl., ¶ 8.

[32]  *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

[33] *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

[34] *See Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

[35] *Officers for Justice*, 688 F.2d at 625; *see also Ross v. Trex Co., Inc.*, No. 09-CV-00670-JSW, 2013 WL 6622919, at *4 (N.D. Cal. Dec. 16, 2013) ("However, as the Ninth Circuit has made clear, the Court's inquiry 'is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.'"), *quoting Hanlon v Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

[36] Fed. R. Civ. P. 23(e)(1).

[37] *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also In re Online DVD Rental Antitrust Litig.*, 779 F.3d at 946.

The Court approved the form of the proposed class notice and notice program.[38]  Gilardi and Sipree, the Court-appointed notice administrators, then implemented the approved notice program, as set forth above.[39]  And Gilardi opines that at least 75 percent of the class has received notice.[40]

The Supreme Court "has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning."[41]  The class members here include approximately 73 million residents of the 15 states and the District of Columbia.[42]  In these circumstances, direct notice is impracticable:

> The best practicable notice under the circumstance is notice by publication in newspapers. In view of the millions of members of the class, notice to class members by individual postal mail, email or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances.  The timeline for notice provides reasonable, appropriate and ample opportunity for class members to oppose the settlement if they wish to do so.[43]

Particularly with the advent of the Internet and the ability to reach class members through targeted advertising, courts have increasingly recognized the ability of an indirect notice campaign to satisfy the requirements of Rule 23.[44]  Moreover, notice plans estimated to reach a minimum of 70 percent are constitutional and comply with Rule 23.[45]  Here, Gilardi opines that at least 75 percent of the class has received notice.[46]  This meets the requirements of Rule 23 and has allowed the class a full and fair opportunity to review and respond to the proposed settlement.

---

[38] ECF No. 430, ¶¶ 4, 6.

[39] Vasquez Decl., ¶¶ 17-24; Qiu Decl., ¶¶ 3-4.

[40] Vasquez Decl., ¶ 31.

[41] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950).

[42] Vasquez Decl., ¶¶ 8-9.

[43] *In re MetLife Demutualization Litig.*, 262 F.R.D. 205, 208 (E.D.N.Y. 2009).

[44] *See, e.g.*, *In re Google Referrer Header Privacy Litig.*, No. 5:10-cv-04809 EJD, 2014 WL 1266091 at *7 (N.D. Cal. Mar. 26, 2014) (approving indirect notice campaign that included Internet-based notice, press release, website dedicated to the settlement, and a toll-free number).

[45] Federal Judicial Center, *Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide* 2010 ("The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%.").

[46] Vasquez Decl., ¶ 31.

### B. The Parties Have Complied with the Class Action Fairness Act

CAFA requires defendants to serve notice of proposed class action settlements "upon the appropriate State official of each State in which a class member resides and the appropriate Federal official."[47]  A court may not grant final approval of a class action settlement until the CAFA notice requirement is met.[48]  Here, defendants provided the required CAFA notices on August 31, 2016.[49]

### C. The Settlement Is the Result of Good-Faith, Arm's-Length Negotiations

This settlement arises out of extended, informed, arm's-length negotiations between counsel for the parties.[50]  The parties reached agreement after almost five years of litigation, including multiple motions to dismiss, multiple rounds of class certification briefing, completion of merits discovery, cross motions for summary judgment, and multiple motions to decertify and to strike the plaintiffs' expert economist.  After a failed initial mediation before the Hon. Phillips, the parties made some progress at the second, and ultimately resolved the case during a series of post-mediation discussions facilitated by the Hon. Phillips.[51]

The settlement itself also bears no signs of collusion or conflict.  In its opinion in *In re Bluetooth*, the Ninth Circuit admonished that courts must, at the final approval stage, ensure that the settlement, taken as a whole, is free of collusion or any indication that the pursuit of the interests of the class counsel or the named plaintiffs "infect[ed]" the negotiations.[52]  The Ninth Circuit has pointed to three factors as troubling signs of a potential disregard for the class's interests during the course of negotiation: (a) when class counsel receive a disproportionate distribution of the settlement; (b) when the parties negotiate a "clear sailing" arrangement that provides for the payment of attorneys' fees separate and apart from class funds; or (c) when the parties arrange for fees not awarded to plaintiffs' counsel to revert to the defendants rather than the class.[53]

---

[47] 28 U.S.C. § 1715(b).

[48] 28 U.S.C. § 1715(d) ( "An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b).]").

[49] Byszewski Decl., ¶ 2.

[50] *Officers for Justice*, 688 F.2d at 625.

[51] Byszewski Decl., ¶ 9.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (finding the presence of a neutral mediator "a factor weighing in favor of a finding of non-collusiveness").

[52] *Id*. at 946-48.

[53] *Id*. at 947.  While these signs are of less concern when a class has already been certified, *id*., still none exist in the present agreement.

1       Here, none of those signs are present.  The proposed settlement is a common fund, all-in

2  settlement with no possibility of reversion.  The funds will be used to cover costs and fees and

3  compensate the class.  There is no "clear sailing" provision, no payment of fees separate and apart

4  from the class funds, and no "kicker" provision like the one in *In re Bluetooth* that would allow

5  unawarded fees to revert to the defendants.[54]  Instead, the proposed class notice informed class

6  members that class counsel will make a request to the Court for attorneys' fees in the amount of up

   to one third of the settlement fund.[55]

7       In short, these non-collusive negotiations between sophisticated sets of counsel, assisted by a

8  neutral mediator, support final approval of the settlement agreement.  As the Ninth Circuit has

9  stated, "We put a good deal of stock in the product of an arms-length, non-collusive, negotiated

   resolution."[56]

10      **D.**    **The Proposed Settlement Is Fair, Adequate, and Reasonable**

11      In determining whether a settlement agreement is fair, adequate, and reasonable, the Court

12  must weigh some or all of the following factors: (1) the strength of the plaintiffs' case; (2) the risk,

13  expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action

14  status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

15  completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the

16  presence of a governmental participant; and (8) the reaction of the class members to the proposed

17  settlement.[57]  Each of these factors supports approval of the settlement here.  Moreover, the Court's

18  inquiry into whether a proposed settlement is fair, adequate, and reasonable is relatively less probing

   where, as here, the parties settle *after* the classes are certified by the Court.[58]

19      **1.**    **The Strength of Plaintiffs' Case Supports Final Approval**

20      The Ninth Circuit instructs this Court to first consider the strength of plaintiffs' case.  While

21  assessing the strength, however, the Court does not reach "any ultimate conclusions on the contested

---

[54] ECF No. 428-1, Ex. A (settlement agreement, at ¶ 24).  This Court has previously recognized that a fee award of 33 percent is "in line with most fee awards under California law."  *Wolph v. Acer American Corp.*, No. C 09-01314-JSW, 2013 WL 5718440, at * 5 (N.D. Cal. Oct. 21, 2013).

[55] ECF No. 428-2, Ex. D.

[56] *Rodriguez v. West Publishing Corp.,* 563 F.3d 948, 965 (9th Cir. 2009).

[57] *In re Bluetooth*, 654 F.3d at 946.

[58] *Cf. Perez v. Tilton*, No. C 05-05241 JSW, 2006 WL 2433240, at *2 (N.D. Cal. Aug. 21, 2006) (where "the parties reach a settlement before a class is certified, a more probing inquiry into whether a proposed settlement is fair, adequate, and reasonable is required").

1   issues of fact and law which underlie the merits of the dispute."[59]  Instead, the Court is to "evaluate

2   objectively the strengths and weaknesses inherent in the litigation and the impact of those

3   considerations on the parties' decisions to reach these agreements."[60]  The Court's assessment of the

4   likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations
    and rough justice."[61]

5          Plaintiffs believe their case against defendants is strong.  But defendants have sought to

6   vigorously defend every issue, at every opportunity.  ~~Indeed, given defendants' admissions regarding~~

7   ~~the existence of the conspiracy, they fought all the harder on every defense available to them and~~

8   ~~took advantage of every procedural mechanism.~~  So the ~~relative~~ strength of plaintiffs' liability case

9   must be understood in light of the following:

10         • First, the availability of the Capper Volstead immunity for defendants' supply

11           restraint, an affirmative defense, was a relatively untested area of law and – if

12           successfully invoked – would have meant the end of the case for plaintiffs.

12         • Second, defendants vigorously opposed class certification – including an appeal to the

13           Ninth Circuit and then to the Supreme Court asserting the unprecedented scope of the

14           certified classes – ~~and moved to decertify multiple times.~~ and filed a motion to decertify that was pending at the time of the
             settlement.

15         • Third, the availability of data necessary to show antitrust impact and pass through –

16           and to control for the ever-evolving list of variables that defendants contended

17           plaintiffs must control for – posed risks to counsel.  This risk was especially acute for

18           California, which as a sizable state is responsible for a significant portion of the

19           damages (potentially nearly half), because defendants mounted unique defenses as to

20           both the data and immunity statute.  And defendants forced counsel to engage in the

21           most demanding and cutting edge econometrics in antitrust litigation, filing highly

22           technical *Daubert* challenges at both class certification and summary judgment.

23           Indeed, twelve of the nineteen expert reports submitted during the course of the

             litigation involved impact and damages.

24         • Fourth, at every step of the way, plaintiffs' counsel faced a platoon of defense firms,

25           as the five defendants combined were represented by Steptoe & Johnson, Williams &

26

27   _____

     [59] *Officers for Justice*, 688 F.2d at 625.

28   [60] *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989).

     [61] *Officers for Justice*, 688 F.2d at 625.

Connolly, Baker & Miller, Eimer Stahl, Gibson Dunn, Bond Schoeneck & King, Shipman & Goodwin, and Keker & Van Nest.

- Finally, as with any trial – and in particular a complex class action antitrust trial – plaintiffs faced the very real risk of walking away with nothing (or substantially reduced damages awarded to the class).

On the other hand, settling with defendants will give class members guaranteed compensation.[62]  And "immediate recovery by way of the compromise to the mere possibility of relief in the future" certainly supports final approval of the settlement.[63]

### 2.   The Risk, Expense, Complexity, and Duration of Further Litigation Supports Final Approval

"An antitrust class action is arguably the most complex action to prosecute. . . . The legal and factual issues involved are always numerous and uncertain in outcome."[64]  As set forth above, the same can be said for this case, where the untested antitrust immunities at issue, defendants' scorched-earth strategies, and the complex econometrics posed significant challenges for plaintiffs. Accordingly, the risk and expense posed by going to trial – followed by near-certain appeals – further supports final approval.[65]

### 3.   The Risk of Maintaining Class Action Status Through Trial Supports Approval

The risk of maintaining class action status through trial, also supports final approval of the settlement here.  As stated above, defendants vigorously opposed class certification, including an appeal to the Ninth Circuit and then to the Supreme Court asserting the unprecedented scope of the certified classes, and ~~moved to decertify multiple times.~~ filed a motion to decertify that was pending at the time of settlement.  Although plaintiffs are confident the class would remain certified through trial, the risk "was not so minimal that this factor could not weigh in favor of the settlement."[66]

---

[62] Byszewski Decl., ¶ 10.

[63] *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).

[64] *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *11 (E.D. Pa. June 2, 2004).

[65] *Rodriquez*, 563 F.3d at 966 (factor favors settlement where "[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years"); *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118 JSW, 2014 WL 1309352, at *6 (N.D. Cal. Mar. 31, 2014).

[66] *Rodriquez*, 563 F.3d at 967 (where defendants sought to take an interlocutory appeal they "would undoubtedly have appealed certification if there were a final, adverse judgment").

### 4. The Amount Offered in Settlement Supports Final Approval

"[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."[67]  Given the relatively untested antitrust immunity statutes at issue, as well as the complex econometric modeling employed by Dr. Sunding and subject to a pending *Daubert* motion, there was a risk faced by the class of no recovery.  So this settlement represents an excellent recovery for the class – ensuring $52 million in cash.  In his report on the merits, Dr. Sunding estimated total class damages to be $181 million.[68]  Thus, this settlement represents recovery of almost 30% of total damages suffered by indirect purchasers,[69] not trebled.

The Ninth Circuit has affirmed the approval of a strikingly similar settlement.  In *Rodriguez*, the district court approved a $49 million antitrust settlement, representing thirty percent of the total damages, estimated by the class expert to be $158 to $168 million.[70]  The Ninth Circuit held that the "negotiated amount is fair and reasonable no matter how you slice it" and that the fact of a cash settlement was a "good indicator of a beneficial settlement."[71]  So too here.

This factor strongly weighs in favor of granting final approval.

### 5. The Extent of Discovery Completed and Stage of Proceedings Support Final Approval

The extent of the discovery conducted to date and the stage of the litigation are both indicators of counsels' familiarity with the case.[72]  Plaintiffs did not enter into the settlement agreement without a thorough understanding of the claims and defenses available in this case, which has been extensively litigated over the past five years.  As explained in plaintiffs' motion for attorneys' fees, they vigorously litigated this matter through class certification, through fact and expert discovery, and through the filing of cross motions for summary judgment and multiple *Daubert* and decertification motions.  Defendants collectively produced over half a million documents and each responded to 20 written interrogatories and 30 requests for admission.  Plain-

[67] *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998); *see also Officers for Justice*, 688 F.2d at 626 ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.").

[68] ECF Nos. 343-46.

[69] Byszewski Decl., ¶ 11.

[70] 563 F.3d at 964-65.

[71] *Id.  See also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (approving $44.5 settlement, recovery of 33% of single damages); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (approving $336 million settlement, recovery of 31% of single damages), *aff'd*, 405 F. App'x 532 (2d Cir. 2010); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) (approving settlements of $1.027 billion, recovery of 33%-41% of single damages).

[72] *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

tiffs deposed a Rule 30(b)(6) witness for each of the defendants.  And plaintiffs deposed defendants'

litigation experts, Mr. Kaplan (twice) and Mr. Gallagher, as well as defendants' consultant during

the course of the conspiracy, Dr. Brown.  Defendants also deposed each of plaintiffs' experts three

times.  Indeed, the parties submitted *nineteen* different expert reports during the course of the

litigation, including *twelve* reflecting regression modeling of the overcharge and its pass through to

consumers.[73]  Thus, the advanced stage of the litigation and the extensive discovery – both fact and

expert – on all liability and damages issues strongly supports final approval of the settlement.[74]

### 6.       The Experience and Views of Class Counsel Support Approval

"The recommendations of plaintiffs' counsel should be given a presumption of

reasonableness."[75]  In this case, counsel are highly experienced in antitrust and class action

litigation, as their declarations filed in connection with both preliminary approval and the motion for

fees, costs and service awards, amply demonstrate.[76]  They have actively litigated this case for many

years, have evaluated the pending settlement at length, and have concluded that it offers substantial

benefits to class members.[77]  Simply put, experienced counsel support this settlement, which

supports its fairness, adequacy and reasonableness.[78]  This factor, therefore, weighs strongly in favor

of final approval.[79]

### 7.       The Presence of a Government Participant

As discussed above, CAFA requires that notice of a settlement be given to the Department of

Justice and affected states with time to comment prior to final approval of the settlement.[80]  This

allows the appropriate state or federal official the chance to voice concerns if they believe that the

---

[73] ECF No. 436.

[74] *See Rodriguez*, 563 F.3d at 967 (factor weighed in favor of settlement approval where parties had conducted extensive discovery and gone through a round of summary judgment motions); *see also In re Mego*, 213 F.3d at 459 (factor weighed in favor of approving settlement where plaintiffs had conducted significant discovery and consulted with experts).

[75] *Lopez v. Bank of Am.*, N.A., No. 10-CV-01207-JST, 2015 WL 5064085, at *5 (N.D. Cal. Aug. 27, 2015); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007) (same).

[76] ECF Nos. 428-1, 436-1.

[77] *Id.*

[78] Byszewski Decl., ¶ 13.

[79] *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir.1992).

[80] *See* 28 U.S.C. § 1715(b).

class action is not in the best interest of their citizens.[81]  Here, none has raised an objection or concern regarding the settlements.  This also supports final approval.[82]

### 8.    The Reaction of the Class Supports Final Approval

"Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the proposed class settlement action are favorable to the class members."[83]  This "strong presumption" of fairness arises here, because only eight objections and one request for exclusion were received out of the millions of class members receiving notice.[84]  The Court separately addresses the objections in its concurrent Order overruling the objections, but none supports rejection of this $52 million cash settlement for the classes.  ~~Moreover, most are serial objectors whose motives here are, at best, suspect.  In any event, the~~ The reaction of the class to the settlement is overwhelmingly positive and strongly favors final approval.[85]

Thus, without exception, each of the factors that this Court considers in its sound discretion supports final approval of the settlement here.

### III.    THE PROPOSED PLAN OF ALLOCATION IS FAIR

Approving a plan for the allocation of a class settlement fund is governed by the same legal standard that applies to the approval of the settlement terms: that the distribution plan is "fair, reasonable and adequate."[86]  A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.[87]  *Pro-rata* distribution plans have been approved in many

---

[81] S. REP. 109-14, 5, 2005 U.S.C.C.A.N. 3, 6.

[82] *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 3648478, at *9 (N.D. Cal. July 7, 2016).

[83] *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 258 (N.D. Cal. 2015); *see also Ross*, 2013 WL 6622919, at *4 ("A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it").

[84] ECF Nos. 432, 434, 435, 437, 440, 441, 444, 446 (supplemental), 449, & 450 (corrected); Vasquez Decl., Ex. 3.

[85] *Cf. Churchill*, 361 F.3d at 577 (affirming settlement with 45 objections out of 90,000 notices sent); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) (finding "an overall positive reaction" by the class where only 57 class members opted out and six objected out of a class of 798,000).

[86] *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).

[87] *Id.*; *Omnivision*, 559 F. Supp. 2d at 1045.

1    prior antitrust cases in this district.[88]  Likewise, claimant fund sharing plans have also been

2    approved.[89]  Plaintiffs' proposed plan of distribution reflects both approved methods.

3           As discussed above, the funds will be distributed to class members based on: (1) the level of

4    purchases – either an individual making normal household purchases or an entity making purchases

5    that exceed normal household purchases; and (2) the number of valid claims filed.  The amount of

6    compensation is fixed because a detailed accounting of milk and fresh milk purchases over a decade

7    on claims in the context of an estimated 73 million member settlement class would result in

8    excessive administrative expense.  Given the magnitude of the class, such precision would defeat the

     important objective of returning as much money as possible to class members.[90]

9           There are two tiers of fixed amounts, however, in recognition that certain entities have made

10   purchases of a higher order of magnitude than normal households.  So there will be two different

11   levels of fixed cash payments, based on class member's purchases and the total number of class

     members making claims.  But the fixed amounts to be paid to class members will not be set until the

12   number submitting claims for cash has been determined to achieve complete exhaustion of funds.[91]

13          NOW, THEREFORE, IT IS HEREBY ORDERED:

14          The Court hereby finally approves the settlement of this action and finds that it is, in all

15   respects, fair, reasonable and adequate to class members pursuant to Rule 23 of the Federal Rules of

16   Civil Procedure.  The Court also finds that the plan of allocation is fair and reasonable.  Moreover,

     the notice given to class members fully and accurately informed them of all material elements of the

17   proposed settlement, constituted the best practicable notice, and fully met the requirements of Rule

18   23 and all applicable constitutional requirements.

19          The notice program has cost $759,205.98 to implement to date, and the Court's order

20   granting preliminary approval already provided for payment of these administrative costs.  Per the

21   settlement agreement, there is $1,240,794.02 remaining to pay for distribution costs.  The Court

22   approves the remainder specified by the agreement for reasonably necessary costs related to

23

24

25          [88] *See, e.g., CRT*, 2016 WL 3648478, at *15; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No.
     07-md-1827, 2011 WL 7575004 (N.D. Cal. Dec. 27, 2011).

26          [89] *See, e.g., In re Online DVD Rental Antitrust Litig.*, 779 F.3d at 945-946 (affirming use of
     claimant-fund-sharing settlement).

27          [90] Byszewski Decl., ¶¶ 4-5.

28          [91] Byszewski Decl., ¶¶ 5-6.

distribution.  These costs are presently estimated to be only $240,000,[92] and the Court specifically approves payment of this amount.

Accordingly, the Court orders that the settlement is finally approved and distribution of the settlement fund, net of approved deductions, shall proceed in accordance with the settlement agreement, as set forth in the Sipree declaration[93] and below:

| Event | Deadline<br>(events may occur earlier than the deadline) |
|---|---|
| Final Approval Hearing | December 16, 2016 |
| Claims Deadline | January 31, 2017, extended to February 21, 2017 for some class members as described on page3 |
| Claims administrator to report number of claimants and amount to be distributed to each level of claimant to exhaust settlement funds remaining after award of fees, costs, service awards, and administrative costs, as ordered by the Court | July 10, 2017 |
| Claims administrator to provide electronic notification to class members via email to choose an online account for distribution | July 31, 2017 |
| Deadline for claimants to elect online account | August 28, 2017 |
| Claims administrator to distribute the money into the online accounts, *e.g.,* Amazon, PayPal, or Google Wallet accounts | September 11, 2017 |
| Claims administrator to identify and report any funds that could not distributed or returned | September 25, 2017 |
| Claims administrator to redistribute remaining funds to class members | October 10, 2017 |
| Claims administrator to provide final report regarding the disbursement of the settlement funds | October 24, 2017 |

---

[92] Qiu Decl., ¶ 8.

[93] Qiu Decl., ¶¶ 5-6.

1    IT IS SO ORDERED.

2    DATED:   June 26, 2017

3                                 HONORABLE JEFFREY S. WHITE

4                                 UNITED STATES DISTRICT COURT JUDGE